UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

                                12-CR-152 (CM)

        -against-

JAMES KEVIN KERGIL,

              Defendant.

-------------------------------------------------------X

## PRE-SENTENCE MEMORANDUM

**GALLET DREYER & BERKEY, LLP**
**845 Third Avenue, 8th Floor**
**New York, New York 10022**
**(212) 935-3131**

**Attorneys for Defendant**
**James Kevin Kergil**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... i

INTRODUCTION ...................................................................................................................1

THE LEGAL STANDARD ......................................................................................................1

PRE-SENTENCE REPORT AND SENTENCING GUIDELINES OBJECTIONS .......................3

    Actual Loss/Intended Loss ...............................................................................................3

    Supervisory Role ..............................................................................................................9

THE SECTION 3553 FACTORS AS APPLIED TO JAMES KEVIN KERGIL .........................10

CONCLUSION ....................................................................................................................17

## TABLE OF AUTHORITIES

### Cases

American General Life Insurance v. Goldstein
741 F.Supp.2d 604 (D. Del. 2010) ................................................................................12

Gall v. United States
552 U.S. 38 (2007)..........................................................................................................1, 2

Hartford Life & Annuity Insurance Co. v. Barnes Irrevocable Trust
2012 WL 688817 (C.D. Cal. 2012)................................................................................12

Kimbrough v. United States
552 U.S. 85 (2007)...........................................................................................................2

Lincoln Benefit Life Company v. Bauer Life Insurance Trust
2013 WL 24590 (M.D. Fla. 2013) .................................................................................12

Lincoln National Insurance Co. v. Snyder
722 F.Supp.2d 546 (D. Del. 2010).................................................................................12

Lincoln National Life Insurance Co. v. Calhoun
596 F.Supp.2d 882 (D.N.J. 2009) .................................................................................12

Lincoln National Life Insurance Co. v. Schlanger Insurance Trust
2010 WL 2898315 (D. Del. 2010)..................................................................................12

Nationwide Life and Annuity Insurance Co. v. Golden
2013 WL 97718 (S.D. Ohio 2013)..................................................................................11

Ohio National Life Assurance Corp. v. Davis
2010 WL 4916643 (C.D. Cal. 2010)...............................................................................12

Penn Mutual Life Insurance Co. v. GreatBanc Trust Co.
2012 WL 2074789 (N.D. Ill. 2012)................................................................................12

Penn Mutual Life Insurance Co. v. Wolk
739 F.Supp.2d 387 (S.D.N.Y. 2010)..............................................................................11

Pepper v. United States
__ U.S. __, 131 S.Ct. 1229 (2011) .................................................................................3

PHL Variable Insurance Co. v. Abrams
2012 WL 10686 (S.D. Cal. 2012) ..................................................................................12

PHL Variable Insurance Co. v. Bank  of Utah
2013 WL 6190345 (D. Minn. 2013) ...................................................................................11

PHL Variable Insurance Co. v. Bowie Irrevocable Trust
718 F.3d 1 (1st Cir. 2013)...............................................................................................11

PHL Variable Insurance Co. v. Gelb Irrevocable Trust
2010 WL 5363377 (N.D. Ill. 2010)...................................................................................12

PHL Variable Insurance Co. v. Hathaway Insurance Trust
2013 WL 6230351 (D. Utah 2013) ...................................................................................11

PHL Variable Insurance Co. v. Joseph Irrevocable Trust
970 F.Supp.2d 932 (D. Minn. 2013) .................................................................................11

PHL Variable Insurance Co. v. Morello Irrevocable Trust
645 F.3d 965 (8th Cir. 2011)............................................................................................11

Principal Life Insurance Co. v. Altman Insurance Trust
2011 WL 7498936 (E.D.N.Y. 2011)..................................................................................11

Principal Life Insurance Co. v. DeRose
2012 WL 1642606 (M.D. Pa. 2012)..................................................................................12

Principal Life Insurance Co. v. Mosberg
2010 WL 473042 (S.D. Fla. 2010)....................................................................................12

Principal Life Insurance Co. v. Rucker Insurance Trust
869 F.Supp.2d 556 (D. Del. 2012) ...................................................................................12

Principal Life Insurance Co. v. Wells Fargo Bank
2011 WL 768058 (C.D. Cal. 2011)...................................................................................12

Principal Life Insurance v. Rucker Insurance Trust
774 F.Supp.2d 674 (D. Del. 2011) ...................................................................................12

Sun Life Assurance Co.v. Berck
770 F.Supp. 2d 728 (D. Del. 2011) ..................................................................................12

United States v. Adelson
441 F.Supp.2d 506 (S.D.N.Y. 2006)..................................................................................8

United States v. Al-Sadawi
432 F.3d 419 (2d Cir. 2005)..............................................................................................9

ii

United States v. Booker
543 U.S. 220 (2005)................................................................................................................1

