UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/8/17
```

James Kevin Kergil,  )
    Petitioner  )
      )
v.  )  Case No. 12-cr-00152-CM
      )
United States of America,  )
    Respondent.  )
_____)

### PETITIONER JAMES KEVIN KERGIL'S MOTION TO REDUCE TERM OF IMPRISONMENT PURSUANT TO 18 U.S.C. §3582(C)

NOW COMES Petitioner James Kevin Kergil, *pro se*, (hereinafter "I" "me" "Mr. Kergil"), to hereby move this Honorable Court to reduce his term of imprisonment based on 18 U.S.C. §3582(c)(2) and the Sentencing Guidelines Amendments 794 and 791, both effective November 1, 2015.

### I. PRELIMINARY STATEMENT

In the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. §994(p) and upon motion of the defendant, the Director of the Bureau of Prisons or on its own motion, the Court may reduce the term of imprisonment of the defendant after considering the factors set forth in §3553(a) to the extent they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. See 18 U.S.C. §3582(c)(2).

The purpose of these new USSG Amendments was among other things to clarify the level of participation in a conspiracy, the amount of loss applicable to a particular defendant, reduce the imposition of large sentences based on an outdated loss schedule, and to end the disparity of different sentences for the same crime. The new Amended Guidelines focus on "intended" loss

and sentencing someone for only their particular profits on their part of the crime and have adopted the Tenth Circuit's decision in *United States v. Manatau*, 647 F.3d 1048 (10th Cir 2011) for the accurate determination of the defendant's Sentencing Guidelines Level based on ONLY the specific loss that the defendant actually intended to cause to a specific victim rather than the total potential loss that might have resulted from the defendant's actions.

In her recent decision in *United States v. Perez*, No. 08-cr-00429-06(DLC) (S.D.N.Y. Sept. 14, 2016), the Honorable Judge Denise Cote determined that Amendment 794 was a clarifying amendment and therefore was to be retroactively applied and that the question of retroactivity of Amendment 794 was a matter of first impression for the Second Circuit. The Ninth Circuit has already held that Amendment 794 was to be retroactively applied on direct review because it was a clarification of the Sentencing Guidelines. See *United States v. Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016). The reason that Judge Cote's analysis in *Perez* is critical in my case is because the commentary under §3B1.2 had provided that a mitigating role adjustment is available to any defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant". Amendment 794 inserted after the phrase "substantially less culpable than the average participant...." the words "in the criminal activity." USSG §3B1.2.

Amendment 794 also introduced a list of several non-exhaustive factors that a sentencing court should consider in determining whether to apply a "mitigating role adjustment" in determining the defendant's sentence. Amendment 794 went on to add that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *Id.* n.3 in Commentary.

This describes my relationship with Binday in a nutshell. Where Binday received 100% of the $32,000,000 in death benefits and commissions determined to be losses in this case, I was paid as an Independent Contractor for professional and techincal services rendered, only 2% of the net loss number, which was $600,000, paid over a period of four years. More importantly, not a single penny was paid to me by the alleged victims in this case: the Insurance Carriers, but rather all of the $600,000 paid to me came from the Binday agency and I was "simply being paid to perform certain tasks", and therefore I should be considered for a sentence modification under this guideline. See *Perez*.

As the Second Circuit has made clear in several cases: "a defendant sentenced under one version may be given the benefit of a later revision if the revision represents not a substantive but merely a clarification of the United States Sentencing Commissions' prior intent." *United States v. Sabbeth*, 277 F.3d 94, 96 (2d Cir. 2002). After Amendment 794, Section 3B1.2 requires the Court to consider at least the following five factors in determining whether a defendant qualifies for a minor role reduction:

(1) The degree to which the defendant understood the scope and structure of the criminal activity;

(2) The degree to which the defendant participated in planning or organizing the criminal activity;

(3) The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(4) The nature and extent of the defendant's participation in the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(5) The degree to which the defendant stood to benefit from the criminal activity. See *Quintero-Leyva*, 823 F.3d at 523, and USSG §3B1.2(b). These factors are non-exhaustive and a district court may also consider other factors when determining to apply the reduction. *Id.* at 523. As was clear from the presentation of the government's case, Binday and the Binday agency received 100% of the $21,000,000 in death benefits and 100% of the $11,000,000 in commissions. There is no way under Amendment 794 that I should have had the same $32,000,000 in loss attributed to me as Binday, even assuming I was involved in the conspiracy, which I was not.

