UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

      - v. -                                          :                    12 Cr. 152 (CM)

JAMES KEVIN KERGIL,                            :

              Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JAMES KEVIN KERGIL'S MOTIONS FOR RELIEF FROM HIS CRIMINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b) AND FOR RESENTENCING

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Sarah K. Eddy
Assistant United States Attorney
  -- Of Counsel --

## <u>TABLE OF CONTENTS</u>

TABLE OF CASES ...................................................................................................................... ii

BACKGROUND ........................................................................................................................... 1

    I.    PROCEDURAL HISTORY............................................................................................. 1

    II.   EVIDENCE OF THE SCHEME TO DEFRAUD ........................................................... 2

    III.  EVIDENCE OF KERGIL'S ROLE................................................................................ 5

    IV.  THE DEFENSE CASE AT TRIAL ............................................................................... 6

    V.   SENTENCING ................................................................................................................ 6

    VI.  KERGIL'S DIRECT APPEAL...................................................................................... 7

ARGUMENT ................................................................................................................................ 8

    I.    KERGIL'S 60(B) MOTIONS ARE NOT COGNIZABLE ........................................... 8

    II.   KERGIL'S COLLATERAL ATTACKS ON HIS CONVICTION FAIL......................... 9

    III.  KERGIL IS NOT ENTITLED TO RESENTENCING .................................................. 11

CONCLUSION............................................................................................................................. 16

## TABLE OF CASES

*Burrell* v. *United States*, 467 F.3d 160 (2d Cir. 2006)..................................................................... 10

*Cordero* v. *United States*, No. 09 Civ. 4388 (SAS),
    2012 WL 5431005 (S.D.N.Y. Nov. 5, 2012) ........................................................................ 9

*Gitten* v. *United States*, 311 F.3d 529 (2d Cir. 2002) ...................................................................... 8

*Kandi* v. *United States*, No. CV16-5389 (RBL),
    2016 WL 6395132 (W.D. Wash. Oct. 27, 2016).................................................................... 13

*United States* v. *Bastien*, No. 09 Cr. 205 (JFB),
    2013 WL 1701601 (E.D.N.Y. Apr. 19, 2013)........................................................................ 9

*United States* v. *Binday*, 804 F.3d 558 (2d Cir. 2015)............................................................... passim

*United States* v. *Confredo*, 528 F.3d 143 (2d Cir. 2008) ............................................................. 15

*United States* v. *Holcombe*, No. 14 Cr. 118 (DLC),
    2016 WL 7742997 (S.D.N.Y. Dec. 19, 2016)....................................................................... 12

*United States* v. *Manatau*, 647 F.3d 1048 (10th Cir. 2011)......................................................... 12

*United States* v. *Morales*, No. 11 Cr. 881 (DLC),
    2016 WL 6426394 (S.D.N.Y. Oct. 27, 2016) ....................................................................... 12

*United States* v. *Perez*, No. 08 Cr. 429 (DLC),
    2016 WL 4775536 (S.D.N.Y. Sept. 14, 2016) ...................................................................... 13

*United States* v. *Perez*, No. 08 Cr. 429 (DLC),
    2016 WL 7742745 (S.D.N.Y. Dec. 19, 2016)....................................................................... 13

*United States* v. *Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016)................................................. 13

*United States* v. *Takhalov*, 827 F.3d 1307 (11th Cir. 2016) .................................................. 10, 11

*United States* v. *Woodward*, No. Cr. 112-257 (JRH),
    2016 WL 4084150 (S.D. Ga. Aug. 1, 2016) ......................................................................... 12

*United States* v. *Yeagley*, No. 13 Civ. 2561 (KMK),
    2017 WL 76903 (S.D.N.Y. Jan. 3, 2017)............................................................................. 10

The Court should deny defendant James Kevin Kergil's two motions for relief from his criminal judgment under Federal Rule of *Civil* Procedure 60(b)(6) ("Rule 60(b)(6)") and his motion for resentencing pursuant to Title 18, United States Code, Section 3582(c)(2) ("Section 3582(c)(2)"). The first two motions are not cognizable as framed and would be barred even if recharacterized as motions for habeas corpus relief under Title 28, United States Code, Section 2255 ("Section 2255"). The third motion, though technically cognizable, lacks all substantive foundation.

