AO 243 (Rev. 01/15)                                                                                    Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
### SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District | Southern District of New York | |
|---|---|---|---|
| Name *(under which you were convicted)*: <br> James Kevin Kergil | | | Docket or Case No.: <br> 1:12-cr-00152 |
| Place of Confinement: <br> U.S.P. Canaan | | Prisoner No.: <br> 66387-054 | |
| UNITED STATES OF AMERICA | | Movant *(include name under which convicted)* | |
| | V. | Michael Binday | |

### MOTION

17CV 4675

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:

United States District Court for the Southern District of New York
500 Pearl St.
New York, NY 10007

(b) Criminal docket or case number (if you know):  1:12-cr-00152

2.  (a) Date of the judgment of conviction (if you know):  6/20/2016
(b) Date of sentencing:  7/31/2014

3.  Length of sentence:  108 months

4.  Nature of crime (all counts):

Conspiracy to Commit Mail & Wire Fraud
Mail Fraud
Wire Fraud
Conspiracy to Destroy Records and Obstruct Justice

5.  (a) What was your plea?  (Check one)
    (1) Not guilty [✓]          (2) Guilty [ ]          (3) Nolo contendere (no contest) [ ]

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have?  (Check one)   Jury [✓]   Judge only [ ]

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes [ ]   No [✓]

8.  Did you appeal from the judgment of conviction?   Yes [✓]   No [ ]

RECEIVED PRO SE OFFICE
2017 JUN 2 PM 2:26
SDNY

AO 243 (Rev. 01/15)                                                                      Page 3

9.   If you did appeal, answer the following:

(a) Name of court:   United States Court of Appeals for the Second Circuit

(b) Docket or case number (if you know):   14-2809-cr; 14-2832-cr,14-2873-cr

(c) Result:   Judgment Affirmed

(d) Date of result (if you know):   10/26/2015

(e) Citation to the case (if you know):

(f) Grounds raised:

(g) Did you file a petition for certiorari in the United States Supreme Court?     Yes [✓]     No [ ]

If "Yes," answer the following:

(1) Docket or case number (if you know):

(2) Result:   Petition Denied

(3) Date of result (if you know):   6/20/2016

(4) Citation to the case (if you know):   136 S.Ct. 2487

(5) Grounds raised:

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes [✓]     No [ ]

11.  If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:   Southern District of New York

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:   Motion for Reconsideration

(5) Grounds raised:   Sentencing Guidelines

AO 243 (Rev. 01/15)

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ✓

(7)  Result:  Pending

(8)  Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:




(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:        Yes ☐        No ☐

(2)  Second petition:    Yes ☐        No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:


12.  For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

AO 243 (Rev. 01/15)

**GROUND ONE:** The District Court Lacked Jurisdiction

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attached Memorandum of Law

(b) **Direct Appeal of Ground One:**

   (1)  If you appealed from the judgment of conviction, did you raise this issue?

      Yes ☐     No ☑

   (2)  If you did not raise this issue in your direct appeal, explain why:

   Must be raised in a 2255 Petition

(c) **Post-Conviction Proceedings:**

   (1)  Did you raise this issue in any post-conviction motion, petition, or application?

      Yes ☐     No ☑

   (2)  If you answer to Question (c)(1) is "Yes," state:

   Type of motion or petition: _____

   Name and location of the court where the motion or petition was filed:

   _____

   Docket or case number (if you know): _____

   Date of the court's decision: _____

   Result (attach a copy of the court's opinion or order, if available):

   (3)  Did you receive a hearing on your motion, petition, or application?

      Yes ☐     No ☐

   (4)  Did you appeal from the denial of your motion, petition, or application?

      Yes ☐     No ☐

   (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

      Yes ☐     No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND TWO:**   Ineffective Assistance of Counsel

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attached Memorandum of Law

(b)  **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☑

(2)   If you did not raise this issue in your direct appeal, explain why:

Must be raised in a 2255 Petition

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☑

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**    Sentence was based on Erroneous Calculation of Loss

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attached Memorandum of Law

(b) **Direct Appeal of Ground Three:**

    (1)   If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐      No ☑

    (2)   If you did not raise this issue in your direct appeal, explain why:

Ineffective Assistance of Counsel must be raised in a 2255 Petition

(c) **Post-Conviction Proceedings:**

    (1)   Did you raise this issue in any post-conviction motion, petition, or application?

          Yes ☐      No ☑

    (2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

    (3)   Did you receive a hearing on your motion, petition, or application?

          Yes ☐      No ☐

    (4)   Did you appeal from the denial of your motion, petition, or application?

          Yes ☐      No ☐

    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

          Yes ☐      No ☐

    (6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

AO 243 (Rev. 01/15)                                                                                      Page 9

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue:

---

**GROUND FOUR:**   Sentencing Guidelines Calculation was Incorrect

---

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attached Memorandum of Law

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☑

(2)   If you did not raise this issue in your direct appeal, explain why:

Ineffective Assistance of Counsel

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☑     No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  Motion to Reduce or Amend Sentence Pursuant to Section 3582

Name and location of the court where the motion or petition was filed:
Southern District of New York

Docket or case number (if you know):  1:12-cr-00152

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

Pending

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☑

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☑

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): 

Date of the court's decision: 

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.    Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Challenging the jurisdiction of the Court, challenging the Indictment, and claims of Ineffective Assistance of Counsel are best done in a Section 2255 Petition

14.    Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?        Yes ☑        No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

Southern District of New York, Docket 1:12-cr-00152. Motion to Reduce Sentence Pursuant to Section 3582

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a)  At the preliminary hearing:
Roger Stavis, Gallet Dryer & Berkey, LLP, 845 Third Avenue 5th Floor, New York NY 10022-6601

(b)  At the arraignment and plea:
same

(c)  At the trial:
same

(d)  At sentencing:
same

(e)  On appeal:
same

(f)  In any post-conviction proceeding:

(g)  On appeal from any ruling against you in a post-conviction proceeding:

16.  Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?   Yes ☑   No ☐

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes ☐   No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the other sentence: _____

(d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

Not Applicable

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –

(1)   the date on which the judgment of conviction became final;

(2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct
and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on
             (month, date, year).

Executed (signed) on _6/01/2017_ (date).

_James Kevin Vergil_
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not
signing this motion.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW YORK

_____

| | |
|---|---|
| JAMES KEVIN KERGIL ) | |
| Petitioner ) | |
| ) | |
| v. ) | CRIMINAL NO. 12-cr-00152-CM |
| ) | |
| UNITED STATES OF AMERICA ) | CIV NO. _____ |
| Respondent ) | |

_____

## MOTION TO VACATE CONVICTION AND REDUCE SENTENCE

### PRELIMINARY STATEMENT

I, James Kevin Kergil (hereinafter "Petitioner", Mr. Kergil, "I" or "me"), do herby submit this memorandum in support of my Petition to Vacate my Conviction and/or Correct or Reduce my Sentence pursuant to 28 U.S.C. §2255.

There can be no doubt that my indictment and conviction are the result of an unreasonable and unconstitutional expansion of the "right-to-control" theory of Mail & Wire Fraud. My indictment and conviction are also inconsistent with fundamental fairness, due process, and decisions in other Circuits such as _United States v. Weimert_, 819 F.3d 351 (7th Cir. 2016); _United States v. Takhalov_, 827 F.3d 1307 (11th Cir. 2016); _United States v. Sadler_, 750 F.3d 85 (6th Cir.2015); as well as notable Supreme Court decisions such as _Cleveland v. United States_, 531 U.S. 12 (2000); _Skilling v. United States_, 561 U.S. 358 (2010); _Sekhar v. United States_, 133 S. Ct. 2720 (2013); _Bond v. United States_, 134 S. Ct. 2077 (2014); _Yates v. United States_, 134 S. Ct. 2077 (2015); and most recently, _Honeycutt v. United States_, 581 U.S. ___ (2017), that was just decided on June 5, 2017 and clarifies what it means to "obtain" property under the federal statutes.

1

I am also a victim of prosecutorial overreach because the fraud statutes were not meant to protect intangible property that could not be "seized" by the defendant and "obtained" from the victim as described in *Skilling* as the "mirror image of fraud" where the victim's loss supplies the fraudster's gain. See *Skilling* at 400. In this case, the *Binday* investors provided over $70,000,000 in premiums to the allegedly defrauded carriers who sustained an alleged "loss" of only $32,000,000 in commissions and death benefits paid, which even the insurance company witnesses considered a cost of doing business rather than a loss. In reality, there was no loss at all in this case, and the government violated my constitutional rights by not allowing the concept of "no loss" to be analyzed – or even have the evidence presented to the jury. And if the premiums were allowed to come into evidence, my prison sentence would have been 12-24 months at most. See e.g. *United States v. Algahaim*, 842 F.3d 796, (2d Cir. 2016)

Because no one has ever been indicted (much less convicted and sentenced to nine years in prison) for the crime of "lying" on an insurance application, there is also a constitutional question of the prosecutorial overreaching in this case violating "the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed." See *United States v. Santos*, 553 U.S. 507, 514 (2008). This rule guards against "the risk of selective or arbitrary enforcement." See *United States v. Kozminski*, 487 U.S. 931, 952 (1988).

The Supreme Court's recent decision in *Honeycutt* concerning forfeitures and Section 853 clearly shows the violation of Due Process in my case and the undeniable miscarriage of justice. See *Honeycutt v. Unites States*, 581 U.S. ___ (2017). Not only does *Honeycutt* negate the forfeitures judgment in my case, it supplements and reinforces the definition of the word "obtain" as defined in *Skilling* and *Sekhar* to show that there was no "property" as defined in the

federal statutes and there was no "property" that could be "obtained" in its unanimous opinion in

*Honeycutt*:

> In addition to limiting forfeiture to tainted property, § 853(a) defines forfeitable property solely in terms of personal possession or use. This is most clear in the specific text of § 853(a)(1)—the provision under which the Government sought forfeiture in this case. Section 853(a)(1) limits forfeiture to property the defendant "obtained ... as the result of" the crime. At the time Congress enacted § 853(a)(1), the verb "obtain" was defined as "to come into possession of" or to "get or acquire." Random House Dictionary of the English Language 995 (1966); see also 7 Oxford English Dictionary 37 (1933) (defining "obtain" as "[t]o come into the possession or enjoyment of (something) by one's own effort, or by request; to procure or gain, as the result of purpose and effort"). That definition persists today. See Black's Law Dictionary 1247 (10th ed. 2014) (defining "obtain" as "[t]o bring into one's own possession; to procure, esp. through effort"); cf. *Sekhar v. United States*, 133 S.Ct. 2720, 2725, 186 L.Ed.2d 794 (2013) ("Obtaining property requires '... the acquisition of property' "). Neither the dictionary definition nor the common usage of the word "obtain" supports the conclusion that an individual "obtains" property that was acquired by someone else.

More importantly, the three cases that the government uses for support of the "right to control" theory of fraud and my conviction: *United States v. DiNome,* 86 F.d 277 (2d Cir. 1996) and *United States v. Rossomando,* 144 F.3d 197 (2d Cir. 1998) and *United States v. Carlo,* 507 F.3d 799 (2d Cir. 2007) actually support my innocence. This is dramatically illustrated in the Second Circuit's recent decision in *United States v. Finazzo,* 850 F.3d 94 (2d Cir. 2017). *Finazzo* makes clear that the Second Circuit's decision in *DiNome* did not do away with the "tangible harm" requirement of *United States v. Mittelstaedt,* 31 F.3d 1208 (2d Cir. 1994). Whereas *Rossomando* requires an "actual concrete" intent to harm, *Mittelstaedt* requires that the harm be something "tangible" like money or property not just "information" or the possibility of reputational damage caused by being involved with child labor or even Stranger Originated Life Insurance (STOLI).

It is also very significant that the Second Circuit found no mail or wire fraud in perhaps the largest fraud in American history in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016). Suffice it to say, if there was no mail and wire fraud in *Countrywide*, there was no mail and wire fraud in *Binday*.