United States v. Brinkworth
68 F.3d 633 (2d Cir. 1995)....................................................................................................9

United States v. Cavera
550 F.3d 180 (2d. Cir. 2008) (en banc) cert. denied, 556 U.S. 1268 (2009) ...............2, 3

United States v. Coffman
94 F.3d 330 (7th Cir. 1996)..................................................................................................9

United States v. Corry
206 F.3d 748 (7th Cir. 2000)................................................................................................9

United States v. Crosby
397 F.3d 103, (2d Cir. 2005)................................................................................................1

United States v. Ebbers
458 F.3d 110, 129 (2d Cir. 2006).......................................................................................10

United States v. Fagans
406 F.3d 138 (2d Cir.2005)..................................................................................................1

United States v. Pereira
465 F.3d 515 (2d Cir. 2006).................................................................................................1

United States v. Robie
166 F.3d 444 (2d Cir. 1999).................................................................................................8

United States v. Stewart
590 F.3d 93 (2d Cir. 2009)...................................................................................................2

United States v. Stockheimer
157 F.3d 1082 (7th Cir. 1998)..............................................................................................9

United States v. Verkhoglyad
516 F.3d 122 (2d Cir. 2008).................................................................................................3

United States v. Watt
707 F.Supp.2d 149 (D. Mass. 2010). .................................................................................11

West Coast Life Insurance Co. v. Life Brokerage Partners, LLC

00520682.DOCX;1

2009 WL 2872823 (S.D. Fla. 2009)..................................................................................12

<u>West Coast Life Insurance Co. v. Secaul Insurance Trust</u>
2010 WL 27907 (S.D. Fla. 2010)....................................................................................12

**<u>Statutes</u>**

18 U.S.C. § 3553(a) ............................................................................................passim

**<u>Other Authorities</u>**

Guideline Section §2B1.1 ..............................................................................................8

Guideline Section §3B1.1 ..............................................................................................9

U.S.S.G. §2B1.1, Application Note 3(a) ........................................................................4

U.S.S.G. §2B1.1, Application Note 3(c) ........................................................................4

U.S.S.G. §2B1.1, Application Note 20(c) ......................................................................8

iv

# INTRODUCTION

This Pre-Sentence Memorandum is submitted with regard to the upcoming sentencing of our client, JAMES KEVIN KERGIL. It addresses both the legal issues and the factors pursuant to §3553 which we believe warrant a sentence below the applicable Guidelines range.

# THE LEGAL STANDARD

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the mandatory aspects of the Sentencing Guidelines were unconstitutional. District courts must still "consider" the sentencing factors set forth in 18 U.S.C. §3553(a), though "robotic incantations" of the §3553(a) factors are not required. <u>See</u> <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005) ("we will not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines"). The ultimate sentence, however, must be based upon the factors enumerated in §3553(a).  <u>See</u> <u>United States v. Pereira</u>, 465 F.3d 515, 523 (2d Cir. 2006) ("a district court must 'consider' the factors listed in § 3553(a) in order for the sentence it imposes to be reasonable").

As the Supreme Court held in <u>Gall v. United States</u>, 552 U.S. 38 (2007), there is no presumption of unreasonableness when a sentence falls outside the Guidelines range, provided the District court properly considered the §3553(a) factors. <u>See</u> <u>id</u>. at 47 ("the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range"). In fact, the Supreme Court's analysis in <u>Gall</u> rejected the premise that a District court may rely on the presumption that a Guidelines sentence is

reasonable. Id. at 50 ("[a sentencing judge] may not presume that the Guidelines range is reasonable"). Instead, in applying the §3553(a) factors, the sentencing judge:

> "must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."

Id.

The Second Circuit has also noted the broad discretion District courts have in imposing a downward variance from the Guidelines range, so long as the court sufficiently justifies the basis for, and extent of, the variance. See United States v. Stewart, 590 F.3d 93, 135 (2d Cir. 2009) ("District courts are generally free to impose sentences outside the recommended Guidelines range but must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance"); United States v. Cavera, 550 F.3d 180, 188 (2d. Cir. 2008) (en banc) cert. denied, 556 U.S. 1268 (2009) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime").

In Kimbrough v. United States, 552 U.S. 85 (2007), the companion case to Gall, the Supreme Court addressed the Guidelines' significant disparity between sentences for offenses involving "crack" versus powder cocaine. The Court ultimately held that for Kimbrough, a Guidelines-range sentence for his crack cocaine offenses was unreasonable under the §3553(a) factors. In reaching that conclusion, the Court determined that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the 'heartland' to which the Commission intends individual Guidelines to apply." Id. at 109. Similarly, the Supreme Court in Pepper v. United States, __ U.S. __, 131

S.Ct. 1229 (2011) upheld the "longstanding principle" that a sentencing judge may consider <u>any</u> evidence not otherwise prohibited by law to support a downward variance from a Guidelines-range sentence, including post-conviction rehabilitation. <u>Id</u>. at 1240.