The Court should examine Amendment 791 as a clarifying Amendment as well because it was effective at the same time as Amendment 794 (November 1, 2015), and clarified the language of Section §2B1.1 that it should be based on the loss that the defendant "intended" to cause the victim, and added the *mens rea* requirement of *Morissette v. United States*, 342 U.S. 246 (1952). It also was a clarifying amendment because it adopted the Tenth Circuit's decision under *Manatau* as the new standard for intended loss, thereby resolving a split amongst the Circuits just as Amendment 794 did. While the Sentencing Commission is silent on whether Amendment 791 is a clarifying or substantive amendment, it is clear that a clarifying amendment would apply retroactively, see *United States v. Amico*, 573 F.3d 150, 151 (2d Cir. 2009). Amendment 791 satisfies the exact same inquiry as does Amendment 794 as described in *United States v. Brooks*, 732 F.3d 148, 149 (2d Cir. 2013), to be a clarifying amendment:

(1) What is the language of the Amendment?

(2) What is its purpose and effect- was it meant to clarify the Sentencing Commission point of view?

(3) Whether the Guideline and Commentary in effect at the time of sentencing is consistent with the amended sentencing manual.

Just as Amendment 794 resolved a circuit split over the interpretation of the "average participant", so too does Amendment 791 resolve a circuit split over the subjectivity of intended loss, and Amendment 791 changes even fewer words than Amendment 794 as this description from the statements on Amendment 791 shows:

> Amendment 791 revises the commentary at $2B1.1, Application Note 3A (ii), which has defined intended loss as "pecuniary harm that was intended to result from the offense. "In interpreting this provision, courts have expressed some disagreement as to whether a subjective or an objective inquiry is required. Compare: *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011)( holding that a subjective inquiry is required), *United States v. Diallo*, 710 F.3d 147, 151 (3d Cir. 2013) ("To make this determination, we look to the defendant's expectation, not to the risk of loss he may have exposed his victims."), *United States v. Confredo*, 528 F.3d 143,152 (2d Cir. 2008) (remanded for consideration of whether defendant had "proven a subjective intent to cause a loss of less than the aggregate amount" of fraudulent loans), and *United States v. Sanders*, 342 F.3d 511,527 (5th Cir. 2003) ("Our case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate the offense level"); with *United States v. Innarelli*, 524 F.3d 286,291 (1st Cir. 2008), and *United States v. Lane*, 323 F.3d 568,590 (7th Cir.2003).

Amendment 791 adopts the approach taken by the Tenth Circuit by revising the commentary in Application Note 3(A)(ii) to provide the intended loss means "the pecuniary harm that the defendant sought to inflict". Amendment 791 reflects the commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability.

As Judge Patti Saris, Chairman of the USSG Commission, stated in the policy statements accompanying the new Amendment 791 to the Sentencing Guidelines and in her many interviews dealing with the disparity of sentences in the Second Circuit alone, there were cases where Billion Dollar fraudsters were getting a year and a day for serious economic crimes. See,

e.g., *United States v. Collins*, No. 13-2902 (2d Cir. Oct 22, 2014), where an attorney for REFCO gave fraudulent opinion letters that cost investors over a Billion Dollars in losses, but he received a sentence of only a year and a day. Also in the Billion Dollar check-kiting scandal involving Adam Weitsman, he received a sentence of a year. In another multi-million dollar check-kiting scandal, Pakistan businessman Saquib Khan was looking at a sentence of 8-9 years, but received a sentence of probation and some community service. And, of course, Your Honor is familiar with the Rajat Gupta case where he was involved with hundreds of millions of dollars of insider trading violations but received a sentence of only 24 months. Finally, Judge Saris discussed a $77 million fraud against Medicare and the US Government, where one of the officers of the fraudulent company received probation as well, despite looking at a sentence of 14 years or more. Please see *United States v. Khandrius*, No. 13-3151 (2d Cir. 2015).