## BACKGROUND

### I.   PROCEDURAL HISTORY

On October 7, 2013, following a twelve-day jury trial before this Court, Kergil and his two co-defendants, Michael Binday and Mark Resnick (together, "the defendants"), were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a scheme to defraud insurance companies which the defendants purported to serve as agents. Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k).

On July 30, 2014, the Court sentenced Kergil to 108 months' imprisonment, to be followed by three years' supervised release. The Court also ordered very substantial forfeiture and restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Kergil and his co-defendants, directing only a limited remand, at the Government's request, for entry of an amended restitution order in a reduced amount of $37,433,914.17. *See United States*

v. *Binday*, 804 F.3d 558, 601 (2d Cir. 2015).  On December 14, 2015, the Second Circuit denied

the defendants' motions for panel and *en banc* rehearing.  On June 20, 2016, the Supreme Court

denied Kergil's and Binday's petitions for a writ of *certiorari*.  On June 24, 2016, this Court

entered the amended restitution order that the Second Circuit had directed be entered.  Shortly

thereafter, Kergil began serving his sentence.

In or about December 2016, Kergil filed two motions for relief from his criminal

judgment pursuant to Rule 60(b)(6) and a motion for resentencing pursuant to

Section 3582(c)(2).

## II.     EVIDENCE OF THE SCHEME TO DEFRAUD

The evidence at trial established that, from in or about 2006 through in or about early

2009, Kergil and his co-defendants, all insurance agents, engaged in a scheme designed to

procure so-called "stranger-originated life insurance" (or "STOLI") policies—policies on the

lives of seniors for the benefit of investors who were strangers to them—by means of fraudulent

applications.  The co-conspirators recruited elderly people of modest means (the "Straw

Insureds") to apply to insurance companies (the "Insurers") for universal life insurance policies,

with the understanding that the resulting policies would actually be owned, paid for, and

controlled by third-party investors.[1]  The defendants secured the Straw Insureds' consent to the

scheme with promises of six-figure payouts—payouts that sometimes materialized and

---

[1] The Insurers were American General Life Insurance Co. and its affiliates, AXA Equitable Life
Insurance Company, John Hancock Life Insurance Company (U.S.A.), The Lincoln National
Life Insurance Company and its predecessors and affiliates, MetLife Investors U.S.A. Insurance,
The Prudential Insurance Company of America, Security Mutual Insurance Company, Sun Life
Assurance Company of Canada, and Union Central Life Insurance Company (now Ameritas).

sometimes did not.  *See United States* v. *Binday*, 804 F.3d at 565-66 (describing scheme).  (Tr. 72-77, 424-26, 611-13).[2]

Meanwhile, Kergil and his co-defendants deceived the Insurers about who was behind these policies, giving the false impression that wealthy individuals wanted the policies on their own lives for estate planning purposes.  The defendants engaged in this deception because the Insurers expressly prohibited their agents from submitting STOLI business to them.  *See Binday*, 804 F.3d at 565, 567.  (GX 1101 at 16 (Lincoln anti-STOLI policy, with Kergil's certification of compliance); GX 2904 (AIG anti-STOLI policy); GX 2915 (Hancock anti-STOLI policy); GX 2922 (Jefferson Pilot anti-STOLI policy); GX 2943 (Prudential anti-STOLI policy); GX 2951 (Union Central anti-STOLI policy)).  STOLI investors exploited the Insurers' actuarial and underwriting processes—which were developed with the expectation that ordinary human beings rather than professional investment funds would be behind the policies—to profit at the expense of the Insurers.  The Insurers, not surprisingly, did not want to be targets of this kind of arbitrage, which exposed them to unwanted economic risk.  (Tr. 505-06, 512-15, 576, 580-82, 641-43; GX 2970, 2971, 2972).  As executives from two Insurers testified at trial, the Insurers understood that STOLI policies would behave in ways that were less economically advantageous to the Insurers and would reduce the Insurers' profitability.  (Tr. 505-06, 512-15, 576, 580-82).  Most importantly, STOLI policies, unlike non-STOLI policies, were expected to never lapse and thus to result in multi-million-dollar payouts in every case.  (Tr. 514, 642).  Moreover, to the extent STOLI policies were being procured based on lies that inflated the insureds' wealth, the Insurers