Finally, Your Honor knows very well that I am a victim of the worst form of Ineffective Assistance from Counsel. Because of Mr. Binday's "shenanigans" and not paying his attorneys after the trial was over, no one filed any post-trial briefs on my behalf. I never heard the terms "Rule 29" or "Rule 33" until I came to the prison camp at FPC Canaan. Because Mr. Binday's attorneys were in charge of the case and my attorney followed their lead, no one even filed a motion for an extension of time to file a Rule 29 or Rule 33 post-trial motion on my behalf. That has to be clear cut legal malpractice and constitutionally Ineffective Assistance of Counsel that mandates vacating my conviction and ordering a new trial. In the alternative, Your Honor clearly has the power to order a reduction in my sentence to time served under this 2255 Petition or the 3582(c) Motion that I filed last year. In any event, the Indictment in my case was constitutionally infirm, this Court lacked jurisdiction because there was no Mail or Wire Fraud here because there was no "scheme to defraud" here, no viable "1341 or 1343 property" at issue here that could be "obtained", and the Court did not correctly analyze the "tangible harm" standard of *Mittelstaedt* as recently reaffirmed in *Finazzo*. For all of those reasons and for the reasons detailed below, I respectfully ask this Court to vacate my conviction or reduce my sentence to time served and to require the government to immediately respond to this Petition as quickly as the Court deems is reasonable.

## I.   MY TRIAL AND CONVICTION WERE FUNDAMENTALLY UNFAIR AND VIOLATED THE DUE PROCESS CLAUSE OF THE CONSTITUTION

Collateral review is available under Section 2255 where "the alleged error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *Reed v. Farley*, 512 U.S. 339, 348 (1994).   The Due Process Clause of the Constitution protects the accused from conviction except upon proof beyond a reasonable doubt of every material fact necessary to secure a conviction. *In Re Winship*, 397 U.S. 358, 364 (1970).  Therefore, to convict Mr. Kergil on a conspiracy theory of mail and wire fraud, it must prove beyond a reasonable doubt that Mr. Kergil contemplated and intended "actual concrete harm" to the insurance carriers that are the alleged victims in this case. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).  Not only did the government fail to prove a conspiracy or any intent to harm the carriers on the part of Mr. Kergil, the government failed at trial to explain how paying premiums to an insurance carrier could possibly be proof of a scheme to defraud or of an intent to harm the carriers or show contemplation of "actual concrete harm" as required within the Second Circuit. *See United States v. Regent Office*, 421 F.2d 1174 (2d Cir. 1970), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994), and *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007).

Furthermore, there is no case in any circuit that Mr. Kergil can find that explains how having the "deceiver" pay money to the "deceived" constitutes mail and wire fraud under any historical understanding or examples of fraud under the common law. In fact, when the government tried to preserve its conviction of someone who lied on a government license application, the Second Circuit called the government's arguments "patently absurd" and cited Judge Leonard Sands' dismissal of a mail and wire fraud indictment in *Evans* as the support for its decision. *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991), *citing United*

*States v. Evans*, <u>844 F.2d 36</u> (2d Cir. 1988). Mr. Kergil respectfully suggests to the Court that not only has the government failed to prove a scheme to defraud, it has not shown how paying millions of dollars in premiums to the carriers could possibly constitute a scheme to obtain "money or property" from the carriers. As the Second Circuit has succinctly stated:

> "…a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. *See Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. **2000**).

As the Second Circuit has said concerning conspiratorial agreements: "In order to convict a defendant of conspiracy, the government must prove both the existence of the conspiracy alleged and the defendant's membership in it beyond a reasonable doubt." *See, e.g., United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end. In order for a defendant to be convicted of a conspiracy, there must be proof beyond a reasonable doubt that the conspirators agreed on the essential nature of the plan." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). This, the government failed to do at Mr. Kergil's trial.

However, in order to prove a conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999). And, with regard to the "property" as the object of the fraud, the government was required "to prove that the defendants knowingly agreed to participate in a scheme that involved the misappropriation of [information] that they knew—based in part on the firms' conduct—constituted confidential information." *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012), reversing fraud convictions, and citing *United States v. Wallace*, 85 F.3d 1063, 1068

(2d Cir. 1996) (defining unlawful intent in conspiracies as "specific intent to achieve th[e] object [of the conspiracy]").

Not only was there no conspiracy proven in this case, the Court's own instructions to the Jury concerning Aiding and Abetting were erroneous and probably caused the Jury to convict Mr. Kergil because they misunderstood that if Mr. Binday was guilty, then Mr. Kergil had to be as well.  If the Court examines the Jury Instructions on pages 1586-1588 of the trial transcripts, the Court in effect tells the Jury to forget about Aiding and Abetting if they do not find that a third person committed the crime and to move on to the next issue.  But that is wrong and reversible constitutional error because assisting a third party in the commission of the crime is the essence of Aiding and Abetting.  If the answer is "no", the Court should have instructed the Jury that they must vote Not Guilty.  Instead, the Court told the Jury to go on to the next thing they had to decide, which is just more questions on Aiding and Abetting (lines 15-23).

Under *United States v. Scotti*, 47 F.3d 1237, 1246 (2d Cir. 1995), the verdict must be set aside because the jury may have reached its verdict based on legally inadequate jury instructions. See also *Yates v. United States*, 354 U.S. 298, 312 (1957), "The proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."

Here, by alleging Aiding and Abetting in the Indictment (18 USC 2), the government charged Mr. Kergil with mail and wire fraud: 1) as a principal under the substantive statutes; and 2) as an aider and abettor under 18 USC 2 which, if found guilty, is an alternate basis of criminal liability to thereby making Mr. Kergil a principal under the substantive statutes. On pages 1591-1596, the Court then proceeds to discuss the elements of Conspiracy.  Here the Court tells the Jury that in deciding whether the government has proven the existence of a conspiracy beyond a

reasonable doubt, "you may consider" whether the alleged co-conspirators did anything to carry out the apparent criminal purpose. This is clearly erroneous. The Jury should have been told that it must consider whether or not a co-conspirator committed one of the overt acts alleged in the Indictment with knowledge of an in furtherance of the agreement to do an unlawful act. This is an essential element of Conspiracy, and the Court erroneously instructed the Jury on this vital and critical element of a conspiracy charge to determine someone's guilt or innocence. Under the Fifth Amendment, a defendant is entitled to be tried under the allegations of the indictment; and therefore, missing an essential element in the instructions to the jury is a violation of Due Process and requires vacating a conviction.  See *United States v. Gallerani*, 68 F.3d 611 (2d Cir. 1995).

## II.   THE GOVERNMENT FAILED AT TRIAL TO PROVE ALL OF THE FACTS NECESSARY TO SECURE A MAIL AND WIRE FRAUD CONVICTION BEYOND A REASONABLE DOUBT

As Justice Harlan stated in his concurrence in *In Re Winship*, 397 U.S. 358 (1970):

"I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Id.* at 372.

At Mr. Kergil's trial, the government not only failed to prove each of the necessary elements of mail and wire fraud beyond a reasonable doubt, it failed to present the necessary facts to prove those elements at all.

Because the government just assumed that STOLI policies were an "evil" that the carriers wished to avoid rather than business that the carriers actually encouraged, they neglected to present at trial, much less prove beyond a reasonable doubt, the necessary facts to support the elements of mail and wire fraud that all must be proven beyond a reasonable doubt. To make this point, Mr. Kergil cannot do better than the Supreme Court did in *In Re Winship*, 397 U.S. 358 (1970), *quoting Speiser v. Randall*, 357 U.S. 513, 525-26 (1958):

The requirement of proof beyond a reasonable doubt plays a vital role in our criminal justice system for cogent reasons.  The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the indictment as well as any conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

There is always in litigation a margin of error, representing error in fact finding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of  persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.  Due process commands that no man shall lose his liberty unless the Government has borne the burden of convincing the factfinder of his guilt.  To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue. Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in

applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt **of every fact necessary to constitute the crime** with which he is charged. *Winship*, 397 U.S. at 364. (Emphasis added).

Mr. Kergil's Indictment claiming fraud also runs afoul of the unanimous Supreme Court decision in ***Skilling v. United States***, 561 U.S. 358 (2010), which reinterpreted the rules for mail and wire fraud after Congress reacted to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), by adding Section 1346 for honest services fraud. The allegations in Mr. Kergil's Indictment also do not fit with what the Supreme Court refers to as the "mirror image theory" of fraud that "the victim's loss of money or property suppl[ying] the defendant's gain," *Skilling* at 400. Indeed, though Mr. Kergil was originally indicted for mail and wire fraud, that was never proven beyond a reasonable doubt at trial, and the government's constructive amendment of the original indictment at trial made Mr. Kergil's case one of what he allegedly "did not tell the carriers" that the policies were actually funded by investors  so that the government's case at trial resembled the type of "scheme of nondisclosure" that *Skilling* held was "outside the bounds" of the fraud statutes. *Skilling* at 410.

In fact, the historical definition of fraud by the Supreme Court in *Skilling* requires a deprivation of property and occurs only when "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling* at 400, *citing United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987). Typically, for there to be fraud, there must be ***both*** a material misrepresentation ***and*** proof that the defendant intended to harm the victim. Mr.

Kergil did not deceive anyone, nor did he make any misrepresentations to anyone, material or otherwise, and the "property" allegedly obtained certainly did not end up in his pocket, and not only was he not aware of any conspiracy to defraud the carriers of any fraud being perpetrated on the carriers, he was the one that actually suffered from Binday's alleged fraud; not the carriers. Most importantly, no evidence was produced at trial to show that Mr. Kergil had the intent to harm anyone, much less the carriers by working with Binday who provided the carriers with $65 - 70 million in premiums. Therefore, no federal fraud or federal mail and wire fraud was properly alleged in his Indictment, or proven at his trial. At Mr. Kergil's trial, the government failed to prove beyond a reasonable doubt that there was any scheme to defraud the carriers of any money or property, and the government also failed to show any mailings or wires in furtherance of a scheme to defraud. Because the government failed to prove each of the elements of mail and wire fraud, when they must prove all of the elements beyond a reasonable doubt, Mr. Kergil is entitled to a judgment of acquittal on all of the Counts of the Superseding Indictment. "If the evidence at trial was insufficient to prove [an element of the crime] we must reverse and order the dismissal of that count." *Burks v. United States*, 437 U.S. 1, 18 (1978).

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that the elements of mail and wire fraud that must be alleged in an indictment and proven beyond a reasonable doubt are that the defendant(s):

(1)     Used either mail or wire communications **in the foreseeable furtherance**,
(2)     of a scheme to defraud,
(3)     involving a material deception,
(4)     with the intent to deprive another of,
(5)     either property or honest services.
*See Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, CRS Report R41931, July 21, 2011.

Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid. The reason the Charles Doyle report to Congress is so important, is that Congress was told in 2011 there were five elements that must be proven beyond a reasonable doubt to convict someone of mail and wire fraud. When the *Binday* defendants were indicted in February 2012, their indictment was based on the three elements of *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004):

> (1)     A scheme to defraud,
> (2)     to obtain money or property,
> (3)     using the mails or wires.

But, whether the Court uses the five elements of Charles Doyle's Report to Congress or the three elements of *Fountain*, the simple truth is the government failed to prove the facts necessary to support each and every element of mail and wire fraud beyond a reasonable doubt. Moreover, Mr. Kergil's Section 2255 Petition should be granted as to all Counts and his Indictment should be dismissed, because it failed to allege any **"knowledge"** on his part that he was **willfully** participating in a scheme to defraud or a conspiracy, nor was any crime or conspiracy proven at trial. One of the elements which has been considered **indispensable** to an indictment for any type of crime is **knowledge**; e.g., knowledge that a law was broken.  In *Pettibone v. United States*, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court in reversing their convictions stated:

> It seems clear that an indictment against a person...must charge a knowledge or notice, on the part of the accused....Unless that fact exists, the statutory offense cannot be committed...and without such knowledge or notice, the evil intent is lacking. *Id.* at 206-07.

This requirement of a direct and explicit allegation of knowledge of breaking the law in an indictment was reiterated in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), where the Supreme Court affirmed the position it had taken in the *Pettibone* case fifty years prior, stating:

Without the knowledge, the intent cannot exist….Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal….This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes. *Id.* at 711.

Moreover, as the Supreme Court has recently summarized in *Elonis v. United States,* 135 S. CT. 2001 (2015) by citing cases like *Liparota v. United States*, 471 U.S. 419 (1985) and *Morissette v. United States*, 342 U.S. 246 (1952), for there to be a crime in American Jurisprudence, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52.   There must be some "concurrence" between an evil thinking mind and an evil act to create a crime. *See Morissette* at 250.