The basic principle is that the length of the sentence this Court imposes on James Kevin Kergil must be "reasonable" in light of the factors enumerated in 18 U.S.C. §3553(a).   <u>See</u> <u>United States v. Cavera</u>, 550 F.3d 180, 189-1990 (2d Cir. 2008)(En Banc), <u>cert</u>. <u>denied</u>, 556 U.S. 1268 (2009);   <u>United States v. Verkhoglyad</u>, 516 F.3d 122, 127 (2d Cir. 2008).   For the reasons argued below, a reasonable sentence, "sufficient, but not greater than necessary" to fulfill the policy objectives of §3553(a), should be a sentence below the applicable Guideline range.

## <u>PRE-SENTENCE REPORT AND SENTENCING GUIDELINES OBJECTIONS</u>

<u>Actual Loss/Intended Loss</u>

We turn first to the issue of the loss calculation under the Sentencing Guidelines.   The PSR has calculated the "actual losses" at $49,301,061 and the "intended" losses at $179,371,340. PSR at p. 8, para. 35.   The Government has calculated "actual" losses at $36,098,992 [Government Sentence Memo at p. 58] and "intended" losses at $130,252,357 or, when commissions are added, $141,947,880 [Government Sentence Memo at p. 57].   Thus, the Government's "actual loss" figure is $13 Million less than Probation's, and the "intended loss" figure is a whopping $37.5 Million less.   When this disconnect is combined with the fact that the Government took the position at trial that the insurance companies suffered no tangible financial losses, these loss calculations lack the requisite certainty on which to base a Guidelines sentence. For the reasons which follow, the only measure of loss capable of accurate measurement is

"actual" loss and, thus far, the Court has not been presented with an accurate measurement of the "actual" losses incurred by the insurance companies.

As the Guidelines make clear, this Court must apply "the greater of actual loss or intended loss." U.S.S.G. §2B1.1, Application Note 3(A).  And in doing so: "The court need only make a reasonable estimate of the loss."  U.S.S.G. §2B1.1, Application Note 3(c).  As matters now stand, however, the "estimates" provided both the PSR and the Government are anything but "reasonable."  This is especially true when one considers that it wasn't so long ago that the Government took the position at trial that there were no financial losses suffered by the insurance companies.

At trial, the Government relied on the theory that the only "loss" here was the insurance companies' "right to control" the life insurance policies they issued.  Even before the trial started, the Government moved in limine: "The Court Should Preclude Evidence and Argument That Defendants' False Representations Did Not Cause Actual Economic Harm."   Because the insurance companies suffered no actual financial losses, the Government argued "…that evidence of, and argument relating to, how the Subject Insurers actually fared, economically, in the wake of defendants' false representations should be precluded."  Government's Motion in Limine at p. 18. Then, once the trial was under way, AUSA Sarah McCallum told the court: "There is no need - and the court has already said this, it is black letter law – there is no need for the government to prove ultimate economic harm.  There is a good reason why that is difficult to prove here, and it is not something we would ever have to prove." (T. 1227).  With regard to this issue of financial "loss," AUSA McCallum described the testimony of the two insurance company witnesses, the sole testimony at trial on the issue of financial loss, as follows: "…both those witnesses said we don't think ultimately so far we have seen a hit to the bottom line…"  (T. 1227).  The

4

Government was successful at trial with its "right to control" theory.   That it now wishes to shift gears, and claim financial losses to the insurance companies, does not obligate this Court to follow suit.

We turn then to the Government's preferred economic "loss" theory: "intended" loss. The methodology employed to reach the Government's $141 Million "intended" loss figure [as distinguished from the PSR figure of $179 Million], is so fundamentally flawed as to be divorced from reality.  The Government's Sentencing Memo describes the formula utilized:

> These projections take the insured's life expectancy and pair it with information from the Insurer, based on the insured's medical records, about the premiums that would have to be paid to keep the contemplated policy in force pending death, to yield a total premium outlay.  Subtracting that total from the face value of the policy (the death benefit) yields the net death benefit loss on the Subject Scheme Application.

Government's Sentence Memo at p. 56.   Yet even as it relies on that formula, the Government concedes that the elements on which the formula was based, were derived from Binday projection charts for only 41 of the 92 "scheme applications."  Government's Sentence Memo at p. 56.

More importantly, in the less than half of the "scheme applications" for which the Government has "projection charts," the projections are based on rank speculation regarding life expectancy and non-existence of "lapsed" policies.  Life expectancy is always speculative at best. And, the Government has conceded that in this case the life expectancy reports were "too aggressive" and the "straw insureds may end up living longer than predicted."  Government's Sentence Memo at p. 67.[1]

---

[1] Aside from the additional premiums earned by the longer life spans, it must be remembered that those additional premiums are invested.  As one insurance executive testified at trial, the companies invested the huge six figure premiums and earned a favorable return on the investment. (Avery T. 545, 549-550).