There are of course other cases that Judge Saris refers to as to why it was necessary to amend the Sentencing Guidelines for White-Collar Economic Crimes, but suffice it to say, Judge Saris clearly points out the problems of the sentence disparity between similar individuals in similar situations in similar crimes as is clearly the problem in my case. Recently, in the New York Post, it was reported that Daniel Kornblatt, a former IRS agent and tax attorney, pled guilty to conspiring with a client to deprive the government of taxes in a $29 million fraudulent tax-evasion scheme. Despite defrauding the US Government itself, Mr. Kornblatt received a sentence of only 18 months. See New York Post, September 21, 2015.

Based on the new Amendment effective November 1, 2015, the Commission raised the minimum amount of every level on §2B1.1, creating a new sentencing level for those sentences that were under the old regime. Therefore, Petitioner James Kevin Kergil will respectfully request that his sentencing level be reduced under the new §2B1.1 U.S.S.G as a clarifying

amendment. Having established the applicable Amendment guideline range with the correct loss information as to me alone, the Court should then consider the factors enumerated in 18 U.S.C. §3553a to reduce the original sentence previously imposed. As Attorney General Eric Holder expressed the goals of sentencing in his May 19, 2010 Memorandum to all Department of Justice prosecutors:

> "Prosecutors should seek sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and offer defendants an opportunity for effective rehabilitation."

I would respectfully suggest that Your Honor compare my case for sentencing purposes to that of Daniel Kornblatt, who was a former IRS agent and tax attorney that effectively "defrauded" the IRS and US Government of over $29,000,000 on just one case and he received a sentence of only 18 months. In my case, a sentence of a year would have been more than adequate under §3553(a). The factors under 18 U.S.C. §3553(a) to be considered by the court to "impose a sentence sufficient, but not greater than necessary" that I would respectfully suggest to Your Honor need to be reviewed by the court are:

> (5) any pertinent policy statement issued by the sentencing commission pursuant to section 994 (a)(2);

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Additionally, because the Sentencing Commission has adopted the Tenth Circuit's opinion in *Manatau,* and the Second Circuit's decision in *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) to limit the amount of loss to the actual amount of loss that the defendant intended not the amount that might have happened, Your Honor should review my entire Sentencing Guidelines Level as well. Moreover, under the Sentencing Guidelines, the amount of loss is meant to be reduced by "the amount the victim has recovered at the time of sentencing

from disposition of the collateral, or if the collateral has not been disposed of by that time the fair market value of the collateral at the time of sentencing." Clearly, the premiums paid to the carriers in this case are more than double the $32,000,000 in losses established by the government.

Judge Saris says the sentencing guidelines commission based the new guidelines for Economic Crimes on the Tenth Circuit's decision in *Manatau*. The newly adopted "*Manatau* Standard" in the Sentencing Guidelines is very important to my case for several reasons. First, a defendant's Sentencing Guidelines should only be based on the loss that he himself intended to the victim(s). As it is clear that I did not fill out, sign, or send in any of the Insurance applications in this case, none of the loss was intended by me, so none of the "intended loss" in this case should be attributable to me. Second, the Sentencing Guidelines through *Manatau* adopt the "*mens rea*" standard of *Morissette*, that for the defendant's conduct to be criminal, the defendant must actually know that he is breaking the law and that he is intentionally causing the criminal harm. As stated in *Manatau*:

> But it is equally true that American criminal law often restricts liability to cases where an intentional choice to do a wrong is present. As Justice Jackson explained, "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.... *Morissette v. United States*, 342 U.S. 246, 250, (1952). The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter. ***Second***, context confirms the point. The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard. Yet, just a few lines later, the sentencing commission's definition of "actual loss" does just that — defining "actual loss" to include the "harm that the defendant ***knew . . . was a potential result of the offense***." U.S.S.G. §2B1.1 cmt. n. 3(A)(iv)." *Manatau*, 647 F.3d at 1051 (emphasis in original).