---

[2] "Tr." refers to the trial transcript; "Sentencing Tr." refers to the transcript of Kergil's and his co-defendants' sentencing, dated July 30, 2014; "GX" refers to a Government exhibit admitted at trial; "Mot. 60(b) No. 1" refers to Kergil's first motion for relief from his criminal judgment pursuant to Rule 60(b); "Mot. 60(b) No. 2" refers to Kergil's second Rule 60(b) motion; and "Resentencing Mot." refers to Kergil's motion for resentencing pursuant to Section 3582(c)(2).

were taking on a greater risk of earlier mortality than they believed, because wealthier people tend to live longer.  (Tr. 576, 578, 735).

But the defendants wanted to facilitate issuance of STOLI policies from the Insurers to investors because each such policy generated massive commissions for the responsible insurance agents, paid for by the unwitting Insurer—as long as the STOLI character of the policy went undetected.  (Tr. 455, 509-10, 923; GX 892).  To circumvent the Insurers' anti-STOLI rules and the terms of their own agency agreements with the Insurers, the defendants littered the applications with lies—not about the Straw Insureds' health, but about their assets and net worth, the existence of third-party financing of premiums for the policies, the Straw Insureds' intent to sell the policies, the purpose of the insurance sought, and whether the Straw Insureds had other life insurance policies or pending applications for such policies.  (*See, e.g.*, GX 531, 541, 605, 650, 2000, 2122).  This false information was provided in response to specific questions asked by the Insurers to try to detect and weed out STOLI and to ensure that applicants could afford the policies for which they were applying.

The defendants did not just lie on application forms.  They routinely backed up their lies with sham documents, arranged elaborate bank transactions to make it look like the Straw Insureds—rather than investors—were paying the premiums on policies, and instructed Straw Insureds they had recruited to refuse to speak to Insurer representatives and, worse, lie if conversation could not be avoided.  (*See, e.g.*, GX 164, 679, 680 (false "estate plans" and financial documents); Tr. 828-29 (false "inspection reports"); Tr. 145, 391-92, 936 (disguised premium payments); GX 1304, 2841, 3019 (coaching seniors to lie)).  All three defendants conspired to destroy documents and electronic records related to their fraud.  (Tr. 980-81; GX 3073, 3075).

### III.    EVIDENCE OF KERGIL'S ROLE

Far from having a minor or peripheral role in the offenses charged, Kergil was a very significant player—a fact reflected in the Court's calculation of his United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, which incorporated a three-point enhancement for managerial or supervisory role pursuant to U.S.S.G. § 3B1.1.  (*See* Sentencing Tr. at 39). Kergil actively recruited field agents to participate in the scheme.  (Tr. 902-05 (cooperator's testimony that Kergil explained scheme to him and importance of "stay[ing] under the [Insurers'] radar")).  He also managed a subset of these agents, supplying them with forms for Straw Insureds to complete and, more importantly, ensuring they had the necessary (false) financials incorporated into their applications and bogus supporting documents to make those financials appear real.  (*See* Tr. 780 (immunized witness's testimony that he received forms from Kergil); Tr. 914-15 (cooperator's testimony that Kergil sent him fake financials in "worksheets" to be incorporated into applications); GX 468, 1182, 1703 (false worksheets from Kergil); Tr. 821, 829 (testimony from corrupt "inspector" who agreed to create financial reports for Kergil that appear verified but were based entirely on Kergil's false figures); Tr. 922 (cooperator's testimony that Kergil told him the inspection reports were "just signed off on and no one actually verified it"); GX 5504 (Kergil fax of false financial figures with note requesting corrupt inspector to "correct" net worth figure upward)).  Kergil not only earned commissions on the fraudulently-procured policies for which he acted as agent himself, but also regularly took a cut of field agents' commissions.  (Tr. 903-04, 923).