There was no scheme to defraud any carrier proven at trial. No witness testified that any of the carriers were deprived of their "economic decision making", nor did anyone prove that Mr. Kergil lied to anyone or misrepresented anything to any carrier, much less interfered with a carrier's right to control its assets. Understandably, an argument can be made that the agents of the carriers each had a "scheme to deceive" the carriers, but even the most notable of the right to control asset/economic decision making cases, *United States v. DiNome*, 86 F.3d 277 (2d Cir. 1996) makes clear that even "deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to the ultimate value of the transaction." *Id.* at 284. In *DiNome*, the Second Circuit cited to *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), for the proposition that:

"To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction. *Mittelstaedt,* 31 F.3d at 1217 (citing *Carpenter,* 484 U.S. at 27)…. "However, the government must show 'that some actual harm or injury was *contemplated* by the schemer.'" *D'Amato,* 39 F.3d at 1257 (quoting *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2d Cir. 1970) (emphasis

in *Regent Office Supply*)). Thus, fraudulent intent is "[e]ssential to a scheme to defraud." *Id.*" *DiNome* at 283-84.

But, even deceitfully breaching a contract is not a crime; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g., United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), and *Regent Office*.

More importantly, there was no evidence adduced at trial or even any allegations by any witness at trial that Mr. Kergil **intended** that any of the Carriers to suffer any loss or "actual concrete" harm, which is the *sine qua non* of mail and wire fraud, and Mr. Kergil certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the pension plan so that the defendant's good faith was unimpaired despite the jury's verdict). Absolutely no one testified that Mr. Kergil ever intended to harm any carrier, or anyone else for that matter, nor did anyone testify to explain how paying premiums to an insurance carrier could possibly cause the insurance carrier any harm or deprive it of its economic decision-making.

Moreover, it is hornbook law that the knowledge of the agent is attributed to the principal as a matter of law, but especially in the world of life insurance applications. *See, e.g.*, the Supreme Court's decision in *Stipcich v. Metropolitan Life*, 277 U.S. 311 (1928), where revelations about the insured's health, given to the insurance carrier's agent were attributed to the carrier, proving that knowledge that the carrier's agent had, just as the agent's knowledge in *Stipcich* was attributed to Metropolitan Life. *See, also, Stockwell v. United States*, 80 U.S. 531 (1871) ("It is not seriously denied that in civil transactions a principal or a partnership is affected by the knowledge of the agent or copartner, and that the knowledge of the agent is in law attributed to his principal…").

14

### III.   THE SECOND CIRCUIT'S RECENT DECISION IN *COUNTRYWIDE* MANDATES VACATING MR. KERGIL'S CONVICTION

The Second Circuit's recent decision in *United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016), *reh'g denied*, 2016 U.S. App. LEXIS ___ (2d Cir. Aug. 22, 2016) ("*Countrywide*") totally eviscerates not only the government's theory of culpability in Mr. Kergil's case, but also the legal reasoning behind the jury instructions and Judge Lynch's opinion in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), on which Mr. Kergil's conviction was based. It would be fair to say that it is impossible for the *Binday* and *Countrywide* decisions to exist in the same universe, much less the same circuit. Ironically, the scholarly *Countrywide* decision traces the roots of federal mail and wire fraud back to the early days of the common law and the Supreme Court's decision in *Durland v. United States*, 161 U.S. 306 (1896), but cites to *Binday* for the "common" elements of mail and wire fraud in the Second Circuit:

1) A Scheme to defraud
2) To obtain money or property
3) By using the mails and wires in furtherance of the scheme to defraud

*Countrywide* 822 F.3d at 657, *citing Binday* at 569.

The bedrock of these elements is the "scheme to defraud," which further requires proof that the defendant had the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation or omission of a "material fact." *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion." *Countrywide* at 657. Even a cursory reading of *Countrywide* shows that there was no scheme to defraud that Mr. Kergil was a party to.

15

The Second Circuit posited the central issue in *Countrywide* as what is fraud in a contract and illustrated the fundamental difference between a mere breach of contract and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide*, 822 F.3d at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion for reconsideration may be based on an intervening change in the law or in this case a Rule 29 motion for a judgment of acquittal. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract.

In *Countrywide,* the Second Circuit concluded that a "scheme to defraud" requires proof of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is no intent not to perform one's obligations under the contract at the time of executing the same, a subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the mail or wire fraud statutes. The legal standard in *Countrywide* was only by a "preponderance of the evidence", whereas in Mr. Kergil's case it was beyond a reasonable doubt.

Citing *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991), and *Durland*, 161 U.S. at 313, the court buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide*, 822 F.3d at 662. Moreover, the scheme to defraud must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation

16

must know that he or she is lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on it or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.* In Mr. Kergil's case, not only did he not lie to any of the carriers, he was not even a party to the contracts at the heart of this case: the insurance applications of the insurance policies issued by the carriers to the individual life insurance trusts controlled by Mr. Binday.

The Second Circuit further emphasized that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that **intention not to perform on the promise when it was made**. *Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the mail and wire fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661–62.

Turning to the evidence presented against Countrywide and its executives, the Second Circuit noted that at trial the government only contended that the defendants had made affirmative misrepresentations. *Id.* at 663. Thus, the court looked to the language of the contracts and noted that the government identified no statements other than those contained in the contracts as affirmative misrepresentations. *Id.* at 663–64. The court then held that the representations complained of were made on the date of contract execution. *Id.* at 665. However, the government failed to present evidence that Countrywide had intent not to provide investment

quality mortgages at the time the contracts were signed. Therefore, there was no "scheme to defraud." *Id.* at 663–66.

The mere fact that Countrywide delivered loans to the Government Sponsored Entities (GSEs) FNMA and FHLML, knowing that the loans were not investment quality, was insufficient. *Id.* at 665–66. In fact, the Second Circuit noted that the government "identified no representations or statements other than those contained in the contracts" to support the fraud claims. *Id.* at 664. Therefore, the jury had a legally insufficient basis to conclude that a misrepresentation was allegedly made with contemporaneous fraudulent intent. *Id.* at 666. For that reason, the Second Circuit reversed the judgment against Countrywide and its CFO, Rebecca Mairone, despite the fact that the fraud at Countrywide was both rampant and notorious. Whereas in *Countrywide* there were thousands of fraudulent loans sold to the government, at Mr. Kergil's trial there was not a single life insurance application processed by Mr. Kergil or that had his name on it.

The essential crime found by the jury in *Countrywide* was a mail and wire fraud scheme to induce Fannie and Freddie to purchase risky mortgage loans originated through the "High Speed Swim Lane" ("HSSL" or "Hustle") program by misrepresenting that the loans were of higher quality than they actually were. This is virtually identical to the government alleging here that the scheme was for Mr. Kergil, in an alleged conspiracy with others, was inducing the Carriers to issue insurance policies based on allegedly false misrepresentations, none of which were made by Mr. Kergil.  The Hustle program implemented this scheme by transferring primary responsibility for approving loans from quality-focused underwriters to volume-focused loan specialists, eliminating quality-control, and reducing the turn-around time for loan funding from 45 days to 15 days.

The district court observed that the financial motive for the fraud was that the *Countrywide* defendants "managed to unload a vast portfolio of risky assets on unwitting buyers and were thereby able to reduce the risk on their own balance sheet at a crucial moment in time." *United States v. Countrywide*, 33 F. Supp. 3d 494, 501, n.9 (S.D.N.Y. 2014). The district court also noted that "if the victims had known that the defendants were lying to them about the quality of the loans produced by the HSSL process, they would never have purchased any of the loans so generated, or parted with any of their money." *Id.* at 502. This is essentially the government's rationale for fraud in Mr. Kergil's case, i.e. that the carriers never would have issued the policies to the Binday-controlled trusts without the alleged "*Shellef*-like" misrepresentations related to the quality of the policies by the agents and brokers.

The court in *Countrywide* calculated the total penalty at almost $3 billion but, after applying one mitigating factor urged by Countrywide, settled on a penalty of $1.27 billion. The district court rejected all of Countrywide's arguments because the evidence proved convincingly that the defendants were fully prepared to jettison reasonable steps to assure loan quality in favor of volume, speed, and profits—and even lied to Fannie and Freddie. In an email, a Countrywide executive admitted lying to Freddie "to conceal the awful quality" of certain loans. *Id.* at 503, n.11. In stark contrast to *Countrywide*, the government must concede that Mr. Kergil did not fill out any applications in this case or lie to anyone, and no evidence of such conduct by Mr. Kergil was presented at trial. Even when Countrywide's own internal quality reports evidenced rapidly deteriorating loan quality, "the defendants shunted critics and criticisms aside, doubled down on their risky behavior, and applied ever more pressure on loan specialists to ignore loan quality concerns." *Id.* at 503.

On appeal, the *Countrywide* defendants argued that the evidence at trial showed at most

an intentional breach of contract—*i.e.*, that they sold mortgages that they knew were not of the quality promised in their contracts—and this was insufficient as a matter of law to constitute mail and wire fraud.  The Second Circuit agreed, concluding that the evidence failed to demonstrate the contemporaneous fraudulent intent necessary to prove a scheme to defraud through contractual promises. *Countrywide* at 662.

The Second Circuit first reviewed the trial evidence in detail and found that, pursuant to contracts with Fannie Mae, Countrywide as the seller of mortgages represented that "as of the date [of] transfer," the mortgages sold would be an "Acceptable Investment" (defined as not suffering any defects that would affect the mortgages' value or marketability).  Similarly, Freddie Mac's selling guide contained a representation by the seller—again, Countrywide—that "all Mortgages sold to Freddie have the characteristics of an investment quality mortgage." The government's theory was that Countrywide sold loans to Fannie and Freddie under these purchase agreements while knowing that the loans were not investment quality, thus intending to defraud them. However, the government adduced no evidence and made no claim that Countrywide had fraudulent intent during the negotiation or execution of these contracts. *Countrywide*, 822 F.3d at 653.

Certain key individuals at Countrywide (including Mairone) were informed of the poor quality of the Hustle loans by various Countrywide employees, but nonetheless sold them to Fannie and Freddie anyway.  The government summarized the evidence showing that these key individuals at Countrywide "knew of the pre-existing contractual representations, knew that the loans originated through HSSL were not consistent with those representations, and nonetheless sold HSSL loans to [Fannie and Freddie] pursuant to those contracts." *Id*. at 655.

The *Countrywide* defendants argued that—because the only representations involved in

the case were contained within contracts with Fannie and Freddie—to demonstrate fraud, rather than a simple breach of contract, under the common law and federal statutes, the government had to prove that defendants never intended to perform those contracts—*i.e.*, at the time of contract execution, defendants knew and intended that they would not perform their future obligations thereunder. *Id.* at 656-57. Similarly here, because the only alleged misrepresentations involved in this case were contained within the insurance applications provided to the carriers—to demonstrate fraud, rather than a simple breach of contract, under the common law and federal statutes, the issue is whether the government has presented sufficient evidence at trial that the people associated with the Binday-controlled trusts never intended to perform on their "contracts"—*i.e.*, insurance policies, at the time of contract execution. As the Second Circuit posed the question in *Countrywide*: "What is required to prove a scheme to defraud when the alleged misrepresentations are contained within a contract?" *Id.* at 658.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland v. United States*, 161 U.S. 306 (1896) and related cases, along with the history of the Common Law and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time. . . .* where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide*, 822 F.3d at 658 (emphasis in original). The Second Circuit also relied on and cited on more than one occasion the case of *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791-92 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation."

*Countrywide*, 822 F.3d at 660. The Second Circuit also quotes the First Circuit in *Sanchez v.*

*Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007) in saying:

> A defendant's failure to disclose information, without more, cannot make out a violation
> of the mail and wire fraud statutes. *See, e.g., Am. United Life Ins. Co. v. Martinez*, 480
> F.3d 1043, 1065, (11th Cir.2007); *United States v. Gray*, 405 F.3d 227, 235–36 (4th
> Cir.2005); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir.2000)....We nevertheless
> observed that "[i]t would be a truly revolutionary change to make a criminal out of every
> salesman (assuming the use of the mails or telephone) who did not take the initiative to
> reveal negative information about the product and who—a jury might find—secretly
> harbored in his heart the hope that the buyer would never ask."