Further, either with or without the "projection charts," the "intended" losses presume that the life insurance policies will not lapse from non-payment of premiums, and that each of the policies will pay a death benefit. Incongruously, the Government relies for its "intended" loss calculation on each and every policy not lapsing, while at the same time conceding that lapses occurred in some of the policies at issue. Government's Sentence Memo at p. 57-58, 66. The Government's theory that no investor would possibly allow a life insurance policy to lapse, despite evidence to the contrary in this very case, was always an exercise in wishful thinking. Investors, even hedge funds, will stop paying hundreds of thousands of dollars for individual life insurance policies if more money can be made more quickly by investing those large sums elsewhere. For those reasons, "intended" loss cannot be measured by the  face value of the life insurance policies.

When it comes to an evaluation of the losses James Kevin Kergil "intended" to inflict on the insurance companies, it cannot be forgotten that the he was a licensed insurance agent. As such, he knew, as the insurance executives themselves testified at this trial, that the insurance companies would not lose money by issuing the "STOLI" policies involved in this case. He was well aware of "lapse" rates and the methods by which insurance companies operate: policies are issued, premiums are collected, and risks are pooled. Because the risks are pooled, losses cannot be calculated by examining any individual policy. As the Government's trial witness, James Avery of Prudential Insurance, testified at trial: "We don't think of it as ever making money on any one policy. You couldn't determine it that way. You have the individual who pays one premium and dies six months later. You lose a lot of money on that policy, but we don't consider that a loss. We consider that – that's the benefit of insurance because there's another 900 people who paid a premium who didn't die. And, again, the premium that's paid by everyone pays for

6

those unfortunate enough to pass away." (Avery T. 516).    Indeed, as the Lincoln National Memorandum of 1/3/07, introduced into evidence as a Government exhibit, explained: Lincoln "priced [universal life policies] so that if we got zero lapses and minimum funded policies, we would achieve profitability consistent with the products overall pricing returns."   GX 2970. Clearly, the insurance business, and the ability to pool risks, was "baked into" the premiums charged by the insurance companies for the policies at issue.

James Kevin Kergil knew as well as James Avery of Prudential and the Lincoln Memorandum, dated January 3, 2007, that the risk of "STOLI" policies was built into the premium structure so that insurance companies could earn profits even from policies like those which are the subject of the instant case.  The insurance companies here were doing what they always do: issuing policies to healthy individuals based on full medical underwriting, collecting premiums and pooling risk. James Kevin Kergil could not have intended for the insurance companies to lose money, because there was no way for those companies to lose money.

For similar reasons, the Government's "actual" loss figures cannot survive scrutiny.  What has changed since the trial where the Government took the position that insurance companies suffered no financial losses?    Moreover, the Government has conceded that some of the policies are still in force [Government Sentence Memo at p. 66], with the insurance companies racking up premiums and reaping profits from those life insurance policies.  Yet even if the Government is correct about the "actual" losses of $36,098,992 and, despite the absence of trial evidence, is now able to prove those "actual" losses by a preponderance of the evidence, it would be a far cry from the $141,947,880 in "intended" losses on which the Government asks this Court to base its sentence.  According to the Guideline §2B1.1(b)(1) loss table, this $100 Million differential

between "intended" and "actual" losses would result in a reduction of 4 levels, from an increase of 26 levels to an increase of 22 levels.

In the final analysis, the reasons provided by the Government as to why the loss calculation "overstates the seriousness of defendant's conduct" and warrant a variance from the Guidelines range [Governments Sentence Memo at pp. 65-66] are actually reasons why it cannot accurately determine either the "intended" or "actual" losses. It is the Government's burden to establish those losses by a preponderance of the evidence. See United States v. Robie, 166 F.3d 444, 455-456 (2d Cir. 1999). If the Government is unable to do so, the Guidelines must be calculated without the enhancements from the Guideline §2B1.1(b)(1) loss table.

In light of the stratospheric Guidelines range calculated by the Government pursuant to its dubious loss calculations, the Government has conceded that defendant's sentence should be lower than recommended under the Guidelines. That concession, however, is nothing more than a recognition that an unyielding adherence to loss figures can sometimes lead to unjust sentencing outcomes. See United States v. Adelson, 441 F.Supp.2d 506, 511 (S.D.N.Y. 2006) (noting "...the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the hard that guideline calculations can visit on human beings if not cabined by common sense."). While we do not in any way wish to minimize the seriousness of the offense, we agree with the Government that with regard to James Kevin Kergil, a Guideline sentence would be unjust and unfair.