Modern criminal law is replete with examples-ranging from homicide law to treason, complicity, conspiracy, and attempt law (where liability is often restricted solely to cases where intent is present). The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law, and the Sentencing Commission chose here to invoke the former term, not the latter.

In fact, under the new Sentencing Guidelines, the definition of "intended loss" makes no mention of "knowledge" or some lesser "*mens rea*" standard. To illustrate this point, the Tenth Circuit gives the example of a "farm boy" who clears the land for an illegal still to earn a day's wages, as opposed to someone involved in the operation of the illegal still that clears the land as well. The "Farm Boy" who is working for his wages is in the exact same position as I am, being paid 1099 wages as an independent contractor working for Binday, who allegedly ran the "still" or the illicit operation. While it is true that Binday paid me $600,000 for doing technical work for the brokers and agents, I did not receive a dime from the Insurance Carriers, the alleged victims in this case, and Binday paid me as an Independent contractor for professional services rendered over a four year period.

Third, the *Manatau* standard adopts the Second Circuit famous standard of what constitutes a crime as it relates to a conspiracy by Judge Learned Hand in *United States v. Falcone*, 311 U.S. 205 (1940): "Proof of criminal intent is required to prevent a 'drag-net of conspiracy' from sweeping up innocent conduct." *Manatau* 647 F.3d at 1053. The new Sentencing Guidelines requires that there must be actual "intended" harm that "*actually* accrued to real victims." *Id.* (emphasis in original). This new standard can be seen in the Third Circuit's recent decision in *United States v. Free*, No. 15-2939 (3d Cir. July 12, 2016), a bankruptcy fraud case where the creditors received 100 cents on the dollar despite the fraudulent conduct by the

defendant, thereby causing the sentence based on the 16 level increase for the amount of losses to be vacated and overturned.

No evidence was adduced at trial that I intended any actual concrete harm to anyone, much less the carriers in this case. See *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). My name was mentioned only once or twice during the entire trial; it was just "assumed" that I was somehow involved in a conspiracy with Binday, which is not allowed under Second Circuit precedent discussed below. But, for the purposes of this Motion, and for the purposes of sentencing under the Sentencing Guidelines, Your Honor must establish what losses, if any, are properly apportioned to me as opposed to Binday. Respectfully, the Court failed to do this. As discussed in more detail below, it is undisputed that over $60 Million was paid to the carriers as part of Binday's scheme; $21 Million was paid in death benefits, and $11 Million was paid in commissions. The government proposed that actual losses were $40 Million, which this Court discounted to $32 Million, and the Second Circuit accepted in its opinion. See *Binday* at *90.

Clearly there was no actual or even intended loss that can be apportioned to me under the Sentencing Guidelines new *Manatau* Standard:

> "Now on appeal, Mr. Manatau renews his argument that the district court failed as a matter of law to apply the proper '*mens rea*' standard when calculating his 'intended loss'. We agree. We hold that 'intended loss' means a loss that the defendant ***purposely*** sought to inflict. 'Intended loss' does not mean a loss that the defendant merely ***knew*** would result from the scheme or a loss he might have ***possibly and potentially*** contemplated." *Manatau*, 647 F.3d at 1049-1050. (Emphasis in original).

As stated above, it is not disputed that the only money that I received was the $600,000 that Binday paid me over a four year period as an independent contractor. I did not receive any

of the commissions or death benefits that are deemed to be "losses" from the "victims" in this case.

## I. LEGAL STANDARD

As a *pro se* Petitioner, I would respectfully ask Your Honor to be as lenient with me as possible and to liberally construe this pleading as much as possible so that Your Honor reads my submission "to raise the strongest possible arguments that they suggest in my favor" See *Berlin v. United States*, 478 F.3d 489, 491 (2d Cir 2007).