Another key part Kergil played was keeping scheme participants in line, making sure they did not reveal the fraud to the Insurers.  In one instance, Kergil agreed to—and did—urge a crooked accountant to lie to an Insurer's investigators.  (*See* GX 136, 158).  Another time, Kergil

forwarded to a co-conspirator field agent a "Checklist" with which to coach Straw Insureds.
(GX 2841). The list urged Straw Insureds to refuse to answer questions from people who might
call to verify information regarding their insurance applications. (*Id.*). A few months later,
when Kergil grew concerned that a particular Straw Insured might be compelled to speak to an
Insurer, he emailed the field agent a list of false answers for the Straw Insured to give the
investigator—chock full of lies designed to ensure that the scheme succeeded and was not
uncovered. (GX 1304).

Finally, when it became clear that federal authorities were investigating him and his co-
conspirators, Kergil instructed two co-conspirator field agents to destroy records evidencing the
scheme—to "get rid of everything with the name Advocate Brokerage, Michael Binday's name
on it and his name on it and get rid of it" (Tr. 980-81), and to "get rid" of their "hard drive[s]."
(*Id.*; Tr. 986-87; *see also* GX 3072 (recorded call between cooperator and Kergil in which Kergil
does not deny he instructed cooperator to delete emails)); GX 3073 (transcript of GX 3072)).

## IV.    THE DEFENSE CASE AT TRIAL

At trial, Kergil and the other defendants did not deny that they told blatant and repeated
lies to the Insurers, but argued, among other things, that their conduct was not fraudulent because
the Insurers "happily issued STOLI policies, while paying lip service to weeding out STOLI
policies for public relations reasons." *Binday*, 804 F.3d at 568.

In convicting the defendants on all counts, the jury rejected this and other arguments.

## V.    SENTENCING

As noted, the Court sentenced Kergil to 108 months' imprisonment for his crimes, and
ordered very substantial restitution and forfeiture. In calculating the appropriate Guidelines
range for all defendants, the Court elected to measure loss based on actual loss (approximately

$38 million) rather than intended loss (approximately $179 million).  (Sentencing Tr. at 37-38).

Although Kergil had opposed application of a three-point enhancement for his managerial or

supervisory role in the offense, pursuant to U.S.S.G. § 3B1.1, the Court found that the

enhancement was warranted.  (Sentencing Tr. at 39).  (Kergil never argued for a *mitigating* role

adjustment.)  Using the actual loss figure and the role enhancement, the Court calculated a

Guidelines range of 155 to 188 months' imprisonment.  (*Id.*).  Finding that the Guidelines were

ill-suited to properly measuring culpability and appropriate punishment for any defendant in this

case, the Court opted to sentence Kergil below the applicable range, to 108 months'

imprisonment.  (*Id.* at 53).

## VI.   KERGIL'S DIRECT APPEAL

On appeal to the Second Circuit, Kergil's principal arguments were that (1) the

indictment failed to adequately allege the crimes of mail fraud, wire fraud, and conspiracy, and

instead alleged a mere scheme to deceive; (2) the Court erred in its instructions to the jury

defining scheme to defraud; (3) the indictment was constructively amended; (4) there was

insufficient evidence of Kergil's intent to defraud the Insurers; (5) the Insurers' actual losses

were unquantifiable, and there was in fact "no loss" for Guidelines purposes; and (6) Kergil's

sentence was substantively unreasonable.

The Second Circuit, in affirming the convictions and sentences of Kergil and his co-

defendants, rejected each of these arguments.  *See Binday*, 804 F.3d at 576-77 (rejecting Kergil's

attack on sufficiency of indictment); *id.* at 578-80 (rejecting general challenge to sufficiency of

intent evidence as well as Kergil's variant of the argument); *id.* at 581-82 (rejecting claim of

instructional error); *id.* at 584-85 (rejecting constructive amendment claim); *id.* at 597-99

(rejecting challenge to loss calculation for sentencing purposes); *id.* at 600-01 (rejecting Kergil's

substantive unreasonableness challenge to his sentence).