The Second Circuit began its opinion by noting that the government must prove a

"scheme to defraud" affecting a federally insured financial institution in violation of the mail or

wire fraud statutes. The court noted that the central question was whether Countrywide engaged

in a scheme to defraud. *Id.* at 657. To do so, the court looked to common law to see how it

treated fraud in the context of contractual breach and noted "that a representation is fraudulent

only if made with the contemporaneous intent to defraud." *Id.* at 658. Thus, to sustain the

verdict, the government needed to prove that a promise was made which Countrywide *never*

intended to fulfill. *Id.* at 658–59. As the Second Circuit explained, a contractual breach alone is

not fraud, because a breach of contract is not an affirmative misrepresentation or omission to the

counterparty. *Id.* The Second Circuit then summarized its holding as follows: "a contractual

promise can only support a claim for fraud upon proof of fraudulent intent not to perform the

promise at the time of contract execution.   Absent such proof, a subsequent breach of that

promise—even where willful and intentional—cannot in itself transform the promise into a

fraud." *Id.* at 662.  Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle
> incorporated into the federal mail and wire fraud statutes.  Applying these principles to a
> fraud claim based on the breach of a contractual promise, we conclude that the proper
> time for identifying fraudulent intent is contemporaneous with the making of the promise,
> not when a victim relies on the promise or is injured by it.  *Only if a contractual promise*

*is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* (emphasis added).

Applying these principles, the Second Circuit concluded that the government's proof at trial failed to meet its burden (using a preponderance of the evidence standard) of proving violations of the mail and wire fraud statutes.   Even though Countrywide made blatant affirmative misrepresentations and intentionally sold non-investment quality mortgages to Fannie and Freddie over the course of their contractual relationship, Countrywide intended to sell investment quality mortgages *at the time the contracts were executed.*   Thus, while Countrywide's post-execution conduct constituted an intentional breach of contract, it did not rise to the level of mail and wire fraud.   The government never argued—much less proved at trial—that the contractual representations at issue were executed with contemporaneous intent never to perform, and the trial record contained no evidence that the key individuals involved had such fraudulent intent in the contract negotiation or execution.   "Instead, the government's proof shows only post-contractual intentional breach of the representations.   Accordingly, the jury had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with contemporaneous fraudulent intent."   *Id.* at 667.   Because the mail and wire fraud statutes require such proof, the Second Circuit held that the government had not proven the requisite violations under the mail and wire fraud statutes necessary to sustain an award of penalties under FIRREA.

Application of *Countrywide* to this case is straightforward and warrants vacating Mr. Kergil's conviction on all counts of the Indictment. If there is a contract involved as there was in Mr. Kergil's case, then the only way fraud can be shown in a contractual relationship is if the alleged fraudster had no intention of keeping his part of the bargain at the time of executing the contract, or signing of the insurance application. In Mr. Kergil's case, it is beyond peradventure

that he was not a party to the insurance contracts in this case, he did not lie to anyone about anything, and a Binday-controlled trust was the owner of each policy and Mr. Binday or his investors intended to pay each and every premium on each policy until the day the insured died. There is nothing in the Indictment nor any evidence adduced at trial that Mr. Binday did not intend to pay the premiums on the policies using investor money until the insured died.  In fact, it was a part of the alleged "scheme" to use investor money to pay the premiums for the otherwise alleged "indigent" insureds and somehow Mr. Binday or his investors would take control of the probably worthless policies to sell them on the open market or to reap the death benefit. This underlying theory by the government is patently absurd and was not addressed, much less proven at trial beyond a reasonable doubt. Nowhere was it alleged that Mr. Kergil lied about the truly "material" representations of the insurance contract which are Age, Gender and Health of the Insured. But, more importantly, the essential part of the insurance contract bargain is that the insured or a premium-payor for the insured (i.e. the Binday Investors) pays the premium until death, and upon the death of the insured, the carrier pays the agreed upon death benefit. If the premium-payor ceases to pay the premium, the policy lapses and there is no fraud based on any alleged misrepresentations made on the insurance application. Once again, Mr. Kergil did not fill out or sign any of those applications, nor was he a party to any contract with any of the carriers and Mr. Binday controlled the trusts, the money, and received all of the commissions from the carrier.  Mr. Kergil did not receive even a penny in commissions from the alleged victims.  Once again this does not meet the "mirror image" of fraud.  See *Skilling* at 400.

The reason that this is important for Mr. Kergil in this case, is that the jury in *Binday* was only told that it is possible to defraud someone by interfering with their "right to control their assets" or "deprive them of their economic decision making." Nowhere in the scholarly history

of the mail and wire fraud statutes in *Countrywide* are the words "deprived of the ability to make an informed economic decisions about what to do with money or property" or the "right to control" assets. See *Binday* jury instructions at 28, for the "right to control" assets theory mentioned: "We refer to that as being deprived of the right to control money or property." But, in the jury instructions in *Binday*, the "right to control assets" was both the "property" obtained as well as the "scheme to defraud." That is why the decision in *Countrywide* wholly undercuts the theory of fraud in *Binday*, because both *Binday* and *Countrywide* are based on contracts and the words "right to control assets" and "deprived of economic decision making" are nowhere to be found in *Countrywide*, which is based on billions of dollars of knowingly fraudulent mortgage applications.

Based on the *Countrywide* decision, there was no evidence adduced at trial or even suggested that Mr. Kergil did not intend to perform on the contract because he did not prepare or even sign the application or the contract, or have a contract with any of the carriers. More importantly, no evidence was presented at trial that the Binday-controlled trusts as the contract holders intended to not pay the premiums, which is the essential element of the insurance bargain. Mr. Kergil was not a party to the contract as Countrywide was in *Countrywide*, and Mr. Kergil was not the agent that recruited straw insureds and lied on the applications as Binday did in *Binday*. Mr. Kergil had no duty to disclose anything to the carriers as he was not an agent and he did not fill out or sign any of the applications here, nor was he a "boss" of any of the agents and brokers here as Mairone was in *Countrywide*. No evidence was produced at trial showing that Mr. Kergil lied to anyone. If Mairone and Countrywide were not responsible for the lies told by their employees in *Countrywide*, Mr. Kergil cannot possibly be responsible for alleged misrepresentations made by agents of the carriers that he never met.

If the "right to control assets" theory has any application, it would be in filling out a complete and honest mortgage application. If someone lies about their income, wealth, or the value of their home on a mortgage application, they literally are stealing money from the bank, but when someone lies on an insurance application other than about Age, Gender, and Health, they are merely "deceiving" the carrier into issuing a policy that they might not normally issue. Countrywide had thousands of fraudulent mortgage applications that cost taxpayers billions of dollars, and yet no one was indicted at Countrywide and the Second Circuit does not even mention the words "right to control assets" or "deprived of economic decision making" in describing the history of mail and wire fraud in America and the Second Circuit.

The Second Circuit in *Countrywide* also observed that the only representations alleged to be false were the contractual guarantees of mortgage quality and the government did not prove, or even attempt to prove, that Countrywide did not intend to perform its promise at the time it executed the contracts. The same reasoning applies here. In this case, the government likewise failed to offer any proof that the contractual representations at issue were made with contemporaneous intent not to perform or that anyone later made other misrepresentations not contained in the contracts as to which fraudulent intent could be found. Therefore, just as the Second Circuit found no mail and wire fraud in *Countrywide*, so too should this Court grant Mr. Kergil's 2255 Petition and vacate his conviction.

**IV.    THERE WAS NO SCHEME TO DEFRAUD PROVEN AT MR. KERGIL'S TRIAL**

In a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive", so as to satisfy that requirement under the Federal mail and wire fraud statutes. See ***United States v. Takhalov***, 827 F.3d 1307 (**11th** Cir. 2016). If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then the government failed to allege a scheme to defraud much less prove it beyond a reasonable doubt at Mr. Kergil's trial, and therefore the Court should vacate Mr. Kergil's conviction on all counts.

To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

Unlike the Parable of the Deceitful Neighbor, nowhere at trial did the government allege, much less prove, that Mr. Kergil lied to anyone or filled out any of the allegedly false insurance applications. Not only was there no scheme to defraud in Mr. Kergil's case, there was not even a

scheme to deceive as described in *Takhalov* by referring to the standards of mail and wire fraud in the Second Circuit. Even deceitfully breaching a contract is not a crime per se; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g., United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited in *Takhalov* by the Eleventh Circuit describing the law of mail and wire fraud in the Second Circuit. If the alleged deceit merely and solely causes the victim to enter into a contract that they would not normally enter, that is merely a "scheme to deceive" and not an illegal scheme to defraud. *Takhalov* at 1314, citing *Shellef* at 108, and *Starr* at 98.

Mr. Kergil's indictment is filled with speculation about how STOLI policies might affect insurance carriers, speculation by the government that is not just specious, but has been proven false in numerous civil lawsuits and was clearly not proven at trial. There was no specific claim of actual fraud, or allegations that Mr. Kergil intended any of the Carriers to suffer any "actual concrete" harm, which is the *sine qua non* of mail and wire fraud, and Mr. Kergil certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See, also, the dispositive quote from *Takhalov* about harm:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*. *Takhalov* at 1313.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation

of the law in that: "a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive", but not one *to defraud*. (Emphasis in original) See *Takhalov* at 1313-14. Even assuming the worst about Mr. Kergil's alleged co-conspirators, they merely wanted to "deceive" the carriers into issuing the policy they might not have issued had they known the alleged true facts. But, even that was not proven at trial, because no one proved that the Binday-controlled Trust was not a bona fide welfare benefit trust.

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit distinguishes between a high-end rare premium bourbon whisky and a cheap bar brand. The fact that the bar-girl secretly worked for the bar does not matter because the businessman got what he bargained for; which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if the bar substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that may be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the deceitful neighbor gave her a real dollar for the four quarters was merely a scheme to deceive, but in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used the phone to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit.

To be a "scheme to defraud" the schemer must also make a misrepresentation that is "material" or essential to the very nature of the bargain. This is important to Mr. Kergil's case because the *Binday* scheme, upon which his indictment was based on, was merely a scheme to deceive in that any misrepresentations were merely to induce the insurance carriers to issue the policies. In Mr. Kergil's case, there was no proof at trial that Mr. Kergil lied or deceived anyone.

There were no allegations in Mr. Kergil's indictment or evidence produced at trial that any broker lied about the essential elements of the insurance bargain, which are age, gender, and health. In describing and adopting the law of the Second Circuit, the difference between a "scheme to deceive" and a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, the Eleventh Circuit stated the following:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef*, 507 F.3d at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury

nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at 1314-15, citing *Shellef*, 507 F.3d at 108.

This statement by the Eleventh Circuit conforms to other case law emanating from the Circuit that without the "intent to harm" there can be no scheme to defraud.  See *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to prove that the defendant actually intended and contemplated "concrete harm" to the pension fund). Therefore, based on the Eleventh Circuit's description of the law of mail and wire fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that the scheme in *Binday* was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder* and ***Skilling v. United States***, 561 U.S. 358 (2010).

More importantly, the Second Circuit's Opinion in *Binday* suggests that this was a victimless crime, by failing to even mention any "tangible harm" or criminal *mens rea* or the "specific intent to defraud" or cheat the carriers with **"material"** misrepresentations that were "essential" to the bargain," the Second Circuit actually proved in its own Opinion that Mr. Kergil was not guilty of any crime and should not have been indicted and tried in the first place.

See for example, the Second Circuit's recent decision in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), where the Court goes to great length to explain that the "tangible harm" requirement of *U.S. v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) was not undone or even called into question by its holding in *DiNome*.  See *United States v. DiNome*, 86 F.3d 277 (2d Cir. 1996).  The Second Circuit  in describing a hypothetical scenario of a supplier lying to a clothing retailer about its identity because it used child labor might implicate the "right to control" theory, but would still not be criminal fraud because there was no "tangible harm" to the retailer:

Consider, instead, a situation in which the supplier is known to use child labor and misrepresents its identity to conceal that fact from the retailer, who has pledged not to transact with the supplier in order to avoid angering its customers. The "right to control" theory may be implicated if the Government can prove that the reputational harm to the retailer caused by the misrepresentation could lead or did lead to economic losses. However, what if the supplier misrepresents its identity merely because the retailer's board of directors has agreed not to transact business with the supplier due to inter-personal animus? In that situation, the Government would likely be able to easily prove that the supplier's misrepresentation affected the retailer's decision making on how to use it assets. However, since the misrepresentation does not seem to implicate "tangible economic" harm to the retailer, the "right to control" theory would not be applicable. *Finazzo* at 118.