In recognition that the Guidelines loss calculations can sometimes result in sentences like the one calculated by the PSR in this case, Application Note 20(c) to Guideline Section §2B1.1, provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may

8

be warranted." See United States v. Corry, 206 F.3d 748, 751 (7th Cir. 2000).   Moreover, there also exists the possibility of a departure where, as here, the disparity between the "intended" loss and the "actual" loss exceeds $100 Million.  See United States v. Stockheimer, 157 F.3d 1082, 1091 (7th Cir. 1998); United States v. Coffman, 94 F.3d 330, 336-337 (7th Cir. 1996).[2] Accordingly, even if the Government can now meet its burden of proving financial "losses," that calculation and its accompanying Guidelines range, should not be the sole determinant of the sentence this Court imposes.

Supervisory Role

The PSR has recommended [Page 9, para. 45] and the Government agrees, that James Kevin Kergil "held a supervisory role in the scheme." Government's Sentence Memo at p. 60. Having represented Mr. Kergil since 2010 and throughout his 2013 trial, I am fully familiar with his role in the charged conspiracy.  For that reason, I was shocked to learn that Mr. Kergil was being considered a "supervisor" of 5 or more individuals and subject to an upward adjustment of 3 levels pursuant to Guideline Section §3B1.1.

It is well recognized that a defendant acts as "a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense…or played a significant role in the decision to recruit or to supervise lower-level participants." United States v. Al-Sadawi, 432 F.3d 419, 426-427 (2d Cir. 2005).  The Government bears the burden of proving the defendant's aggravating role in the offense by a preponderance of the evidence. See United States v. Brinkworth, 68 F.3d 633, 641 (2d Cir. 1995).   Where is the Government's evidence of Kergil's supervisory role?

---

[2] The deficiencies in the methodology employed by the Government as outlined above serve to distinguish the instant case from the 8th Circuit's reliance on the face value of life insurance policies in United States v. Jenkins, 578 F.3d 745, 749-751 (8th Cir. 2009).

The answer to the question becomes a matter of semantics.  The Government supports its argument by employing phraseology such as this: "Kergil was the one who conveyed to Resnick and Krupit Binday's instruction to destroy records."  Government's Sentence Memo at p. 60. This criminal conspiracy was not some stratified drug network or mafia family with supervisors, lieutenants, captains and soldiers.  There were no "orders" or "instructions" to be "conveyed." Rather, this defendant discussed with his co-conspirators the subject of destroying records, and these were discussions among equals, not orders being handed down from above.  James Kevin Kergil was incapable of ordering any of the other conspirators to do anything and they were not obligated to listen to him either.

Like his co-defendants and the Government's cooperating witness, James Kevin. Kergil was an insurance agent.  He played a role similar to all the other insurance agents, i.e. finding applicants and facilitating their life insurance applications.  Some did more of location of applicants, and some did more with regard to the applications themselves.  All had their individual roles, but none held supervisory authority over the others.  Other than the Government's turns of a phrase, there exists no evidence that James Kevin Kergil supervised or controlled anyone other than himself.  The adjustment is without any factual basis whatever and wholly unwarranted.

## THE SECTION 3553 FACTORS AS APPLIED TO JAMES KEVIN KERGIL

The instant case is one in which the §3553(a) factors militate toward the application of a downward variance from the recommended Guidelines range. Should this Court accept the Government's present theory of "intended" loss, the recommended period of incarceration would be a quarter of a century.  Cf. United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) ("it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences

amounting to life imprisonment."). Even the Government concedes that would be too harsh under the circumstances. As one judge has commented:

> "The real question is the relationship to the loss figure to the issues raised in 18 U.S.C. §3553(a). Loss under the Guidelines is effectively a proxy for evaluating culpability. Sometimes it is appropriate and sometimes it is not."

United States v. Watt, 707 F.Supp.2d 149, 155 (D. Mass. 2010).

So, we turn to the §3553(a) factors which will determine the appropriate sentence for James Kevin Kergil. With regard to the "nature and circumstances of the offense," it bears emphasis that prior to the instant case, instances of "STOLI" fraud were almost uniformly been addressed through the commencement of civil law suits. The identical fraudulent conduct for which these defendants were convicted was rampant throughout the country in the years prior to the financial crisis of 2008. Insurance companies, rather than prosecutors, commenced law suits against the insurance agents, beneficiaries and trusts responsible for the "STOLI" frauds. By those civil law suits the insurance companies sought to rescind the fraudulent policies and retain the premiums already paid. Such law suits were commenced in the Southern and Eastern Districts of New York. See, e.g. Penn Mutual Life Insurance Co. v. Wolk, 739 F.Supp.2d 387 (S.D.N.Y. 2010); Principal Life Insurance Co. v. Altman Insurance Trust, 2011 WL 7498936 (E.D.N.Y. 2011). Such law suits also filled the dockets of District Courts throughout the United States. See, e.g. PHL Variable Insurance Co. v. Bowie Irrevocable Trust, 718 F.3d 1 (1st Cir. 2013); PHL Variable Insurance Co. v. Morello Irrevocable Trust, 645 F.3d 965 (8th Cir. 2011); PHL Variable Insurance Co. v. Hathaway Insurance Trust, 2013 WL 6230351 (D. Utah 2013); PHL Variable Insurance Co. v. Bank of Utah, 2013 WL 6190345 (D. Minn. 2013); PHL Variable Insurance Co. v. Joseph Irrevocable Trust, 970 F.Supp.2d 932 (D. Minn. 2013); Nationwide Life and Annuity Insurance Co. v. Golden, 2013 WL 97718 (S.D. Ohio 2013); Lincoln Benefit Life