I am asking Your Honor to reduce my sentence to a year and a day based on the new Sentencing Guidelines effective November 1, 2015, because of the policy statements issued by the Sentencing Commission through its Chairman, Judge Patti Saris, and because of the factors set forth in §3553(a), which all favor such a reduction in sentence in my particular case. See *United States v. Mock*, 612 F.3d 133, 137 (2d Cir. 2010), *citing Dillon v. United States*, 130 S.Ct. 2683, 2692 (2010).

Because the policy statements made by the Sentencing Commission clearly favor a reduction in my sentence; in fact a total review of what was the actual intended loss that I intended to inflict on the carriers as opposed to Binday, I believe Your Honor has a duty to review my personal sentence in the interest of justice. That said, to make the review of my case easier for Your Honor, I will speak in the third person as "Mr. Kergil" as opposed to Binday, who was both the architect and the engineer of the scheme in this case as well as the ultimate and only manager. I was not in a conspiracy with Binday nor did I receive any money from the alleged victims in this case, the carriers. I believe the policy statements of the new Sentencing Guidelines favor a review of my sentence and I believe it was "plain error" to saddle me with 22 levels because of the amount of Binday's fraud. That said, I believe once Your Honor reviews the

Section 3553(a) factors as they apply to me, Your Honor will reduce my sentence to a year and a day.

## II. THE COURT FAILED TO PROPERLY CALCULATE MY PERSONAL SENTENCING GUIDELINES

In addition to the review of my sentence by the Court in light of the new Amendments 794 and 791, my sentence in this case was procedurally unreasonable because Your Honor failed to make the two-pronged finding required by the Second Circuit's decision in *United States v. Studley*, 47 F.3d 569 (2nd Cir. 1995). It is black letter law in the Second Circuit that "[t]he scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy ". See *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991). "The focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a conspirator". See *United States v. Rigo*, No. 15-1914 (2d Cir. May 23, 2016), U.S.S.G. §1B1.3.

In this case, the Court assigned a 22-level increase to each of us, but the law is clear that the Court should have analyzed what portion of the total loss is applicable to each of us based on our individual conduct using the factors outlined in *Studley*. See also *United States v. Getto*, 729 F.3d 221, 234 (2d Cir.2013) ("The Guidelines also require the District Court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant," *citing Studley*, 47 F.3d 569, 574 (2d Cir. 1995)). This Your Honor did not do.

If Your Honor had properly allocated the amount of loss to the carrier victims of the Binday Scheme, Your Honor would have determined that not a penny of the death benefit or commissions came to me, but rather 100% was paid to Binday and his agency. Your Honor will also recall the testimony of Tracy Robinson, Mr. Binday's secretary, that she filled out tall of the

applications as Mr. Binday instructed her to do. She never mentioned my name at all. In fact, no one mentioned my name at trial as it pertained to filling out or submitting applications to the carriers. Of the $21,000,000 in death benefits and $11,000,000 in commissions that this Court determined to be actual losses in this case, I did not receive a dime, and Mr. Binday received 100% of the so-called "losses" in this case. The only money I received in this case was the $600,000 that I received as an Independent Contractor from Binday over a four year period for consulting and professional services. I was not part of any of Binday's schemes, and much like the example in *Manatau* of the day-laborer "farm boy" clearing the field for the illegal still operator, I was in many respects like Tracy Robinson in that I did what Binday told me to do and was paid for the services I provided but I did not share in any of the proceeds of the Binday scheme, and certainly did not receive any money directly from the carriers who were the victims in this case, as is required by both Second Circuit Law and the Sentencing Guidelines themselves.

Moreover, under the new Sentencing Guidelines, this Court should determine the actual loss that I personally, and not Binday or the conspiracy, intended to inflict on the alleged victims. Just as in *Manatau* where the actual loss Manatau inflicted was only $1,840 and the government argued that the intended loss was more than $60,000, so too in my case, the actual loss that I inflicted in this case (to the Carriers) is ZERO, and yet the government is trying to attribute the same $32,000,000 in losses to me that is attributable to Binday and Binday alone.