## ARGUMENT

The Court should deny all three of Kergil's pending motions.  The first two are

procedurally incoherent; Kergil cannot use a civil procedure rule to reopen the criminal judgment

against him, and there is no civil judgment that could serve as the target of these motions.  The

Court may, with appropriate notice to Kergil, choose to recharacterize his Rule 60(b)(6) motions

as a motion for habeas relief under Section 2255.  But that would not improve his arguments,

which were already rejected by the Second Circuit on direct appeal and are therefore

procedurally barred.

Kergil's motion for resentencing also fails.  The amendments to the Guidelines

commentary which he seeks to invoke do not have retroactive effect on collateral review.  Even

if they did, those amendments would be of no assistance to Kergil, who performed a managerial

and supervisory role in the offenses of conviction rather than a minor or peripheral one, and

whose sentence was not based on any measure of intended loss.

### I.   KERGIL'S 60(B) MOTIONS ARE NOT COGNIZABLE

Rule 60(b)(6) is a rule of civil—not criminal—procedure that permits a court to relieve a

party from a civil judgment for "any . . . reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).[3]  It

cannot be used to reopen or challenge criminal judgments.  *See Gitten* v. *United States*, 311 F.3d

529, 534 (2d Cir. 2002) (new attacks on an underlying conviction "are beyond the scope of Rule

60(b)"); *United States* v. *Bastien*, No. 09 Cr. 205 (JFB), 2013 WL 1701601, at *6 (E.D.N.Y.

---

[3] Even in civil cases, application of Rule 60(b)(6) is limited to "extraordinary circumstances, or
where the judgment may work an extreme and undue hardship."  *Matarese* v. *LeFevre*, 801 F.2d
98, 106 (2d Cir. 1986).

Apr. 19, 2013) ("Rule 60 of the Federal Rules of Civil Procedure applies only to *civil* cases; the rule provides a mechanism for relief from *civil* judgments, exclusively."); *Cordero* v. *United States*, No. 09 Civ. 4388 (SAS), 2012 WL 5431005, at \*4 (S.D.N.Y. Nov. 5, 2012) (Rule 60(b) "is not the appropriate vehicle for lodging new attacks against an underlying criminal conviction").  There is no civil judgment from which to seek relief here.

Instead, the procedural vehicle available to Kergil for collaterally attacking his criminal judgment is a motion for habeas corpus pursuant to Section 2255.  *See United States* v. *Bastien*, 2013 WL 1701601, at \*6.  Because Kergil is acting *pro se*, the Court may construe his procedurally improper Rule 60(b)(6) motions as a motion pursuant to Section 2255.  *See id.* ("When a *pro se* litigant files a postconviction motion unsuccessfully seeking relief under a certain provision of the law, a court may construe that motion as one brought pursuant to [Section 2255] without requiring the litigant to re-plead.").  Before doing so, however, the Court would have to alert Kergil to its intent to recharacterize, warn him that subsequent Section 2255 motions will be subject to the "second and successive" restrictions on such motions, and provide him with an opportunity to withdraw or amend his filing.  *Id.*

## II.    KERGIL'S COLLATERAL ATTACKS ON HIS CONVICTION FAIL

If the Court were to give Kergil the opportunity to have his Rule 60(b) motions treated as a Section 2255 motion, and if Kergil were to accede to the recharacterization, his attacks on his conviction would still fail.

The arguments that Kergil presents in his two Rule 60(b) motions are that there was insufficient evidence of his "specific intent to defraud or cause any harm to the" Insurers (Mot. 60(b) No. 1 at 1, 7; Mot. 60(b)(6) No. 2 at 16-17); (2) there was insufficient evidence of his intent to join the charged conspiracy (Mot. 60(b) No. 1 at 2-3); and, relatedly, (3) the scheme the

Government alleged in the indictment and proved at trial was a scheme to deceive rather than to defraud and thus not cognizable under the wire or mail fraud statutes (Mot. 60(b) No. 2 at 1-4, 7-16). The factual predicate Kergil offers for these arguments is, in essence, that he "had no idea Binday was doing something wrong" and "did not intend to defraud the carriers." (Mot. 60(b) No. 1 at 10).