The scenario described above in Finazzo is exactly the same as is in this case. Whereas "STOLI-type" policies might be just as distasteful to the carriers, as child-labor might be to a board of directors in the apparel industry, the truth is the economics is exactly the same between a "STOLI" policy and an estate planning policy. Moreover, recent lawsuits and crack downs on carriers by state regulators show that the carriers including Prudential and Lincoln actually welcomed and encouraged the STOLI business, which has since become even more profitable than estate planning policies because STOLI polices lapse much faster than do polices purchased by rich people for the benefit of their family trusts and future generations. With STOLI, the premium rates are the same, the commissions are the same, the life expectancy risk is the same and the profit potential with STOLI is far greater for the carrier. So there is no "tangible harm" as described in *Finazzo*.

In vacating a bank fraud conviction, the Supreme Court discussed the right to control theory of fraud and confirmed that no actual loss by the victim was necessary to secure a conviction, but there had to be an actual intent to harm the bank even though the fraud or theft was against the bank's customers, not the bank. See *Shaw v. United States*, 137 S. CT. 462, 476 (2016). Similarly, both *Rossomando* and *DiNome* required some form of contemplation of actual

32

harm by the depriving the alleged victim of "potentially valuable economic information." See *DiNome* at 283.

Therefore, by ignoring the Second Court's precedents in *Regent Office, Starr, D'Amato, Mittelstaedt,* and even *Rossomando* requiring an intended objective and calculable "tangible harm" to the alleged victims, the jury's verdict is clearly erroneous as a matter of law. The key question from this Court to decide is not if some potential alleged "co-conspirator" made a misrepresentation on an application, but rather whether that alleged misrepresentation was **material** and essential to the bargain and if there was any "concrete" harm intended to the carriers. Since there is no difference in the commission rate to the agent or the life expectancy of an insured caused by whether the policy is STOLI or an estate planning policy, the lies told by the agents to their carriers cannot possible be **material** and cannot be held against Mr. Kergil as a matter of law in a Mail and Wire Fraud prosecution.

Similarly, in *DiNome* where the only thing that the government could pin on the defendant was that he lied to a bank on his mortgage application about his amount of income and his employment, which is what led Judge Oakes to suggest the "government was overreaching in prosecuting the case in the first place," even the majority in *DiNome* concluded that the "government must show that some actual harm or injury was contemplated by the scheme. Thus, fraudulent intent is essential to a scheme to defraud." See *DiNome* at 283 citing *D'Amato* at 1257 (quoting *United States v. Regent Office Supply Co.*, 421 F. 2d 1174, 1180 (2d Cir. 1970).

But the Second Circuit in *DiNome* goes even further by citing *Mittelstaedt* where the defendant not only misappropriated information from a Long Island Village, he then used confederates to bid on the project concealing from the village his economic interest in the transaction. In reversing *Mittelstaedt* conviction, the Second Court concluded that the only

impact the missing information would have had is on who would get the bid and where the money would be spent, and "without more, is not a **tangible harm** and therefore does not constitute a deprivation of Section 1341 property." *U.S. v. DiNome* at 283, quoting *Mittelstaedt* at 1217.

Therefore, because the jury was not informed of the difference between a "scheme to deceive" as opposed to a "scheme to defraud" as required by *Starr* and *Shellef* and as described recently in *United States v. Takhalov*, 827 F. 3d 1307 (11th Cir. 2016), and does not even mention the concept of "tangible harm" or that "intended harm" to the victim is the key to fraudulent intent as required by *D'Amato* and *Regent Office*, or even explain the requirement of "tangible harm: as cited most recently in *Finazzo* and as explained in *Mittelstaedt* and *DiNome* one must conclude that the jury instructions constitute reversible error as a matter of law as there was no fraudulent intent on the part of Mr. Kergil to "harm" anyone or "obtain any 1341 or 1343 property" from the carriers.

## V.   THE GOVERNMENT FAILED TO DISPROVE MR. KERGIL'S GOOD FAITH

It is axiomatic that good faith is a complete defense to a charge of mail and wire fraud, and that the prosecution bears the burden of disproving good faith beyond a reasonable doubt. *United States v. Alkins,* 925 F.2d 541 (2d Cir. 1991). As the Second Circuit has held: "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to [commit mail fraud]." *United States v. Daugerdas*, 837 F.3d 212, 221 (2d Cir. 2016), *citing Alkins*, 925 F.2d at 550. The good faith defense that the Second Circuit has approved focuses on (1) "a good faith, unconflicted decision may not be second-guessed by the

government or by the courts", *United States v. D'Amato,* 39 F.3d 1249, 1258 (2d Cir. 1994), or (2) on a defendant's "honest belief in the truth of ...representations made..., however inaccurate the statement may turn out to be." *Alkins,* 925 F.2d at 550. The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan. "[T]he focus of the good faith defense is on the representations made by the defendant, and on the intent with which he made them." *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997).

A defendant can assert a good faith defense to a mail or wire fraud charge at any time because the question of intent is of paramount importance and therefore a good faith defense provides a complete defense to a charge of mail and wire fraud. *See Coleman v. United States*, 167 F.2d 837, 839 (5th Cir. 1948). *See, also, United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (holding that a good faith defense is an appropriate defense); and *United States v. Wall*, 130 F.3d 739, 746 (6th Cir. 1997) (holding that since mail fraud is a specific intent crime, a good faith defense is a complete defense to mail and wire fraud).   As stated in the Second Circuit's decision in *Rossomando*, absent the intent to defraud, there is no crime. See *Rossomando* at 201. Therefore, a good faith defense is directly related to the *mens rea* element of crimes involving fraud. *See, e.g., United States v. Grissom*, 44 F.33d 1507, 1512 (10th Cir. 1995) (holding that "good faith" negates the requisite element of intent); *United States v. Hohn*, 963 F.2d 380 (9th Cir. 1992) (holding that good faith belief in truth negates intent to defraud); and *United States v. Somerstein*, 971 F. Supp. 736, 741 (E.D.N.Y. 1997) (stating that good faith defense is a complete defense to mail fraud).

As the Second Circuit described in *Alkins*, good faith is a complete defense to a mail fraud charge, *citing United States v. Bronston*, 658 F.2d 920, 931 (2d Cir.1981), *550 *cert. denied*, 456 U.S. 915 (1982).

> "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud. The government must prove lack of good faith beyond a reasonable doubt. *Id*. In the instant case, the district court instructed the jury as follows:
>
> Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of fraud. A defendant has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.
>
> Under the anti-fraud statutes, even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, still it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be." *Bronston* at 931.

The Second Circuit's Opinion in Mr. Kergil's case does not mention the words "good faith" anywhere. In fact, the Court probably does not mention the words "good faith" in its Opinion because nowhere during the trial did the prosecution address Mr. Kergil's good faith, much less disprove it beyond a reasonable doubt. Just as the Second Circuit has required an actual intent to do "concrete harm" to the alleged victim, *see, e.g., Rossomando*, and *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)(holding that an intent to harm has to have been contemplated); a good faith defense provides a complete defense for the defendant because mail and wire fraud are specific intent crimes, and if the criminal intent or *mens rea* is negated by the defendant's good faith, there can be no crime under American jurisprudence.

By having the Court consider Mr. Kergil's good faith belief that he was not committing a crime or participating in any type of conspiracy to do something illegal or prohibited by statute, it is consistent with holding the government to a strict standard of proving criminal intent beyond a

reasonable doubt.  The good faith defense forces the government to prove not only criminal intent, but that the defendant lacked any good faith. The defendant is under no burden to prove his good faith. Instead, the government has the burden of disproving the defendant's good faith, and this the government failed to do at trial.  Nowhere does the government attack Mr. Kergil's good faith in the Trial Transcript and the words "good faith" are nowhere to be found in the Second Circuit's Opinion.

## VI.   MR. KERGIL DID NOT RECEIVE FAIR WARNING OR FAIR NOTICE THAT HIS CONDUCT VIOLATED ANY LAW AS REQUIRED BY THE CONSTITUTION

"It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Cole* v. *Arkansas,* 333 U.S. 196, 201 (1948). Petitioner's conviction cannot, therefore, be allowed to stand." *Rabe v. Washington*, 405 U.S. 313, 315 (1972).

See, also, *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005): "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *quoting United States v. Harriss*, 347 U.S. 612, 617 (1954). "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. As the Court recognized in *Pierce* v. *United States,* 314 U.S. 306, 311 (1941), judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

In *United States v. Marks*, 430 U.S. 188 (1977), the Supreme Court required the reversal

of convictions based on an unexpected construction and judicial expansion of the state trespass

statute by relying on its decision in *Bouie*, 378 U.S. at 353-54:

> "Indeed, an unforeseeable judicial enlargement of a criminal statute, applied
> retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the
> Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that
> makes an action done before the passing of the law, and which was *innocent* when done,
> criminal; and punishes such action,' or 'that *aggravates* a *crime,* or makes it *greater* than
> it was, when committed.' If a state legislature is barred by the *Ex Post Facto* Clause from
> passing such a law, it must follow that a State Supreme Court is barred by the Due
> Process Clause from achieving precisely the same result by judicial construction." *Marks*,
> 430 U.S. at 192, *citing Bouie* at 353-54.

This is exactly what happened to Mr. Kergil in that the Court allowed the government to

expand the mail and wire fraud statutes far beyond any conduct covered before either by the

statute or by the courts of the Second Circuit. There is no other case in the 120 years since

Durland where someone has been indicted, tried, and convicted for essentially lying on an

insurance application about STOLI or the intent to finance or sell an insurance policy. The theory

of misrepresentations depriving someone of "money or property" in the form of access to

information important to their economic decision making and, thereby, right to control one's

assets, is a "judicial expansion" by the Second Circuit and has normally been found only in the

area of mortgage fraud, loan fraud, and insurance claim fraud. *United States v. Chandler*, 98 F.3d

711, 716 (2d Cir. 1996), *United States v. DiNome*, 86 F.3d 277, 284–85 (2d Cir. 1996), and

*United States v. Rodolitz*, 786 F.2d 77, 80–81 (2d Cir. 1986). *See United States v. Binday*, 804

F.3d 558, 571 (2d Cir. 2015). Additionally, such a conception of "money or property" has also

been used in cases involving securities fraud cases like *United States v. Wallach*, 935 F.2d 445,

461 (2d Cir. 1991), or in loan fee cases like *United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007).

*See Binday* at 570.   However, the Government is unable to point to a single case predating

*Binday* wherein a conviction is based solely on misrepresentations on an insurance application. The entire universe of misrepresentations affecting someone's economic decision making amounting to fraud stems from *Wallach* to *Dinome, Rossomando*, and *Carlo*, all of which were clarified and distinguished by the "*Shellef* Doctrine" of *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007):

> "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," we concluded that such a charge cannot apply to situations where the alleged victims "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." *Shellef*, 507 F.3d at 107-09, *citing United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987).

In fact, prior to *Carlo* and *Shellef*, the only mail and wire fraud case dealing with insurance transactions was *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit stated that there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships, in circumstances like those presented here." *Id.* at 150.

The Second Circuit's decision in *Brennan* in 1999 suggests that there is no precedent for criminal liability based on nondisclosure and misrepresentations between sophisticated parties in insurance contract negotiations. Furthermore, in 2000, the Second Circuit stated in *Pierce*: "a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000), *citing Carpenter v. United States*, 484 U.S. 19, 27-28 (1987). "Economic decision making" is not a property right or property that can be taken or obtained from the victim. From *Carlo* and *Shellef* in 2007, there is nothing concerning economic decision-making until the *Binday* indictment of February 2012. However, there is a big difference between lying on a mortgage application and making "*Shellef*-like" immaterial

misrepresentations that do not go to an essential element of the bargain on an insurance application, as the Binday defendants were accused of doing. In this case, there was no fraud on the carrier's economic decision making through "material" misrepresentations of Age, Gender, and Health, and there was no attempt to obtain money or property as required by the Second Circuit in *Pierce* and the Supreme Court's "mirror image theory of fraud" as in ***Skilling v. United States***, 561 U.S. 358, 400 (2010) ("the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other"); *Starr*, 816 F.2d at 98-99. *See, also, United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) (rejecting government's theory that merely inducing the customers "to part with their money because of the false representations…amounted to fraud"), and *United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994) (reversing conviction for mail and wire fraud where the government failed to show an intent **to harm** the victim), and *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to show that the defendant actually intended and contemplated "actual concrete harm" to the pension fund).