Company v. Bauer Life Insurance Trust, 2013 WL 24590 (M.D. Fla. 2013); Principal Life Insurance Co. v. Rucker Insurance Trust, 869 F.Supp.2d 556 (D. Del. 2012); Penn Mutual Life Insurance Co. v. GreatBanc Trust Co., 2012 WL 2074789 (N.D. Ill. 2012); Principal Life Insurance Co. v. DeRose, 2012 WL 1642606 (M.D. Pa. 2012); Hartford Life & Annuity Insurance Co. v. Barnes Irrevocable Trust, 2012 WL 688817 (C.D. Cal. 2012); PHL Variable Insurance Co. v. Abrams, 2012 WL 10686 (S.D. Cal. 2012); Principal Life Insurance v. Rucker Insurance Trust, 774 F.Supp.2d 674 (D. Del. 2011); Sun Life Assurance Co.v. Berck, 770 F.Supp.2d 728 (D. Del. 2011); Principal Life Insurance Co. v. Wells Fargo Bank, 2011 WL 768058 (C.D. Cal. 2011); Ohio National Life Assurance Corp. v. Davis, 2010 WL 4916643 (C.D. Cal. 2010); PHL Variable Insurance Co. v. Gelb Irrevocable Trust, 2010 WL 5363377 (N.D. Ill. 2010); American General Life Insurance v. Goldstein, 741 F.Supp.2d 604 (D. Del. 2010); Lincoln National Life Insurance Co. v. Schlanger Insurance Trust, 2010 WL 2898315 (D. Del. 2010); Lincoln National Insurance Co. v. Snyder, 722 F.Supp.2d 546 (D. Del. 2010); Principal Life Insurance Co. v. Mosberg, 2010 WL 473042 (S.D. Fla. 2010); West Coast Life Insurance Co. v. Secaul Insurance Trust, 2010 WL 27907 (S.D. Fla. 2010); West Coast Life Insurance Co. v. Life Brokerage Partners, LLC, 2009 WL 2872823 (S.D. Fla. 2009); Lincoln National Life Insurance Co. v. Calhoun, 596 F.Supp.2d 882 (D.N.J. 2009).

This is by no means an effort to excuse the criminal conduct for which this defendant has been convicted. We wish to make clear that we are not arguing that the case against him should have been civil rather than criminal. Rather, our objective is to place the criminal conduct in the context of when it was committed and how the insurance companies reacted to it. There was a virtual epidemic of "STOLI" fraud and the fraud was addressed through the civil justice system. This is relevant not only to the "nature and circumstances of the offense," but also to the need of

the sentence "to afford adequate deterrence." 18 U.S.C. §3553(a)(2)(B). Indeed, the very existence of this criminal case is the most potent "deterrence" imaginable, because it puts on notice all who would deign to commit "STOLI" fraud against insurance companies that they will face criminal penalties and not merely a civil law suit. Any prison sentence this Court will impose will be sure to send shock waves, and drive home the point not only that fraud against insurance companies will not be tolerated, but that it will be punished in the most severe manner possible.

We turn next to the "history and characteristics" of the defendant, James Kevin Kergil. 18 U.S.C. §3553(a)(1). In this regard we are constrained to point out that the Government's submission evinces the tendency to paint all three co-defendants with the same brush: "defendants evince no remorse for or recognition of the unlawfulness of their conduct." Government's Sentence Memo at p. 1. I do not know which of the "defendants" the Government is referring to, but it is surely not James Kevin Kergil.[3] The determination of his sentence and his remorse must, of necessity, be an individualized determination.