It is indisputable that the carriers were paid more than $60,000,000 in premiums in this case, so even from Binday's perspective there is no actual loss in this case. And, since even Binday "intended" to use investor money to pay the premiums on the policies until the insureds died, there is no "intended" loss in this case either, but I will let Mr. Binday make his own

motions. Suffice it to say for my case, this Court erred in calculating my personal Sentencing Guidelines just as the district courts did in *Manatau* and *Rigo*.

### III. IF THERE WAS ANY LOSS IN THIS CASE NONE OF IT WAS ATTRIBUTABLE TO MR. KERGIL

Not only should your Honor reassess my minimal (non-existent) role in the Binday conspiracy pursuant to the clarifying Amendment 794, at sentencing Your Honor committed procedural error by failing to make particularized findings concerning the proper apportionment of losses caused to the victims in this case (i.e. the carriers) by the alleged co-conspirators. Clearly, based on the new Sentencing Guidelines of November 1, 2015 and the law of the Second Circuit, the Court must make "particularized" findings of the "intended" loss that each of the defendants actually intended to cause.

Assuming, arguendo, that there was in fact any loss to the carriers in this case, which clearly there was not; none of that loss can be attributable to me. Two good examples for Your Honor to consider are the "Gifting Tables "case of *United States v. Platt*, U.S. App. LEXIS 6157 (2d Cir. 2015) where the sentences were vacated because the district court relied on a spreadsheet of losses provided by the government without any particularized finding for each defendant, and *United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) where the government tried to hold Getto responsible for "boiler room" type sales that he had nothing to do with. In both cases the sentences were vacated because the district court did not use the *Studley* prongs to make particularized findings as to the loss apportioned to each defendant based on his role in the conspiracy. As the Second Circuit noted in both *Platt* and *Getto*: "The scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy". See *Platt* at 608 Fed. Appx. 31, *quoting Getto*, 729 F 3d at 234.

Most importantly, just like the "gifting-table ladies" in *Platt*:

> For the purposes of sentencing, mere "knowledge of another participant's criminal acts or of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." See *Platt* at 31, *citing Studley*, 47 F 3d at 575.

The defendants' sentences in *Platt* were all vacated despite the fact that they supervised, trained, and otherwise interacted with the gifting table participants because the Second Circuit held that was insufficient to determine the amount of loss that was to be attributable to each of them, based on their own conduct for the purposes of calculating the loss amount for the purposes of sentencing each defendant. The reason that is extremely important in my case is because there was no evidence adduced at trial that any conduct of mine contributed to the absolute "concrete "loss of any of the carriers. See *Rossomando* at 201.

In fact, because there was no evidence adduced at trial that any money came to me personally from any carrier, unlike Binday, there is no loss from any victim that is directly attributable to my conduct and because of the new Sentencing Guidelines, this Court has a duty to show the amount of loss that I actually "criminally" intended to cause under *Manatau*, *Morissette*, and the new Sentencing Guidelines, and that amount is clearly ZERO. I received no money from any of the victims and I certainly did not intend to harm anyone including the carriers, and I worked independently as an Independent Insurance Agent out of my home, so I am even more removed than Getto was and the gifting table ladies were for the purposes of sentencing and establishing the appropriate Sentencing Guidelines Level.

Moreover, it is clear that under the new clarifying Amendment 794 that my role, if any, was minimal and I should have the benefit of the sentencing level reductions under Amendment 794 and none of the burden of the 22 level enhancement for intended loss under Amendment

791.Once Your Honor recalculates my proper Sentencing Guidelines level, it should be clear that a sentence of a year and a day is perfectly reasonable considering the actors under §3553(a).