These arguments are all foreclosed from consideration on collateral review, because each was squarely addressed and rejected by the Second Circuit on direct appeal. *See, e.g.*, *United States* v. *Yeagley*, No. 13 Civ. 2561 (KMK), 2017 WL 76903, at *5 (S.D.N.Y. Jan. 3, 2017) (applying long-standing "mandate rule," which "bars re-litigation of issues or claims that were resolved, explicitly or implicitly, on direct appeal"); *see also Burrell* v. *United States*, 467 F.3d 160, 165 (2d Cir. 2006) (discussing mandate rule). As noted above, Kergil argued on direct appeal that the indictment insufficiently alleged, and the proof was insufficient to establish, that he had the requisite *mens rea* for any of the crimes of which he was convicted. He and his co-defendants expressly, repeatedly, and aggressively argued at every stage of the litigation that the Government could show only a scheme to deceive and not a scheme to defraud. The Second Circuit considered all of these arguments carefully on appeal, and resoundingly rejected each one. *See Binday*, 804 F.3d at 576-77, 578-80, 581-82.

The mandate rule thus precludes collateral review of Kergil's claims. Even if it did not—that is, even if the Court could reach the merits of Kergil's arguments—his claims would have to be denied as meritless for the same reasons the Second Circuit (and this Court before it) found them meritless on direct review. In renewing his challenges to the sufficiency of the indictment and proof relating to "scheme to defraud," Kergil relies heavily on *United States* v. *Takhalov*, 827 F.3d 1307 (11th Cir. 2016), an Eleventh Circuit case that was decided after his conviction

became final.  But that case does not help Kergil.  In *Takhalov*, the court held that it was error for a district court to refuse to instruct the jury in a wire fraud case that it "must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay."  827 F.3d at 1310; *see id.* at 1323-24 (explaining that error was not harmless, and ordering retrial).  In concluding that the requested instruction was warranted on the facts of that case, the *Takhalov* court relied on the very same body of Second Circuit law that the Second Circuit itself relied on in affirming Kergil's convictions.  *See id.* at 1313-14.  And unlike the defendants in *Takhalov*, Kergil and his co-defendants *got the instruction* that the Eleventh Circuit held was warranted under Second Circuit law:

> "In order for the government to prove a scheme to defraud, it must prove that the scheme, if successful, would have created a discrepancy between what the insurance companies reasonably anticipated and what they actually received. If all the government proves is that under the scheme the insurance companies would enter into transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm, then the government will not have met its burden of proof."

*Binday*, 804 F.3d at 581 (quoting jury instruction).  *Takhalov*, in sum, breathes no new life into Kergil's claims but merely reaffirms the validity of this Court's jury instructions and the soundness of this Court's and the Second Circuit's reasoning in upholding Kergil's conviction.

## III.    KERGIL IS NOT ENTITLED TO RESENTENCING

Finally, the Court should reject Kergil's bid for resentencing pursuant to Section 3582(c)(2).[4]  The Guidelines amendments Kergil seeks to invoke—Amendments 794

---

[4] To the extent Kergil's motion for resentencing rests on the Court's purportedly erroneous calculation of his sentence in the first instance (*see* Mot. Resentencing at 12-16), it is foreclosed by the mandate rule.  As discussed above, the Second Circuit already considered and rejected Kergil's multi-pronged attack on his sentence, which involved claims of both substantive and procedural unreasonableness.

(addressing minor role adjustment) and 792 (addressing, among other things, intended loss assessment under U.S.S.G. § 2B1.1)[5]—do not have retroactive effect, and thus are not applicable to Kergil.  Even if they did have retroactive effect, they would afford Kergil no relief.