Therefore, because Mr. Kergil's indictment, trial, and verdicts were for past conduct done by other people that was clearly innocent at the time that they did it, and is arguably still innocent to this day, and because neither those people nor Mr. Kergil had any "Fair Warning" of what was criminal at the time, and because Mr. Kergil was a victim of an unconstitutional judicial expansion of the mail and wire fraud statute without any warning or notice, Mr. Kergil should be entitled to protection under the Fair Warning Doctrine. Therefore, Mr. Kergil's conviction should be reversed and a judgment of acquittal as to all charges be made in its place based on the Constitution's requirement of Fair Warning as contained in the Due Process Clause of the Fifth Amendment.

## VII.   MR. KERGIL'S PROSECUTION AND CONVICTION ALSO VIOLATED THE EX POST FACTO CLAUSE

While the *Ex Post Facto* Clause (Article I, Sections 9 and 10) is generally thought of as a limitation on the power of the legislature to create new laws, the principal on which the *Ex Post Facto* Clause is based is "the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of Constitutional liberty." *See United States v. Marks*, 430 U.S. 188 (1977), *citing United States v. Harriss*, 347 U.S. 612, 617 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). As such, the right of the Due Process Clause of the Fifth Amendment protects the individual from such judicial expansion of statutes and judicial action that the legislature would be prohibited from doing under the *Ex Post Facto* Clause.

Similarly, in *Rabe v. Washington*, 405 U.S. 313 (1972), the Supreme Court reversed a conviction under a state obscenity law because it rested on an unforeseeable judicial construction of the statute. The Supreme Court in reversing the conviction in *Marks*, discussed the judicial expansion in *Rabe*, and stressed that "reversal was mandated because affected citizens lacked fair notice that the statute would be thus applied." *See Marks* at 192.  The Supreme Court's decisions in both *Rabe* and *Marks* show that Mr. Kergil's prosecution violated the Constitution's prohibition against *Ex Post Facto* laws, even if created by a judicial expansion of the statute as was done in *Binday*. The *Ex Post Facto* Clause prohibits any prosecution by the government for conduct that was innocent when performed, and it is based on the principal that "persons have a right to fair warning of that conduct which will give rise to criminal penalties." *See United States v. Rosengarten*, 857 F.2d 76 (2d Cir. 1988), *quoting Marks*, 430 U.S. at 191. *See, also, Casillas v. Scully*, 769 F.2d 60, 65 (2d Cir. 1985), which reiterated the Supreme Court's conclusion in *Bouie v. City of Columbia*, 378 U.S. 347 (1964).

In fact, the Supreme Court in *Marks* cites another pornography case *Hamling v. United States*, 418 U.S. 87, 102 (1974), for the proposition that any judicial expansion of a statute is prohibited, whereas any judicial narrowing of a statute by the Supreme Court must be applied on a retroactive basis for the benefit of the defendant. Because the obscenity standards in *Miller v. California*, 413 U.S. 15 (1973) both helped and hurt the defendants in *Marks*, the Supreme Court had to decide what was to be applied retroactively and what was not. The Supreme Court cited *Hamling* in *Marks* for the proposition that "any constitutional principal enunciated in *Miller* which would serve to benefit petitioners must be applied in this case," while any retroactive judicial expansion of the interpretation of a statute is constitutionally prohibited. *See Marks* at 197, *citing Hamling* at 102.

Therefore, the Supreme Court's rulings in the obscenity cases make clear that judicial expansion of a statute by the courts violates the *Ex Post Facto* Clause and any positive pronouncement by the Supreme Court or the Second Circuit that benefits a defendant must be used retroactively for Mr. Kergil's benefit. A clear example of this, is the Second Circuit's decision in *Countrywide*, which came after Mr. Kergil's indictment and trial, and makes clear that unless they can show that Mr. Kergil had no intention of living up to his contractual promises at the inception of the contracts between 2006 and 2008, that there can be no mail and wire fraud in the performance or non-performance of a contract between private parties. *See United States v. Countrywide Home Loans*, 822 F.3d 650 (2d Cir. 2016). Just as *Countrywide* narrowed the definition of mail and wire fraud in contractual relations, and the Supreme Court's decision in cases like *Elonis* required clear evil intent, and even *Skilling* narrowed the reach of the fraud statutes, that narrowing should inure to Mr. Kergil's benefit.

## VIII. MR. KERGIL WAS NOT GIVEN ADEQUATE NOTICE OR FAIR WARNING THAT HIS CONDUCT WAS PROSCRIBED IN VIOLATION OF THE DUE PROCESS CLAUSE

Constitutional substantive due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954); *see also Kolender v. Lawson*, 461 U.S. 352 (1983); *Lanzetta v. New Jersey*, 306 U.S. 451 (1939). **At this late date, the government has failed to state with particularity what act of Mr. Kergil's alone (as opposed to anyone else's conduct) was a crime**. Mr. Kergil was not a party to the contracts with the carriers and did not help to fill out the applications or cause any of the mailings or wires that may have been in furtherance of the scheme. The unwarranted expansion of the mail and wire fraud statutes to the private contractual relationships in this case based on the alleged yet unproven conspiracy, where the government has inferred Mr. Kergil's fraudulent intent based on the alleged conduct of others, has eviscerated the distinction between breach of contract and fraud—precisely the harm the Second Circuit sought to avoid in *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994), in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. *See also Countrywide*, where the Second Circuit reviewed the history of the mail and wire fraud statutes from 1896 on, and determined that a contemporaneous fraudulent intent at the time of making the contractual promises is necessary to transform a breach of contract into a fraud. Even an intentional breach of contract is not enough to turn a simple breach of contract into a fraud. More importantly, if there was no fraud in the misrepresentations in the thousands of mortgage applications in *Countrywide*, it is difficult to understand how there can be a scheme to defraud in this case, or interference with the carriers' economic decision-making by paying them insurance premiums. If the billions of dollars of losses in *Countrywide* did not constitute mail and wire

fraud, how could there be fraud in this case where the intent was to pay premiums on the insurance policy and the insurance carriers ended up making millions of dollars at Mr. Kergil's and Mr. Binday's investors expense?

> The Supreme Court emphasized the importance of this limitation:

> Although the [due process] doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Court has] recognized that the more important aspect of the doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.   Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections. *Kolender*, 461 U.S. at 357-58.

Imprecise laws—or imprecise applications of laws—give rise to "arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).  Both the actual notice and the fair warning requirements of the Due Process Clause were violated in this case.

The guilty verdict here is clearly not supported by the Second Circuit's recent decisions in *Finazzo* and *Countrywide*, and *Countrywide* mandates not just a vacating of the conviction, but would seem to suggest that this Court should grant the motion for reconsideration on Mr. Kergil's behalf based on *Countrywide*. If not set aside, Mr. Kergil's verdict would open a virtual Pandora's Box of unlimited mail and wire fraud prosecutions for any *unintentional* breach of a commercial contract between private parties involving the use of the mails or wires based on a conspiracy theory that all businesspeople are involved in conspiracy. After the decision in *Binday*, anyone who lies on insurance application is guilty of mail and wire fraud because the "misrepresentation" conflates the intent of the scheme to defraud element with the money or property element so that the only other thing to be proven is the "foreseeable" use of the mails and wires, which of course every modern business clearly uses in the day-to-day innocent performance of its business. The three elements of mail and wire fraud in *Fountain v. United*

44

*States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005) have now been conflated to just one element, which is the material misrepresentation on any application because that deprives the recipient of the "right to control assets" and because there is no business that would not either send in the application by mail, fax machine, email, or even FedEx.  Ergo, tens of millions of American commit Mail and Wire Fraud every day based on *Binday*. This is especially true in Mr. Kergil's case where, because of the conspiracy theory, conduct by people that he never met or even talked to is somehow allowed to be imputed to him by the Court's decision. Such expansion of the mail and wire fraud statutes is not permitted by the Due Process Clause, which precludes the use of general statutory provisions in order to criminalize minor breaches of contractual provisions.  *See United States v. Bass*, 404 U.S. 336, 347-50 (1971). Moreover, in the Supreme Court's unanimous decision in the famous *Arthur Andersen* case, the Supreme Court emphasized the principle that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed" and that "legislatures and not courts should define criminal activity." *Id.* at 696 (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.)).

Congress may have constitutional authority to extend the application of the mail and wire fraud statutes to govern civil disputes between private parties involving mere nondisclosures or misrepresentations involving a contract, but it has yet to do so, and this Court should not allow the government to usurp the role of Congress in this fashion.  "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a statute broader than that clearly warranted by the text." *Ratzlaf v. United States*, 510 U.S. 135, 148 (1994) (quoting *Crandon v. United States*, 495 U.S. 152, 160 (1990)).  The guilty verdict in this case violates all of these fundamental principles of Due Process. Moreover, the only mail and wire fraud case in the Second Circuit dealing with insurance prior to the *Binday* indictment of 2012 is the Second Circuit's reversal of mail and wire fraud convictions in *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit stated that there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships." *Id.* at 150

## IX.    MR. KERGIL'S INDICTMENT FAILED TO APPRISE HIM OF WHAT CONDUCT WAS UNLAWFUL AS REQUIRED BY THE SIXTH AMENDMENT

The Notice Clause of the Sixth Amendment requires that a criminal defendant must be informed of the actual nature and the cause of the accusations against him.  An indictment that merely tracks the language of a statute and alleges vague criminality **but alleges no facts that actually violate the statute it charges** cannot be sustained.  See, *United States v. Simmons*, 96 U.S. 360, 362 (1878):

> "…the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense….An indictment not so framed is defective, although it may follow the language of the statute."

"Real notice of the true nature of the charge…is the first and most universally recognized requirement of Due Process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). "Fair warning should be…in language the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen v. United States*, 544 U.S. 696 (2005) citing *McBoyle v United States*, 283 U.S. 25, 27 (1931). "The office of the indictment demands specific facts of what conduct by the accused constitutes a crime, and that conduct must be correlated with what is prohibited by the statute and what is the very core of criminality." *United States v. Russell*, 369 U.S. 749, 764 (1962). Far from informing Mr. Kergil of the nature of the accusation, the indictment here left the prosecution free to roam at large; to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal. See *Russell* at 768.

Mr. Kergil should receive a judgment of acquittal because his indictment (1) failed to sufficiently allege that anyone was deprived of "property" within the meaning of the statutes; (2) failed to sufficiently allege that he intended to defraud anyone of anything; and (3) failed to sufficiently allege any mailing or wiring that was in furtherance of the scheme to defraud, as

required by the Supreme Court in *Parr v. United States*, 363 U.S. 370 (1960), *United States v. Maze,* 414 U.S. 395 (1974), and *Kann v. United States*, 323 U.S. 88 (1944).  For these reasons, as written, Mr. Kergil's Indictment was defective and insufficient on its face, and therefore this Court should issue a judgment of acquittal in his favor.

Mr. Kergil should also be granted a judgment of acquittal because his indictment fails to allege any "**knowledge**" on his part that he was **willfully** participating in a scheme to defraud or that he knew that any of his conduct was actually breaking the law. Nor was there any evidence adduced at trial that showed Mr. Kergil had the knowledge that there was any criminal conspiracy going on and that he "willingly" participated in the alleged conspiracy.  In *Pettibone v. United States*, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their conviction, stated: "It seems clear that an indictment against a person…must charge a knowledge or notice, on the part of the accused.…Unless that fact exists, the statutory offense cannot be committed…and without such knowledge or notice, the evil intent is lacking." *Id.* at 206-7. This requirement of a direct and explicit allegation of knowledge of breaking the law or knowledge that a law was broken in an indictment was reiterated by the Supreme Court 50 years later in *Direct Sales v. United States*, 319 U.S. 703 (1943), where the Supreme Court reaffirmed *Pettibone* by citing *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940), *aff'd* 311 U.S. 205 (1940), where conspiracy allegations would turn innocent conduct into crimes and:

> Without the knowledge, the intent cannot exist.…Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal.…This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes.  *Direct Sales*, 319 U.S. at 711.