James Kevin Kergil is more than the sum of his criminal activity. He is first and foremost a dutiful son, who moved his 92 year-old mother, Florence, into his home, in order to provide the care and attention she requires. PSR at p.13, para. 64. Florence Kergil's physician, Margaret E. Vaughan, M.D. has written a letter describing Kevin's role in his mother's care:

> "Mrs. Kergil lives with her son and although she receives assistance
> from a home health aid 8 hours 7 days a week, he is her sole provider

---

[3] One particular example is the Government's claim: "All three-unlike many of the defendants who appear before this Court-are well-educated individuals who enjoyed significant educational and other advantages, yet committed serious crimes in spite of those advantages." Government's Sentence memo at p. 61. According to the PSR, James Kevin Kergil attended Community College and never graduated from a 4-year college. PSR at p. 14, paras. 74-75. While he is certainly not uneducated, it is difficult to determine precisely what the Government is referring to as his "educational advantage" in life.

and maintains her safety and supports her financially and emotionally. He does her shopping and  finances bill pay and all other aspects related to her life."

Exhibit A, Letter of Margaret E. Vaughan, M.D.

His mother's home health aide, █████████, a former neighbor, writes:

"…three years later after I moved I lost my job again and it just so happened that the very day someone told me Kevin was looking for me to take care of his mom.  Kevin takes care of his mother as well when I am not here.  Sometimes because recently I was diagnosed with breast cancer so on the day of chemo and sometimes a couple or a few days after I am still not feeling well, Kevin will take care of mom.  She needs round the clock care.  Everything must be done for her.  She can't be left alone because she may fall or get into things.  So I must say he takes care of her very well and is always with her around the clock."

Exhibit B, Letter of █████████; see Exhibit C, Letter of Leslie P. Lawler ("Over the past two years, Kevin has taken on the role of Adult Caregiver for his elderly mother.  He opted to bring Mother into his home to provide the one-on-one care not available in long-term care facilities. He is an amazing son, having put his own life on hold to put her first and foremost."); Exhibit D, Letter of Susan Haywood ("While many children of aging parents who can't live alone choose placing their parent in a nursing home, Kevin didn't choose that option.  He moved his mother into his home and has an aide there every day to help take care of her.").

Kevin Kergil's care and concern are not limited to his mother.  He is the quintessential "good neighbor."  █████████, a former neighbor and current home health care aid for his mother, writes in her letter:

"He is a very caring person and would do anything to help. He is very understanding and giving.  There was a time I lost my job and it got very hard.  I lost power because Con Ed was shut off because I didn't pay the bill on time and he was there for me.  He ran an extension cord from his place to mine until Con Ed came back on the next day. Otherwise I would have been in the dark with my animals.  Not to mention it was summer and it was very hot."

Exhibit B. Letter of ████████.

Kevin Kergil is also a very community minded citizen of the City of Peekskill, where he has lived for many years.  His neighbor, Leslie P. Lawler, writes:

> "I have known Kevin since approximately 2008, when I met him at a Peekskill Common Council Work Session. I was heartened to learn he was my neighbor 'up the hill,' and over the years, he has become a dear friend, treasured neighbor, and fellow parishioner at Our Lady of the Assumption Church.  Kevin and I share a strong passion for neighborhood quality of life improvements.  I can attest that Kevin has worked hard to advocate for strong code enforcement, clean neighborhoods, and increased law enforcement presence to combat drug activity and traffic in Peekskill neighborhoods. He has petitioned our local police department for stepped-up neighborhood presence and has brought our collective concerns to the Common Council meetings."

Exhibit C, Letter of Leslie P. Lawler.

That community minded spirit has led him to work directly with the Peekskill Police Department on their efforts to combat the drug problems in the city.  Detective Todd Gallagher, recently retired from the Peekskill Police Department, told me in a telephone conversation on July 9, 2014, that Kevin has over the years provided him with information that has led to multiple arrests.

Kevin Kergil is also very active with animal shelters in Peekskill.  His neighbor and fellow animal lover, Leslie Lawler, writes:

> "Kevin is also an incredible animal rights advocate and has proven to be the kind and knowledgeable liaison that Peekskill has desperately needed.  He works closely with Officer Wendell Bowman, Animal Control for the City of Peekskill to oversee the TNR (Trap, Neuter and Release) Program which provides for working with local vets and animal shelters to spay and neuter stray cats in the City."

Exhibit C. Letter of Leslie P. Lawler; see Exhibit D, Letter of Susan Haywood ("Kevin is also the one called to get a cat to the veterinarian when there is an emergency or when there is a problem at the shelter.  He never says no unless there is no one with his mother.  Because of his volunteer efforts he has improved the quality of life for the animals in our community and fort the residents that care about them.").

The strictures of 18 U.S.C. §3553(a) require this Court to balance the nature and circumstances of the offense and the history and characteristics of the defendant against "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  As shown above, James Kevin Kergil is a devoted son and community minded individual.  Throughout his life, he has made substantial efforts to improve his city and the lives of those close to him. This is not to say that James Kevin Kergil is not deserving of incarceration.  But his conduct, placed in the context of his history and characteristics and with due consideration of the nature of the offense, does not warrant the ill-defined "substantial term of incarceration" which the Government recommends. Government's Sentence Memo at p. 75.