### IV. MR. KERGIL SHOULD HAVE HIS SENTENCE REDUCED PURSUANT TO THE NEW SENTENCING GUIDELINES EFFECTIVE NOVEMBER 1, 2015

Assuming arguendo that Mr. Kergil was part of the Binday conspiracy, which he clearly was not, and assuming that the Binday Scheme was a scheme to defraud instead of a scheme to deceive, which it was not, and assuming that the carriers experienced a loss caused by the Binday Scheme, which even government witness James Avery of Prudential Insurance Company of America testified that there were no fraud losses to the carriers, if the Court correctly applied the *Studley* factors, even assuming the worst, Mr. Kergil should still be resentenced to a year and a day under the new Guidelines because the Court did not properly calculate the amount of loss or the appropriate Sentencing Guidelines level for Mr. Kergil, and the Court did not employ the *Studley* factors or apportion the loss among the alleged co-conspirators as the Court is required to do by the Second Circuit.

Clearly the sentencing of Mr. Kergil constitutes plain error, but this §3582 Motion is not an appeal to the Second Circuit but rather an appeal to reason for Your Honor to correct the inaccuracies and obvious mistakes made in the interests of justice. Everyone, no matter how despicable, has a due process right to be sentenced on accurate information at sentencing, and that did not happen in Mr. Kergil's case. See, e.g., *Townsend v. Burke*, 334 U.S. 736 (1948).

An excellent case for Your Honor to review and compare to Binday is the Second Circuit's decision in *United States v. Khandrius*, where Khandrius's sentence was vacated but one of his co-conspirators, Dr. Wahl, received probation (as noticed in Patti Saris' comments on the November 2015 Guidelines) and the other, Shelikova, who pled guilty to the $77 Million

Medicaid fraud, received a sentence of 20 years. For the purpose of arguing Mr. Kergil's §3582 Motion, it is not important that Dr. Wahl received probation though he was part of a $77 Million fraud, but it is important to note that as noticed in Judge Saris' comments, there are huge sentencing disparities in the Second Circuit alone (See, e.g., another case Judge Saris points out *United States v. Collins*, No. 13-2902 (2d Cir. Oct 22, 2014) where the attorney at the center of a Billion dollar REFCO fraud received only a year and a day sentence and that was after two trials). Considering the *Collins* case and Dr. Wahl and the *Khandrius* case, a sentence of a year and a day under the new Sentencing Guidelines is more than adequate to satisfy the goals of sentencing and the factors under §3553(a).

That said, Your Honor should carefully consider that in *Khandrius*, of the three alleged co-conspirators in a $77 Million fraud against the government, Dr. Wahl received probation, Ms. Shelikova received 20 years, and Khandrius had his sentence vacated. For the purposes of the §3582 Motion, it is important to note Judge Saris' commentary on the *Khandrius* and *Collins* cases because those comments directly impact Mr. Kergil's sentence and recommend a sentencing for him in the interests of justice on the basis of the new Guidelines. But, Your Honor should also review the Second Circuit's vacating of Khandrius's sentence at the same time they affirmed Ms. Shelikova's 20 year sentence. The Second Circuit felt that the district court erred by not taking into account the "two prongs" of *Studley*, and most importantly, the district court failed to examine the factors identified by the Second Circuit in *Studley* to determine the scope of the individual defendants' agreement in the conspiracy:

> "(1) Whether the participants pooled their profits and resources, or whether they worked independently;
>
> (2) Whether the defendant assisted in designing and executing the illegal scheme; and

(3) What role the defendant agreed to play in the operation either by an explicit agreement or implicitly by his conduct.

*United States v. Studley*, 47 F.3d 569, 574-75 (2d Cir. 1995).

The district court felt that Khandrius's conduct evidenced an implicit agreement to include all of the conspiracy's activities, so the court included all $77 Million in fraudulent Medicare billings in calculating Khandrius's sentence under the Guidelines. The Second Circuit found this to be totally erroneous, but that is precisely what Your Honor has done to Mr. Kergil in this case, by attributing the entire $32 Million in estimated losses to Mr. Kergil as well as Binday. If there was a conspiracy here, Mr. Kergil was not a party to it. Therefore, it is a clear miscarriage of justice to attribute the entire $32 Million to Mr. Kergil as well as Binday, where the record is clear that Binday was 100% in control of the operation and received 100% of the proceeds of the alleged fraud, while Mr. Kergil did not receive a single penny from the Carriers in the alleged fraud.