Section 3582(c)(2) allows a court to modify a sentence "when a defendant has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(2).  The Commission's policy statements are set forth in U.S.S.G. § 1B1.10 ("Section 1B1.10"), which makes plain that "a reduction in the defendant's term of imprisonment is not consistent with this policy statement and is not authorized under 18 U.S.C. § 3582(c)(2)" unless the amendment invoked is listed in subsection (d) of Section 1B1.10.  U.S.S.G. § 1B1.10(a)(2)(A).  Neither Amendment 792 nor Amendment 794 is listed in subsection (d).

Because the amendments Kergil invokes are not listed in subsection (d), they cannot supply a basis for a motion seeking a sentence reduction under Section 3582(c)(2).  *See United States* v. *Morales*, No. 11 Cr. 881 (DLC), 2016 WL 6426394, at *2 (S.D.N.Y. Oct. 27, 2016) (holding that district court lacks authority to reduce a sentence based on an amendment—in that case, Amendment 794—not listed in subsection (d) of Section 1B1.10); *United States* v. *Holcombe*, No. 14 Cr. 118 (DLC), 2016 WL 7742997, at *1 (S.D.N.Y. Dec. 19, 2016) (same); *United States* v. *Woodward*, No. Cr. 112-257 (JRH), 2016 WL 4084150, at *1 (S.D. Ga. Aug. 1, 2016) (denying Section 3582(c)(2) motion based on Amendment 792 because that amendment is

---

[5] Although Kergil claims to be invoking Amendment 791 (which simply adjusts the loss tables based on inflation), it is clear from his briefing that he is in fact seeking to invoke Amendment 792.  (*See* Mot. Resentencing at 4-10 (discussing Sentencing Commission's adoption of intended loss approach from *United States* v. *Manatau*, 647 F.3d 1048 (10th Cir. 2011), which is reflected in Amendment 792 rather than 791)).

not listed in subsection (d)); *Kandi* v. *United States*, No. CV16-5389 (RBL), 2016 WL 6395132, at *2 (W.D. Wash. Oct. 27, 2016) (same).  The case that Kergil cites to support retroactive application of the amendments he invokes, *United States* v. *Perez*, No. 08 Cr. 429 (DLC), 2016 WL 4775536 (S.D.N.Y. Sept. 14, 2016), does not alter the analysis.  There, Judge Cote asked the parties to brief whether Amendment 794 applied retroactively, and suggested some reasons why it might in fact have retroactive effect.  *Id.* at *2-3.  Upon further analysis—including of Section 1B1.10—and consideration of the parties' briefing, however, Judge Cote adopted her reasoning from *United States* v. *Morales*, 2016 WL 6426394, at *2, to hold that Amendment 794 did not have retroactive effect and therefore was of no avail to the petitioner in *Perez*.  *See United States* v. *Perez*, No. 08 Cr. 429 (DLC), 2016 WL 7742745, at *1 (S.D.N.Y. Dec. 19, 2016) ("The Guidelines Manual lists the amendments that the Sentencing Commission has decided shall be applied retroactively, and Amendment 794 is not listed.  Therefore, the Court has no authority to reduce Perez' sentencing under § 3582(c)(2).").  As Judge Cote further explained, a Ninth Circuit decision holding that Amendment 794 has retroactive effect to a case *on direct appeal* is inapplicable to cases on collateral review.  *See id.* (distinguishing *United States* v. *Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016)).

Finally, even if Kergil were able to invoke the amendments he cites, they would afford no basis for a sentence reduction in his case.  As for Amendment 794, Kergil's claim to entitlement to an adjustment for his purportedly "minimal" or "minor" role in the offense under the newly amended commentary to U.S.S.G. § 3B1.2 has no merit.  Kergil did not seek, nor could he plausibly have sought, any minor role adjustment at sentencing.  Among the facts that precluded such an adjustment, and instead warranted an aggravating role *enhancement* under U.S.S.G. § 3B1.1 (which the Court in fact applied), were:  Kergil's management and supervision of other

13

field agents in the conspiracy; the fact that he took a cut of field agents' commissions; his orchestration of the false financial statements supporting the fraudulent insurance applications; his recruitment of corrupt financial professionals and inspectors to manufacture false financials; his coaching of field agents, Straw Insureds, and other scheme participants to tell lies to Insurers; and his directive to two co-conspirator field agents to destroy evidence of the scheme when the FBI began investigating. These are the actions of a major participant, not a minimal or minor one, and nothing in Amendment 794 alters that.