It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless

clearly within its terms. "There can be no constructive offences, and before a man can be punished, his case must be plainly and unmistakably within the statute." *United States v. Lacher*, 134 U.S. 624 (1890). But in this case the government sought to punish Mr. Kergil for unspecific "otherwise innocent conduct" that he did not cause and could not possibly foresee. See *United States v. Cleveland*, 531 U.S. 12 (2000).

## X.   THE RULE OF LENITY REQUIRES VACATING MR. KERGIL'S CONVICTION ON ALL COUNTS OF THE INDICTMENT

It is axiomatic that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997). "[T]he touchstone [of due process] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267. "[A] defendant must have knowledge of 'the facts that make his conduct fit the definition of the offense.'" *Staples v. United States*, 511 U.S. 600, 608 (1994).

Thus, in order to be exposed to criminal penalties, a defendant must have been put on notice that his conduct was criminal. See *Lanier* 266-67. A criminal statute "must give a clear and unmistakable warning as to the acts which will subject one to criminal punishment. And courts are without power to supply that which Congress has left vague." *Screws v. United States*, 325 U.S. 91, 136 (1945). The Supreme Court's ruling in *Lanier* as to the Rule of Lenity is based in large part of the Supreme Court's decision in *United States v. Bass*, 404 U.S. 336 (1971):

> "As we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bass*, 404 U.S. at 347, which in turn is based on *Harriss*, "no man shall be held criminally responsible for conduct for which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954). *Bass* goes on to say "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distaste among men languishing in prison unless the lawmaker has clearly said they should." *Bass*, 404 U.S. at 348

In the famous *Arthur Andersen* case, the unanimous Supreme Court stated "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress...and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005). In *Lanier*, a judge that forced women defendants to have oral sex with him was protected by the Rule of Lenity from criminal prosecution: "The canon of strict construction of criminal statutes, or Rule of Lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it to only conduct covered... due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266.

Two good examples of the Rule of Lenity in action are *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit reversed the mail fraud convictions of an insurance executive based on the Rule of Lenity because the government could point to no precedent, and the Second Circuit could find no case, for criminal liability for nondisclosures and/or misrepresentations between sophisticated parties involving an insurance transaction, stating that there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships." *Brennan*, 183 F.3d at 150. Therefore, the Second Circuit reversed *Brennan*'s conviction and dismissed the indictment against him, because the Second Circuit could find no fraud in misrepresentations between sophisticated parties in negotiating an insurance contract.  See the Seventh Circuit's recent decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), vacating the conviction of a banker engaged in deceitful sharp business practices in the sale of a bank's property.

Similarly, Judge Eginton made a decision in *United States v. $52,037.96*, No. 14-cv-00591 (D. Conn. Sept. 2015), to dismiss criminal charges against a corporation based on the Rule of Lenity concerning a scheme by a Connecticut corporation to have straw buyers purchase BMW's in Connecticut that would then be shipped to China. Not only does Judge Eginton base his decision on the *Skilling* "Mirror Image of Fraud" theory first discussed in *Starr* and adopted by the unanimous Court in *Skilling*, Judge Eginton states that the basic rules of property go back more than 500 years, and that once someone buys a piece a property, what the purchaser does with the property is the purchaser's business, not BMW's business. The same can be said in this case, that once the policy is purchased, the carrier has no say in the policy unless they want to bring a civil case of fraud to rescind the policy. But just as Judge Eginton found it ludicrous that the sale of a few BMW's in Connecticut could affect BMW's sales or its "economic decision making" in China, so too is the thought ludicrous that misrepresentations on 30-40 insurance policies could possibly affect the economic decision making or right to control assets of a major insurance carrier like Lincoln.

Furthermore, Your Honor needs to take judicial notice that at no time then or now was STOLI (Stranger Originated Life Insurance) illegal. In fact, several of the largest decisions against the carriers trying to void STOLI contracts happened in New York. For example, Lincoln was ordered to pay out $10,000,000 in the "Butcher of Brooklyn" case where the poor butcher died just weeks after using a hedge fund's money to purchase a life insurance contract. See *Life Product Clearing, LLC v. Angel*, 530 F.Supp.2d 646 (2008). And, in 2010, see the famous case of *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 940 N.E.2d 535 (2010), where multiple policies were paid out to investors in the death of famous attorney Arthur Kramer. So it can only be said that Mr. Kergil's indictment in February of 2012 was not just shocking and a

surprise, it was an "unconstitutional expansion" of the mail and wire fraud statute that gave him

no Fair Warning that he was committing a crime, or Fair Notice that he was violating the statute.

And, because of the ambiguity caused by this unconstitutional and judicial expansion, he should

be protected by the Due Process Clause's "Rule of Lenity" as well. Therefore, Your Honor

should grant this Petition, and vacate the conviction or at the very least reduce Mr. Kergil's

sentence to time served.

A review of these principles and the cases above shows that the statutes used in this case

do not pass muster with the Rule of Lenity, Fair Warning, or Due Process. How would any lay

person or insurance professional know that filling out an insurance application and paying

premiums in 2006-2008 would become a federal crime in 2014-2015? Thus, the language of the

statutes in Mr. Kergil's case are impermissibly vague, as they do not give any fair warning and

violate the Rule of Lenity. Based on the Second Circuit's decision in *Brennan* (2000), *Shellef*

(2007) and most recently *Countrywide* (2016), it makes no sense that Mr. Kergil should serve

nine years for a non-crime that he did not commit.

The Rule of Lenity dictates that criminal liability not be imposed for otherwise legal acts

done in the ordinary course of business. As the First Circuit has stated, "[t]he federal mail fraud

statute . . . is built upon a single, archaic 204-word sentence which . . . has undergone repeated

periods of rapid expansion and contraction." *United States v. Urciuoli*, 513 F.3d 290, 293 (1st

Cir. 2008).  During the period referenced in the Indictment, there was no federal or state statute,

no federal or state regulation, no federal or state revenue ruling or advisory opinion, and no

federal or state judicial decision, which prevented the stranger owned life insurance business.

There is no possible way that Mr. Kergil could have known in 2006-2008 (or at any time for that

matter) that the government in 2012, years after-the-fact, would seek to brand him a criminal for

doing something that neither a statute, nor any construction thereof, nor any case, had ever before held was unlawful or improper in any way.  See *United States v. Emmons*, 410 U.S. 396, 411 (1973) ("this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."); *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) ("The Rule of Lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").  As of the year 2000, the Second Circuit saw no fraud in the negotiation of insurance contracts between sophisticated parties.  See *Brennan* at 150.

The Rule of Lenity is founded on "two policies that have long been part of our tradition": (i) provision of notice to the public, and (ii) separation of powers between the legislature and judiciary. *Bass*, 404 U.S. at 348.  As the Supreme Court explained:

> [The Rule of Lenity] reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. *Dunn v. United States*, 442 U.S. 100, 112 (1979).

The Rule of Lenity also serves as a key mechanism in preserving the separation of powers between Congress and the Judiciary.  The Supreme Court elaborated upon this principle in *Bass*. "[A]s we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bass*, 404 U.S. at 347 (citing *Rewis*, 401 U.S. at 812); *Ladner v. United States*, 358 U.S. 169, 177 (1958); *Bell v. United States*, 349 U.S. 81 (1955)).  The Supreme Court went on to state:

> [B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.  This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Bass*, 404 U.S. at 348.  Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.  More importantly, before the government can deprive a citizen of his liberty for conducting himself in the ordinary course of business and doing normally noncriminal acts in the ordinary course of business, it must be clear that Congress defined those specific acts to be criminal. *Bass*, 404 U.S. at 348.

"The criminal law should not be a series of traps for the unwary." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003). To that end, the Due Process Clause demands that criminal statutes describe each particular offense with sufficient definiteness to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Harriss*, 347 U.S. at 617. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.*; see also the famous *Arthur Andersen* case: "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress . . . and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP*, 544 U.S. at 703, *citing McBoyle v. United States*, 283 U.S. 25 (1931).

In *McBoyle*, Justice Oliver Wendell Holmes emphasized the fair notice rationale inherent in the Due Process Clause. Such notice must be provided even if defendants did not actually read the United States Code or the Federal Register (which would not have helped in this case in any event because no regulations govern how a life insurance policy can be sold or paid for). "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle*, 283 U.S. at 27.

The Supreme Court reiterated this point forty years later. See *Bass*, 404 U.S. at 348. The need for fair warning is especially acute in the context of criminal statutes like mail and wire fraud that mandate the imposition of severe penal sanctions for the ordinary use of the mails and wires in the ordinary course of otherwise legal and non-fraudulent business activities. In Mr.

Kergil's case, there was no "bright-line" warning of any kind. "There are three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The two that are applicable here are the Rule of Lenity and the unforeseeably expansive interpretation doctrine:

> [T]he canon of strict construction of criminal statutes, or Rule of Lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. *Id.*

"Under the Rule of Lenity, grievous ambiguity in a penal statute is resolved in the defendant s favor." The unforeseeably expansive interpretation doctrine "principally bars unforeseeable and retroactive judicial expansion of narrow and precise statutory language." "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant s conduct was criminal." *Lanier*, 520 U.S. at 267.

### A. THE RULE OF LENITY DICTATES THAT CRIMINAL LIABILITY NOT BE IMPOSED FOR OTHERWISE LEGAL ACTS DONE IN THE ORDINARY COURSE OF BUSINESS

Developed in the common law courts in the seventeenth and eighteenth centuries to limit the harshness of English criminal law, the Rule of Lenity was adopted by the Supreme Court in 1820 in Chief Justice Marshall's oft-cited decision in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (acknowledging that the Rule of Lenity reflects "the tenderness of the law for the rights of individuals"). The Rule was endorsed a century later by Justice Holmes in *McBoyle*, and the Supreme Court has consistently acknowledged its validity ever since. See, e.g., *United States v. Granderson*, 511 U.S. 39, 54 (1994); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992); *Taylor v. United States*, 495 U.S. 575, 596 (1990); *McNally v.*

*United States*, 483 U.S. 350, 359-60 (1987), as recognized in *Cleveland v. United States*, 531 U.S. 12 (2000); *Dowling v. United States*, 473 U.S. 207, 213-14 (1985); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284-85 (1978); *Rewis v. United States*, 401 U.S. 808, 812 (1971); *Ladner v. United States*, 358 U.S. 169, 177-78 (1958); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952).

Modern cases recognize that the rule of strict construction now known as the Rule of Lenity has three fundamental purposes: "to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Each of these purposes is essential to the proper functioning of the criminal justice system. The first purpose is to ensure fair notice.  Warning must be given "to the world in language that the common world will understand." *Bass*, 404 U.S. at 348 (quoting *McBoyle*, 283 U.S. at 27).  And although it is typically fictitious to assume that wrongdoers read statutes, fair notice is nevertheless "required in any system of law." *United States v. R.L.C.*, 503 U.S. 291, 309 (1992) (Scalia, J., concurring).  Indeed, fair notice is closely tied to the principle of legality itself.

Two ramifications stem from the need for fair notice. First, a premium is put on the common sense meaning of a statute.  See, e.g., *McBoyle*, 283 U.S. at 27. It is inherently unfair to impose on "the common world" a statutory interpretation that is overly obscure or clever. Second, a premium is put on the text itself.  Judges should not rely on extra textual considerations to construe an unclear criminal statute against a defendant. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon v. United States*, 494 U.S. 152, 160 (1990). The Rule of Lenity

"preclude[s] our resolution of [an] ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history." *Hughey v. United States*, 495 U.S. 411, 422 (1990).

Lenity's second purpose is to preserve the separation of powers. See *Bass*, 404 U.S. at 348. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.* "This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* (citations omitted). "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think, perhaps along with some Members of Congress, is the preferred result . . . This admonition takes on a particular importance when the Court construes criminal laws." *United States v. Granderson*, 511 U.S. 39, 68-69 (1994) (Kennedy, J., concurring) (citations omitted). Lenity prevents the imposition of punishments that are not clearly authorized by Congress, the only branch of government competent to establish **federal** criminal penalties.