What constitutes a "substantial term of incarceration" with respect to the offense lies in the discretion of this Court.  When considering what constitutes a "substantial term of incarceration", this Court should look at the good James Kevin Kergil has done for his mother and others in the community and balance that against the harm caused the insurance companies by his participation in the "STOLI" fraud conspiracy.  We believe such an analysis will lead the Court to the conclusion that a sentence substantially below the guidelines is warranted.  Such a sentence would be "sufficient, but not greater than necessary, " and would fulfill the policy objectives of §3553(a).

## **CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that this Court impose a sentence below the Guidelines range for James Kevin Kergil.

Dated: New York, New York
      July 14, 2014

                        Respectfully submitted,

                        GALLET DREYER & BERLEY, LLP

By:   _____
                        Roger L. Stavis
                        Adam M. Felsenstein
                        *Attorneys for Defendant James Kevin Kergil*
                        845 Third Avenue—8th Floor
                        New York, New York 10022
                        (212) 935-3131

17

Exhibit A



**MOUNT KISCO MEDICAL GROUP P.C.**

www.mkmg.com

111 Bedford Road ♦ Katonah NY 10536
914-232-3135 ♦ Fax: 914-767-3141

6/18/14

To whom it May Concern,

Mr. Kevin Kergil is the son of Mrs. Florence Kergil who is 92 yrs old with multiple medical problems including CVA, Afib, depression/anxiety. Mrs Kergil lives with her son and although she receives assistance from a home health aide 8hrs 7days a week, he is her sole provider and maintains her safety and supports her financially and emotionally. He does her shopping and finances/bill pay and all other aspects related to her life.

Sincerely
Margaret Vaughan MD



**MARGARET E. VAUGHAN MD**
Internal Medicine

111 Bedford Road ♦ Katonah NY 10536-2115
914-232-3135 ♦ Fax: 914-767-3140

Exhibit B

Redacted

Exhibit C

*Leslie P. Lawler*
*964 Constant Avenue*
*Peekskill, NY 10566*
*(914) 260-5973*

July 7, 2014

To Whom It May Concern:

Please let this letter serve as reference for Kevin Kergil.

I have known Kevin since approximately 2008, when I met him at a Peekskill Common Council Work Session. I was heartened to learn he was my neighbor "up the hill," and over the years, he has become a dear friend, treasured neighbor, and fellow parishioner at Our Lady of the Assumption Church.

Kevin and I share a strong passion for neighborhood quality of life improvements. I can attest that Kevin has worked hard to advocate for strong code enforcement, clean neighborhoods, and increased law enforcement presence to combat drug activity and traffic in Peekskill neighborhoods. He has petitioned our local police department for stepped-up neighborhood presence and has brought our collective concerns to the Common Council meetings.

Kevin is also an incredible animal rights advocate and has proven to be the kind and knowledgeable liaison that Peekskill has desperately needed. He works closely with Officer Wendell Bowman, Animal Control for the City of Peekskill, and with Susan Haywood, who has been contracted by the City of Peekskill to oversee the TNR (Trap, Neuter and Release) Program which provides for working with local vets and animal shelters to spay and neuter stray cats in the City.

Over the past two years, Kevin has taken on the role of Adult Caregiver for his elderly mother. He opted to bring Mother into his home to provide the one-on-one care not available in long-term care facilities. He is an amazing son, having put his own life on hold to put her first and foremost.

In light of the above, I humbly and respectfully ask the Court's leniency regarding Kevin's situation. Please feel free to contact me if you require anything further.

Sincerely,

Leslie P. Lawler

Exhibit D

July 10, 2014

Susan Haywood
118 Rolling Way
Peekskill, NY 10566

To whom it may concern:

I have known James Kevin Kergil personally for the past five years. Our common concern for stray/abandoned cats is what caused our paths to cross. It was during adoption events that I saw how honest and forthcoming Kevin is. While some cats get attention and are adopted on looks alone, Kevin would always share the cat's medical history as well as any personality/behavior issues the cat may have with prospective adopters. He is always upfront no matter how it may negatively affect an adoption. Kevin is also the one called to get a cat to the veterinarian when there is an emergency or when there is a problem at the shelter. He never says no unless there is no one with his mother. Because of his volunteer efforts he has improved the quality of life for the animals in our community and for the residents that care about them.

This brings me to another revelation about Kevin's character. His mother is in her nineties and suffers from medical and psychological issues. She is not able to live by herself safely. While his mom was in the hospital awaiting discharge he would often discuss with me his concerns and options in caring for her as I share the same parent issues and am a registered nurse. While many children of aging parents who can't live alone choose placing their parent in a nursing home, Kevin didn't choose that option. He moved his mother into his home and has an aide there every day to help take care of her.

I hope the court considers the positive aspects of Kevin's character when judging him.

If I can be of further assistance please let me know.

Thank You,

Susan Haywood

Susan Haywood