## V. A SENTENCE OF A YEAR AND A DAY SATISFIES THE GOALS OF SENTENCING UNDER THE GUIDELINES

Section 3582 (a) mandates that the Sentencing Court "shall" consider the factors set forth in 18 U.S.C. §3553(a) to the extent they are applicable, "***recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation***." Even assuming that Mr. Kergil knew what Binday was up to, the Supreme Court has made it clear that knowledge alone is not sufficient to show a criminal *mens rea* as recognized by *Morissette* before a crime can be charged:

> "That knowledge alone is sufficient to show intent is emphatically not the modern view."
> See *Giles v. California*, 554 U.S. 353, 368 (2008).

Even in the light favoring the government's verdict it is clear that Mr. Kergil intended no harm or losses to the Insurance Carriers and received no money from the Carriers as required by *Skilling v. United States*, 561 U.S. 358, 400 (2010) and the "Mirror Image theory" of fraud. Moreover, because Mr. Kergil was paid by Binday for services rendered, he is definitely entitled to a mitigating role downward reduction under Amendment 794 for having such a small role, if any, in the Binday conspiracy. See *United States v. Cruickshank,* 2016 US App. LEXIS 17169 (11th Cir. Sept. 20, 2016).

Because the Carriers were paid over $60,000,000 in premium, even assuming that $32,000,000 in death benefits and commissions as the current amount of losses, which government witnesses say it is not, there is still a large gain to the carriers and no loss in this case. But, if there were any loss in this case, the percentage assigned to Mr. Kergil under the *Studley* factors would be infinitesimally small, and that is assuming Mr. Kergil was part of the conspiracy, which clearly he is not. Instead, Mr. Kergil is like the day laborer that clears the field for the still operator, or even worse, is the innocent man swept up in the net of conspiracy in *United States v. Falcone*, 311 U.S. 205 (1940). Under either scenario, and under the analysis of the clarifying Amendments 791 and 794, a sentence of nine years is grossly unreasonable for Mr. Kergil especially when Your Honor is directed to recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." See §3582(a)

A sentence of a year and a day would achieve all the goals of sentencing and is not more than reasonably necessary to meet the goals of sentencing while taking into account all of the factors under §3553(a) as the Court is required to do. If Your Honor was to reduce Mr. Kergil's sentence to a year and a day, Mr. Kergil could spend the next few years taking care of his 95 year old disabled mother rather than washing dishes in the Camp's kitchen. There is no benefit to

society or Mr. Kergil's mother keeping him incarcerated. He can be just as easily assigned to Home Confinement or Federal Location Monitoring (FLM) so that he can assist his mother in the final years of her life. If Joseph Collins received a year and a day for the Billion Dollar REFCO fraud, and Dr. Wahl received probation for the $77 Million fraud in *Khandrius*, it is certainly fitting that Mr. Kergil receive a year and a day sentence under the $32,000,000 Binday conspiracy that he was not a party to other than as an independent contractor hired to perform certain technical and professional services. Binday paid Mr. Kergil $600,000 over four years, Mr. Kergil did not receive a penny from the Carriers in the alleged fraud, and Mr. Kergil does not deserve a sentence any longer than a year and a day.

## CONCLUSION

For the above reasons, and in light of the clarifying Amendments 791 and 794 to the Sentencing Guidelines, Mr. Kergil respectfully asks this Court to modify his sentence pursuant to Section 3582(c) and to hereby reduce his sentence to no more than a year and a day.

Respectfully Submitted,

/s/ James Kevin Kergil
James Kevin Kergil
Reg. No. 66387-054
Petitioner *Pro Se*
Incarcerated Inmate
FPC Canaan
P.O. Box 200
Waymart, PA 18472