Nor, relatedly, is there any truth to Kergil's assertion that he was simply a cog in co-defendant Binday's machine, who had "no proprietary interest in the criminal activity and . . . [wa]s simply being paid to perform certain tasks." U.S.S.G. § 3B1.2, cmt. n.3 (as amended). Kergil was integral to scheme, skimmed others' commissions, and personally profited to the tune of *nearly two million dollars* in death benefits paid out on two Straw Insureds' fraudulently procured policies. As the Government proved at trial, Kergil recruited one Straw Insured, Hanni Lennard, to the STOLI scheme, and managed with Binday's help to secure two $2 million policies on her life. (GX 1677, 1621, 1667). Kergil worked with Binday to coach Lennard to lie about her financials if approached by an Insurer. (GX 1687 (Kergil email to Binday confirming he had spoken with Lennard's daughter about making sure she did not speak to any insurer; Binday admonition that "[i]f she does speak to anyone, she should be consistent with the financials" Kergil had prepared); GX 1703 (false net worth and income worksheet)). When Lennard died, Kergil and Binday schemed to ensure that each got a massive cut of one Insurer's death benefit: with $343,000 going to Binday and over $1 million going to Kergil. (GX 1720; GX 1654; GX 1698; GX 2670 at 7, 11, 41, 45, 84 (withdrawal of $1 million and purchase of cashier's check in amount of $1,000,472.18); *id.* at 30 (statement showing check of $306,245.02

14

paid out); GX 2659-A at 302-03 (cashier's checks in amounts of $1,000,472.18 and $306,245.02 deposited into personal account Kergil held jointly with his mother); GX 2659 at 268 (deposit of $1.3 million into Kergil's personal account); GX 5004 (stipulation that on or about March 13, 2012, Kergil paid $343,143.59 for the benefit of Binday from the personal account he held with his mother)). Kergil then made $900,000 upon the death of another Straw Insured, Doris Riviere, after he, Binday, and a third person scrambled to "invest" in the fraudulently-procured policy on the eve of the insured's death. (*See* GX 2659 at 226; GX 2693 at 5, 6; GX 2671 at 1; Tr. 1156-59). Plainly, Kergil had a proprietary interest in the scheme. Amendment 794 therefore has no application.

Amendment 792 is no more helpful to Kergil. This Court did not sentence Kergil based on loss amount, and indeed specifically rejected an "intended loss" approach even to calculating the Guidelines in the first instance. Moreover, even if the Court had adopted an intended loss measure, its analysis no doubt would have comported with Amendment 792, which reflects adoption of the same "subjective" measure of intended loss that has long been standard in the Second Circuit and was in fact urged by the Government in this very case. *See* Amendment 792 (*citing United States* v. *Confredo*, 528 F.3d 143, 152 (2d Cir. 2008), as comporting with the amended commentary).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Kergil's motions for relief under Rule 60(b)(6) and his motion for resentencing pursuant to Section 3582(c)(2).

DATED:          February 8, 2017
                New York, New York


                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney


                        By: ___/s/_____
                              Sarah K. Eddy
                              Assistant U.S. Attorney
                              Southern District of New York
                              Tel. (212) 637-1033

16

**CERTIFICATE OF SERVICE**

I, Sarah K. Eddy, hereby certify that on February 8, 2017 I caused a true and correct copy

of this memorandum of law to be served on defendant James Kevin Kergil by U.S. mail at the

following address:

> James Kevin Kergil
> Reg. No. 66387-054
> FPC Canaan
> P.O. Box 200
> Waymart, PA  18472

                                        _____/s/_____
                                        Sarah K. Eddy
                                        Assistant U.S. Attorney