Lenity's third purpose is to avoid arbitrariness and inconsistency in the enforcement of criminal statutes. See *Kozminski*, 487 U.S. at 952. The Rule of Lenity responds to this need by "fostering uniformity in the interpretation of criminal statutes." It fosters uniformity because, in each case of criminal statutory interpretation, it requires courts to examine the text for ambiguity and to resolve any such ambiguity in the same direction. Faithfully applied, the Rule of Lenity prevents the government from punishing individuals based on an innovative or ambiguous reading of the criminal code as was clearly done here in this case, where even at this late date there has been no proof of any "scheme to defraud" (See, e.g., *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), describing the law of mail and wire fraud in the Second Circuit and

the differences between a "scheme to deceive", which is not illegal, and a "scheme to defraud" which is. Nor was there any scheme to obtain money or property from the carriers, but rather to pay the carriers millions of dollars in premiums. (See *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. See *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)"). Nor was there any mailing or wire that Mr. Kergil caused to be made in "furtherance" of any scheme even assuming the foreseeability of mailings and wires in modern business today; see the First Circuit's recent decision reversing a massive fraud conviction where the mailings charged in the indictment were not in furtherance of the scheme. *United States v. Tavares*, No. 14-2313, 2016 U.S. App. LEXIS 22502 (1st Cir. Dec. 19, 2016) (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at *33 (internal citations omitted), the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States*, 323 U.S. 88, 95 (1944)). In Mr. Kergil's indictment, there is not even a single mailing or wire that was made by him or even attributed to him much less caused by him, and at trial the only mailings and wires discussed were done by other people and were innocent acts not done in the furtherance of any scheme to defraud. If for no other reason than this gaping void in causation, and lack of furtherance in a scheme to defraud, in addition to the Rule of Lenity, this 2255 Petition should be granted.

## B.  THE RULE OF LENITY CLEARLY APPLIES IN THIS CASE

The Second Circuit has defined the Rule of Lenity as a canon of statutory construction so that "in criminal prosecutions... ambiguities in a statute are resolved in the defendants' favor." See *United States v. Plaza Health Labs, Inc.*, 3 F.3d 643, 649 (2d Cir. 1993). It is utilized in

those situations in which a reasonable doubt exists about a statute's intended scope and those concerns over the scope of a statute or any ambiguity in the reach of the statute "should be resolved in favor of lenity." *Liparota v. United States*, 71 U.S. 419, 427 (1985) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971). See also *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952) ("We should not derive criminal outlawry from some ambiguous implication.").

While the Rule of Lenity is a canon of statutory construction and not a federal statute itself, the rule is called into service to protect the constitutional rights of Fair Warning and Due Process: "Application of the Rule of Lenity ensures that criminal statutes will provide *fair warning* concerning conduct rendered illegal. *Liparota*, 417 U.S. at 427 (emphasis in original). The Rule of Lenity insures the Constitutional rights of fair warning and fair notice granted in the Due Process Clause guarantee of the Fifth Amendment and as established by the Supreme Court, by resolving any ambiguity in a criminal statute as to apply the statute only to conduct clearly prohibited by the statute and no other conduct, because the Rule of Lenity requires a criminal statute to "give fair warning of the conduct that makes it a crime." See *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964). See also *Connally v. General Construction Company*, 269 U.S. 385, 391 (1926).

The touchstone of the Due Process analysis of the Rule of Lenity is whether the statute made it reasonably clear that at the relevant time that the defendant's conduct was criminal. See *United States v. Lanier*, 520 U.S. 259, 266-67 (1997), citing *Kolender v. Lawson*, 461 U.S. 352, 355-57 (1983). Clearly, in this case, no one in America much less the Second Circuit, was ever accused of criminal charges just for making misrepresentations on an insurance application before the indictments in this case in February 2012. In fact while there were literally hundreds

of civil lawsuits involving STOLI cases prior to Mr. Kergil's indictment in February of 2012, (most of which were lost by the carriers), there was not a single indictment anywhere in the country involving "*Shellef*-like" misrepresentations of deceit as used by the Binday Agency in the insurance applications in that case. The *Binday* Indictment in February 2012 was five years after most of the applications in this case. Therefore, Mr. Kergil's indictment and prosecution was "unconstitutionally surprising" as the Second Circuit stated in reversing the conviction of an individual found in a Connecticut State park with 14 pictures of child pornography. See *United States v. Dauray*, 215 F 3d 257, 265 (2d Cir. 2000).

The Supreme Court's recent decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015) also confirms that the cornerstone of our judicial heritage is that a person should not be deemed criminally responsible for mere negligence but only from the "concurrence of an evil-meaning mind with an evil-doing hand." "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." After all, "[e]ven a dog distinguishes between being stumbled over and being kicked." *Morissette* v. *United States,* 342 U.S. 246, 250-52 (1952). See, also, *United States* v. *United States Gypsum,* 438 U.S. 422 (1978), in which the requirement of some *mens rea* for a crime is firmly embedded in the American System of Justice. As the Supreme Court has observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Id.* at 436. "Thus, to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the statute prohibits." *Id.* at 445. Therefore, something more is required than the doing of the act proscribed by the statute. *United States v. Balint*, 258 U.S. 250 (1922).

Furthermore, not only does Mr. Kergil's Indictment not contain the words "*mens rea*", "scienter", or "specific intent to defraud", he did not **cause** any of the mailings or wires in this case, and none of the mailings or wires were done in the furtherance of any fraud, because there was no scheme to defraud. See, for example, the First Circuit's recent decision in *Tavares*, where the First Circuit overturned massive fraud convictions because none of the mailings were caused by the defendants, and none of the mailings were in furtherance of the alleged fraud.

If someone lies on a mortgage application and then receives $400,000 to buy a house that is only worth $200,000, the fraudster has clearly "stolen" at least $200,000 if not more from the bank. But in this case, if the "essence of the fraud" was the "commissions" as Judge Lynch asserts in the *Binday* opinion at 56-57, then the only way these commissions were created in the *Binday* case or this case was with the payment of premiums by Mr. Binday's investors that was paid to the carriers, and the carriers enjoyed a huge windfall, not a loss of "money or property" as required by the Second Circuit's decision in *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. See also *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)." Therefore, as in *Starr*, Mr. Binday may have "defrauded" the investors (Postal Service in *Starr*), but he did not defraud the carriers (the customers in *Starr*), and in *Binday*, the defendants were indicted for "defrauding" the carriers. In this case, Mr. Kergil deceived no one and was not in a conspiracy to deceive anyone, and in fact, he did not receive a dime in commissions as Mr. Binday received 100% of the commissions. Once again, there was no evidence presented at trial that Mr. Kergil lied about anything to anyone, or that paying premiums to a carrier somehow deprived the carrier of its "economic decision making" or right to control its assets.

Just as the Rule of Lenity protected the perverted Judge Lanier and the sexual deviant Charles Dauray, an even more stunning case can be found in the Second Circuit's recent decision in *United States v. Valle*, No. 14-2710 (2d Cir. 2016). Gilberto Valle, a former New York City police officer, was accused of conspiring with a man named Bollinger to kidnap, rape, torture, and then to kill and cannibalize a woman he knew from college as well as the unauthorized use of a computer to track that woman, as well as other women, to satisfy their perverse fantasies. Based on the Rule of Lenity, the district court judge, the Honorable Judge Gardephe, granted Valle's motions for a Rule 29 judgment of acquittal and a Rule 33 Motion for a New Trial. Judge Gardephe let stand the jury's verdict of unauthorized computer use, for which Judge Gardephe gave Valle 22 months. Of course, the government appealed and surprisingly the Second Circuit affirmed the Rule 29 judgment of acquittal, but vacated Valle's conviction of unauthorized use of the computer to track down the real life victims of his perverse fantasies, also based on the Rule of Lenity. Gilberto Valle was found to be an innocent man under the law, despite the fact that the Second Circuit detailed dozens of emails where Valle planned on doing unspeakable things to real women with real co-conspirators that he met on a fantasy website. The details are so graphic in both opinions because the Second Circuit mentions the names of the real victims and what Valle and his alleged co-conspirators intended to do to them.

Valle, according to Judge Gardephe and the Second Circuit, provided Bollinger and other alleged co-conspirators with the real name and real addresses of real women who could have been kidnapped, raped, tortured, and killed by Valle's co-conspirators. Assuming *arguendo* that Valle was just a sexual miscreant participating in disgusting sexual fantasies on the internet, how does Valle know that Bollinger was not a homicidal maniac? If Valle and Bollinger were not in a conspiracy, then clearly Mr. Kergil was not in a conspiracy with any of the alleged co-

conspirators in this case. And, if Judge Lynch was correct in the *Binday* opinion for the Second Circuit that the "object" of the *Binday* conspiracy was the "millions of dollars in commissions", then clearly under the *Studley* factors and elements (see *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)), Mr. Kergil was not part of any conspiracy with Mr. Binday and the other brokers in this case, as he did not personally receive a single penny from the alleged victims, the insurance carriers, nor did he share resources or profits with any of the alleged co-conspirators (many of whom he never met or even communicated with). And, whereas the Second Circuit's opinion in *Valle* details many explicit emails between Valle and Bollinger and others, there is not a single email mentioned at trial or the Second Circuit's opinion in *Binday* that shows Mr. Kergil was part of any conspiracy or any agreement with anyone to do some illegal act, much less a conspiracy to defraud some of the largest insurance carriers in the country. In fact, the actual accusations against Mr. Kergil are very few and involve only innocent conduct. At trial, the government actually presented witnesses who did not even know who Mr. Kergil was, as they had never talked with him much less entered a conspiracy with him and **NO WITNESS** claimed that Mr. Kergil defrauded them or anyone else. Moreover, there is not a single mailing or wire listed in the indictment that is attributable to Mr. Kergil or was "caused" by Mr. Kergil in "furtherance" of the non-existent "scheme to defraud" or the alleged conspiracy. Because the Indictment is totally defective in not giving Mr. Kergil notice of the **TRUE** nature and cause of the accusations against him as required by the Sixth Amendment, it must be dismissed and this 2255 Petition should be granted on his behalf. But, clearly the Rule of Lenity should be invoked to protect Mr. Kergil from a novel and ambiguous application of the mail and wire fraud statutes through a judicial expansion in *Binday*, that no one could imagine in 2006-2008 would be deemed criminal by the Second Circuit in 2015.

If the Rule of Lenity can be utilized to protect the constitutional rights of perverts and deviants like Gilberto Valle, Charles Dauray, and Judge Lanier, then it should also be used to protect the Due Process rights of a charitable and magnanimous person like Mr. Kergil.

And, unlike in Gilberto Valle's case, there were no emails between Mr. Kergil and any other alleged co-conspirators that showed the "agreement on any conspiracy" much less an agreement on some grossly illegal conduct. Clearly, there were no emails produced at trial that shows Mr. Kergil knew that he was breaking the law or committing a crime as is required by both the Due Process Clause and the Law of Conspiracy. But, if anything, the emails produced at Mr. Kergil's trial prove that his conduct was innocent, his Good Faith was unimpaired, and that he never agreed to do anything knowingly illegal with anyone. Therefore, the Rule of Lenity mandates that this Court grant Mr. Kergil's 2255 Petition and dismiss all counts of the Indictment as they apply to him.

## CONCLUSION

For the above reasons, and especially in light of the Supreme Court's recent decision in *Honeycutt v. United States*, 581 U.S. ___ (2017), Mr. Kergil respectfully asks this Court to vacate his conviction or at the very least reduce his sentence to time served.

Respectfully Submitted,

/s/ James Kevin Kergil
Petitioner pro se
Incarcerated Inmate
James Kevin Kergil
Reg. No. 66387054
FPC Canaan
P.O. Box 200
Waymart, PA  18472
June 15, 2017

JAMES KEVIN KERGIL
REG. NO. 66387054
FPC CANAAN
P.O. BOX 200
WAYMART, PA 18472



7014 2120 0003 2941 6703



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 06001 $ 010.39⁰
02 1W
0001391655 JUN 16 2017

CRIM. DETS GP

CLERK OF THE COURT
SOUTHERN DISTRICT OF NEW YORK
D.P. MOYNIHAN, U.S. COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007



USM P3
SDNY



RECEIVED
JUN 19 2017
CLERK'S OFFICE
S.D.N.Y.