UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,      :

    - v. -             :         12 Cr. 152 (CM)

JAMES KEVIN KERGIL,      :

              Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JAMES KEVIN KERGIL'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE AND REDUCE HIS SENTENCE

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Eun Young Choi
Assistant United States Attorney
   -- Of Counsel --

# TABLE OF CONTENTS

BACKGROUND ....................................................................................................... 1

   I.    PROCEDURAL HISTORY ............................................................................ 1

   II.   EVIDENCE OF THE SCHEME TO DEFRAUD ......................................... 2

   III.  EVIDENCE OF KERGIL'S ROLE ............................................................ 5

   IV.  THE DEFENSE CASE AT TRIAL ............................................................ 6

   V.   SENTENCING ............................................................................................. 7

   VI.  KERGIL'S DIRECT APPEAL .................................................................... 7

ARGUMENT .......................................................................................................... 8

   I.    LAW GOVERNING SECTION 2255 PETITIONS ................................... 8

   II.   THE MANDATE RULE AND PROCEDURAL DEFAULT ...................... 9

   III.  KERGIL'S COLLATERAL ATTACKS ON HIS CONVICTION FAIL ...................... 11

   A.   The Mandate Rule and Procedural Default Preclude Consideration of These
Arguments ................................................................................................ 11

   B.   Each of Kergil's Arguments are Without Merit ........................................ 12

       1.    The Government Proved a Cognizable Scheme to Defraud at Trial ..................... 12

       2.    The Government Proved Kergil's Intent to Defraud at Trial................................. 16

       3.    There is No Error In Kergil's Conspiracy Conviction............................................ 19

       4.    There is No Error In the Jury Instruction for Aiding and Abetting Liability ......... 19

   IV.  KERGIL'S CONSTITUTIONAL CLAIMS ARE BOTH PROCEDURALLY
BARRED AND MERITLESS ..................................................................... 21

   A.   Applicable Law .......................................................................................... 21

   B.   Discussion .................................................................................................. 22

V.   KERGIL CANNOT ESTABLISH THAT HE SUFFERED FROM INEFFECTIVE ASSISTANCE OF COUNSEL .......................................................................... 25

A.   Applicable Law ........................................................................................ 25

B.   Discussion ................................................................................................ 27

VI.   KERGIL IS NOT ENTITLED TO RESENTENCING ................................... 28

VII.   KERGIL CANNOT CHALLENGE HIS ORDER OF FORFEITURE ........................... 29

CONCLUSION ...................................................................................................... 31

The Court should deny defendant James Kevin Kergil's motion to vacate his conviction and reduce his sentence pursuant to Title 28, United States Code, Section 2255.  In his motion papers ("Motion" or "Petition") and accompanying Memorandum ("Mem."), Kergil argues, *inter alia*, that the Government failed to establish a cognizable theory of fraud at trial; that the evidence at trial did not suffice to sustain his convictions; that there was error in the instructions to the jury; that his conviction implicated constitutional concerns such as due process, fair notice, the rule of lenity, and the *ex post facto* clause; that he suffered from ineffective assistance due to his trial counsel's failure to file post-trial motions; that he is entitled to a resentencing; and that the order of forfeiture entered against him should be vacated.  Kergil's claims do not afford him the relief he seeks, because each argument raised (i) was either rejected by the Second Circuit—expressly or implicitly—on direct appeal, or Kergil's failure to so raise renders it procedurally defaulted; and/or (ii) is utterly without merit.  Accordingly, the Court should deny his Motion without a hearing, and further deny any application for a certificate of appealability.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On October 7, 2013, following a twelve-day jury trial before this Court, Kergil and his two co-defendants, Michael Binday and Mark Resnick (together, "the defendants"), were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a scheme to defraud insurance companies which the defendants purported to serve as agents.  Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in

violation of Title 18, United States Code, Section 1512(k).

On July 30, 2014, the Court sentenced Kergil to 108 months' imprisonment, to be followed by three years' supervised release.  The Court also ordered very substantial forfeiture and restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Kergil and his co-defendants, directing only a limited remand, at the Government's request, for entry of an amended restitution order in a reduced amount of $37,433,914.17.  *See United States* v. *Binday*, 804 F.3d 558, 601 (2d Cir. 2015).  On December 14, 2015, the Second Circuit denied the defendants' motions for panel and *en banc* rehearing.  On June 20, 2016, the Supreme Court denied Kergil's and Binday's petitions for a writ of *certiorari*.  On June 24, 2016, this Court entered the amended restitution order that the Second Circuit had directed be entered.  Shortly thereafter, Kergil began serving his sentence.

In or about December 2016, Kergil filed two motions for relief from his criminal judgment pursuant to Rule 60(b)(6) and a motion for resentencing pursuant to Section 3582(c)(2).  This Court denied those motions on or about August 16, 2017

In or about June 2017, Kergil filed the instant motion for relief pursuant to Title 28, United States Code, Section 2255.

## II.     EVIDENCE OF THE SCHEME TO DEFRAUD

The evidence at trial established that, from in or about 2006 through in or about early 2009, Kergil and his co-defendants, all insurance agents, engaged in a scheme designed to procure so-called "stranger-originated life insurance" (or "STOLI") policies—policies on the lives of seniors for the benefit of investors who were strangers to them—by means of fraudulent applications.  The co-conspirators recruited elderly people of modest means (the "Straw

2

Insureds") to apply to insurance companies (the "Insurers") for universal life insurance policies, with the understanding that the resulting policies would actually be owned, paid for, and controlled by third-party investors.[1]  The defendants secured the Straw Insureds' consent to the scheme with promises of six-figure payouts—payouts that sometimes materialized and sometimes did not.  *See United States* v. *Binday*, 804 F.3d at 565-66 (describing scheme).  (Tr. 72-77, 424-26, 611-13).[2]

Meanwhile, Kergil and his co-defendants deceived the Insurers about who was behind these policies, giving the false impression that wealthy individuals wanted the policies on their own lives for estate planning purposes.  The defendants engaged in this deception because the Insurers expressly prohibited their agents from submitting STOLI business to them.  *See Binday*, 804 F.3d at 565, 567.  (GX 1101 at 16 (Lincoln anti-STOLI policy, with Kergil's certification of compliance); GX 2904 (AIG anti-STOLI policy); GX 2915 (Hancock anti-STOLI policy); GX 2922 (Jefferson Pilot anti-STOLI policy); GX 2943 (Prudential anti-STOLI policy); GX 2951 (Union Central anti-STOLI policy)).  STOLI investors exploited the Insurers' actuarial and underwriting processes—which were developed with the expectation that ordinary human beings rather than professional investment funds would be behind the policies—to profit at the expense of the Insurers.  The Insurers, not surprisingly, did not want to be targets of this kind of arbitrage, which exposed them to unwanted economic risk.  (Tr. 505-06, 512-15, 576, 580-82, 641-43; GX

---

[1] The Insurers were American General Life Insurance Co. and its affiliates, AXA Equitable Life Insurance Company, John Hancock Life Insurance Company (U.S.A.), The Lincoln National Life Insurance Company and its predecessors and affiliates, MetLife Investors U.S.A. Insurance, The Prudential Insurance Company of America, Security Mutual Insurance Company, Sun Life Assurance Company of Canada, and Union Central Life Insurance Company (now Ameritas).

[2] "Tr." refers to the trial transcript; "Sentencing Tr." refers to the transcript of Kergil's and his co-defendants' sentencing, dated July 30, 2014; "GX" refers to a Government exhibit admitted at trial.

2970, 2971, 2972).  As executives from two Insurers testified at trial, the Insurers understood

that STOLI policies would behave in ways that were less economically advantageous to the

Insurers and would reduce the Insurers' profitability.  (Tr. 505-06, 512-15, 576, 580-82).  Most

importantly, STOLI policies, unlike non-STOLI policies, were expected to never lapse and thus

to result in multi-million-dollar payouts in every case.  (Tr. 514, 642).  Moreover, to the extent

STOLI policies were being procured based on lies that inflated the insureds' wealth, the Insurers

were taking on a greater risk of earlier mortality than they believed, because wealthier people

tend to live longer.  (Tr. 576, 578, 735).

But the defendants wanted to facilitate issuance of STOLI policies from the Insurers to

investors because each such policy generated massive commissions for the responsible insurance

agents, paid for by the unwitting Insurer—as long as the STOLI character of the policy went

undetected.  (Tr. 455, 509-10, 923; GX 892).  To circumvent the Insurers' anti-STOLI rules and

the terms of their own agency agreements with the Insurers, the defendants littered the

applications with lies—not about the Straw Insureds' health, but about their assets and net worth,

the existence of third-party financing of premiums for the policies, the Straw Insureds' intent to

sell the policies, the purpose of the insurance sought, and whether the Straw Insureds had other

life insurance policies or pending applications for such policies.  (*See, e.g.*, GX 531, 541, 605,

650, 2000, 2122).  This false information was provided in response to specific questions asked

by the Insurers to try to detect and weed out STOLI and to ensure that applicants could afford the

policies for which they were applying.

The defendants did not just lie on application forms.   They routinely backed up their lies

with sham documents, arranged elaborate bank transactions to make it look like the Straw

Insureds—rather than investors—were paying the premiums on policies, and instructed Straw

Insureds they had recruited to refuse to speak to Insurer representatives and, worse, lie if

conversation could not be avoided.  (*See, e.g.*, GX 164, 679, 680 (false "estate plans" and

financial documents); Tr. 828-29 (false "inspection reports"); Tr. 145, 391-92, 936 (disguised

premium payments); GX 1304, 2841, 3019 (coaching seniors to lie)).  All three defendants

conspired to destroy documents and electronic records related to their fraud.  (Tr. 980-81; GX

3073, 3075).

### III.    EVIDENCE OF KERGIL'S ROLE

Far from having a minor or peripheral role in the offenses charged, Kergil was a very

significant player—a fact reflected in the Court's calculation of his United States Sentencing

Guidelines ("Guidelines" or "U.S.S.G.") range, which incorporated a three-point enhancement

for managerial or supervisory role pursuant to U.S.S.G. § 3B1.1.  (*See* Sentencing Tr. at 39).

Kergil actively recruited field agents to participate in the scheme.  (Tr. 902-05 (cooperator's

testimony that Kergil explained scheme to him and importance of "stay[ing] under the [Insurers']

radar")).  He also managed a subset of these agents, supplying them with forms for Straw

Insureds to complete and, more importantly, ensuring they had the necessary (false) financials

incorporated into their applications and bogus supporting documents to make those financials

appear real.  (*See* Tr. 780 (immunized witness's testimony that he received forms from Kergil);

Tr. 914-15 (cooperator's testimony that Kergil sent him fake financials in "worksheets" to be

incorporated into applications); GX 468, 1182, 1703 (false worksheets from Kergil); Tr. 821,

829 (testimony from corrupt "inspector" who agreed to create financial reports for Kergil that

appear verified but were based entirely on Kergil's false figures); Tr. 922 (cooperator's

testimony that Kergil told him the inspection reports were "just signed off on and no one actually

verified it"); GX 5504 (Kergil fax of false financial figures with note requesting corrupt

inspector to "correct" net worth figure upward)).  Kergil not only earned commissions on the fraudulently-procured policies for which he acted as agent himself, but also regularly took a cut of field agents' commissions.  (Tr. 903-04, 923).

Another key part Kergil played was keeping scheme participants in line, making sure they did not reveal the fraud to the Insurers.  In one instance, Kergil agreed to—and did—urge a crooked accountant to lie to an Insurer's investigators.  (*See* GX 136, 158).  Another time, Kergil forwarded to a co-conspirator field agent a "Checklist" with which to coach Straw Insureds. (GX 2841).  The list urged Straw Insureds to refuse to answer questions from people who might call to verify information regarding their insurance applications.  (*Id.*).  A few months later, when Kergil grew concerned that a particular Straw Insured might be compelled to speak to an Insurer, he emailed the field agent a list of false answers for the Straw Insured to give the investigator—chock full of lies designed to ensure that the scheme succeeded and was not uncovered.  (GX 1304).

Finally, when it became clear that federal authorities were investigating him and his co-conspirators, Kergil instructed two co-conspirator field agents to destroy records evidencing the scheme—to "get rid of everything with the name Advocate Brokerage, Michael Binday's name on it and his name on it and get rid of it" (Tr. 980-81), and to "get rid of" their "hard drive[s]." (*Id.*; Tr. 986-87; *see also* GX 3072 (recorded call between cooperator and Kergil in which Kergil does not deny he instructed cooperator to delete emails)); GX 3073 (transcript of GX 3072)).

IV.     THE DEFENSE CASE AT TRIAL

At trial, Kergil and the other defendants did not deny that they told blatant and repeated lies to the Insurers, but argued, among other things, that their conduct was not fraudulent because the Insurers "happily issued STOLI policies, while paying lip service to weeding out STOLI

policies for public relations reasons." *Binday*, 804 F.3d at 568.

In convicting the defendants on all counts, the jury rejected this and other arguments.

## V.      SENTENCING

As noted, the Court sentenced Kergil to 108 months' imprisonment for his crimes, and ordered very substantial restitution and forfeiture.  In calculating the appropriate Guidelines range for all defendants, the Court elected to measure loss based on actual loss (approximately $38 million) rather than intended loss (approximately $179 million).  (Sentencing Tr. at 37-38). Although Kergil had opposed application of a three-point enhancement for his managerial or supervisory role in the offense, pursuant to U.S.S.G. § 3B1.1, the Court found that the enhancement was warranted.  (Sentencing Tr. at 39).  (Kergil never argued for a *mitigating* role adjustment.)  Using the actual loss figure and the role enhancement, the Court calculated a Guidelines range of 155 to 188 months' imprisonment.  (*Id.*).  Finding that the Guidelines were ill-suited to properly measuring culpability and appropriate punishment for any defendant in this case, the Court opted to sentence Kergil below the applicable range, to 108 months' imprisonment.  (*Id.* at 53).

## VI.      KERGIL'S DIRECT APPEAL

On appeal to the Second Circuit, Kergil's principal arguments were that (1) the indictment failed to adequately allege the crimes of mail fraud, wire fraud, and conspiracy, and instead alleged a mere scheme to deceive; (2) the Court erred in its instructions to the jury defining scheme to defraud; (3) the indictment was constructively amended; (4) there was insufficient evidence of Kergil's intent to defraud the Insurers; (5) the Insurers' actual losses were unquantifiable, and there was in fact "no loss" for Guidelines purposes; and (6) Kergil's sentence was substantively unreasonable.

7

The Second Circuit, in affirming the convictions and sentences of Kergil and his co-defendants, rejected each of these arguments.  *See Binday*, 804 F.3d at 576-77 (rejecting Kergil's attack on sufficiency of indictment); *id.* at 578-80 (rejecting general challenge to sufficiency of intent evidence as well as Kergil's variant of the argument); *id.* at 581-82 (rejecting claim of instructional error); *id.* at 584-85 (rejecting constructive amendment claim); *id.* at 597-99 (rejecting challenge to loss calculation for sentencing purposes); *id.* at 600-01 (rejecting Kergil's substantive unreasonableness challenge to his sentence).

## ARGUMENT

The Court should deny Kergil's motion for relief under Section 2255.  To begin, each of his varied arguments are procedurally precluded from consideration either due to the mandate rule, or because of procedural default.  And, in any event, each argument raised by Kergil is meritless as a matter of substance, for the reasons discussed below.

### I.     LAW GOVERNING SECTION 2255 PETITIONS

Pursuant to 28 U.S.C. § 2255, a prisoner sentenced in federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" when the petitioner claims "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  Section 2255 states that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than

formal pleadings drafted by lawyers." *Erickson* v. *Pardus,* 551 U.S. 89, 94 (2007) (internal

quotation marks and citations omitted); *Williams* v. *Kullman,* 722 F.2d 1048, 1050 (2d Cir.1983)

(noting that courts should review *pro se* habeas petitions with a lenient eye).  Nevertheless, Rule

4(b) of the Rules Governing Section 2255 Proceedings provides that "[i]f it plainly appears from

the motion, any attached exhibits, and the record of prior proceedings that the moving party is

not entitled to relief, the judge must dismiss the motion."  Rules Governing § 2255 Proceedings

for the United States District Courts, Rule 4(b), 28 U.S.C. foll. § 2255.

## II.     THE MANDATE RULE AND PROCEDURAL DEFAULT

"It is well established that a § 2255 petition cannot be used to relitigate questions which

were raised and considered on direct appeal." *United States* v. *Pitcher,* 559 F.3d 120, 123 (2d

Cir. 2009) (internal quotation marks omitted); *accord United States* v. *Perez,* 129 F.3d 255, 260

(2d Cir. 1997) ("A § 2255 motion may not relitigate issues that were raised and considered on

direct appeal."); *United States* v. *Natelli,* 553 F.2d 5, 7 (2d Cir. 1977) (per curiam) ("[O]nce a

matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a

collateral attack under section 2255.").  This principle, also known as the "mandate rule,"

represents "a branch of the law-of-the-case doctrine" that "holds 'that where issues have been

explicitly or implicitly decided on appeal, the district court is obliged . . . to follow the decision

of the appellate court.'"  *Burrell* v. *United States*, 467 F.3d 160, 165 (2d Cir. 2006) (quoting

*United States* v. *Minicone*, 994 F.2d 86, 89 (2d Cir. 1993)); *see also United States* v. *Yeagley*,

No. 13 Civ. 2561 (KMK), 2017 WL 76903, at *5 (S.D.N.Y. Jan. 3, 2017) (applying long-

standing "mandate rule," which "bars re-litigation of issues or claims that were resolved,

explicitly or implicitly, on direct appeal"); *United States* v. *Kergil*, No. 12 Cr. 152 (CM), 2017

WL 3726044, at *2 (S.D.N.Y. Aug. 16, 2017) (applying mandate rule in denying Kergil's previously filed Rule 60 motions, which raised similar arguments)).

It is further well-settled that federal prisoners may not employ Section 2255 habeas petitions as a substitute for direct appeal. *See, e.g.*, *Bousley* v. *United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations omitted); *United States* v. *Perez*, 129 F.3d 255, 260 (2d Cir. 1997) ("A defendant is . . . barred from raising claims in his § 2255 motion that he failed to raise on direct appeal unless he shows cause for the omission and prejudice resulting therefrom."). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (citations omitted); *accord Massaro* v. *United States*, 538 U.S. 500, 504 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). "To satisfy the cause requirement the petitioner must show circumstances external to the petitioner, something that cannot be fairly attributed to him." *United States* v. *Zhang,* 506 F.3d 162, 166 (2d Cir. 2007) (internal quotation marks omitted).

If a defendant fails to establish "cause" and "prejudice" to excuse a procedural default, he can obtain collateral review of his constitutional claim only by demonstrating that the constitutional error "has probably resulted in the conviction of one who is actually innocent." *Bousley*, 523 U.S. at 623 (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.*

### III.   KERGIL'S COLLATERAL ATTACKS ON HIS CONVICTION FAIL

Kergil first raises a variety of arguments relating to the substance of his convictions.  The gravamen of Kergil's arguments in this regard is that (1) the scheme the Government alleged in the indictment and proved at trial was not a scheme to defraud, and as such was not cognizable under the mail and wire fraud statutes (Mem. at 5, 9-14, 27-34); and (2) there was insufficient evidence of Kergil's intent to harm the insurance carriers and to disprove his good faith (Mem. at 5, 14-26, 34-37).  Relatedly, Kergil asserts that (3) there was insufficient evidence of a conspiracy (Mem. at 5-6); and (4) there was error in the Court's instructions regarding both conspiracy and aiding and abetting liability in this case (Mem. at 6-8).  Each of these claims should be rejected on both procedural and substantive grounds.

### A.   The Mandate Rule and Procedural Default Preclude Consideration of These Arguments

Each of Kergil's arguments regarding the substance of his convictions are clearly foreclosed from consideration on collateral review, because each was addressed and rejected by the Second Circuit on direct appeal.  As noted above, Kergil argued on direct appeal that the indictment insufficiently alleged, and the proof was insufficient to establish, that he had the requisite *mens rea* for any of the crimes of which he was convicted.  He and his co-defendants expressly, repeatedly, and aggressively argued at every stage of the litigation that the Government could show only a scheme to deceive and not a scheme to defraud.  The Second Circuit considered all of these arguments carefully on appeal, and resoundingly rejected each one.  *See Binday*, 804 F.3d at 576-77, 578-80, 581-82.  And although Kergil did not specifically argue on appeal that the jury instructions regarding conspiracy and aiding and abetting liability were erroneous, his argument here is also precluded by the mandate rule.  Kergil's objections to the jury instructions in part focus on whether the Government could have established the

requisite *mens rea* for the defendant's fraudulent intent, a conclusion that the Second Circuit clearly resolved in the Government's favor on appeal.  *See id.*  Moreover, to the extent that the Court construes Kergil's claims regarding erroneous jury instructions as to conspiracy and aiding and abetting liability in ways that are not directly or indirectly foreclosed by the Second Circuit's consideration of his counts of conviction, Kergil's claims are still procedurally barred in this regard because he failed to raise these arguments on appeal, and does not (and cannot) establish either cause or prejudice to justify his failure to so raise them.

**B.      Each of Kergil's Arguments are Without Merit**

In any event, even if the arguments Kergil now raises were not procedurally barred due to the mandate rule (or because of his failure to raise them previously)—that is, even if the Court could reach the merits of Kergil's arguments—his claims would have to be denied as meritless, in light of governing precedent.

**1.      The Government Proved a Cognizable Scheme to Defraud at Trial**

Kergil asserts that "[t]here was no scheme to defraud any carrier proven at trial," because "[n]o witness testified that any of the carriers were deprived of their 'economic decision making,'" or "right to control its assets."  (Mem. at 13).  In so doing, Kergil attempts to assert that because the Government "just assumed that STOLI policies were an 'evil' that the carriers wished to avoid rather than a business that the carriers actually encouraged" (Mem. at 9), the Government at best only established a "scheme to deceive" the carriers, which is insufficient because "even 'deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to the ultimate value of the transaction.'"  (Mem. at 13 (quoting *United States* v. *DiNome*, 86 F.3d 227, 284 (2d Cir. 1996)).  But, as the Second Circuit recognized, the Government's proof at trial sufficed to prove that, far from only a simple "no-

sale" scheme, the misrepresentations and "deceit affected the victim's economic calculus or the benefits and burdens of the agreement" so as to be cognizable under the mail and wire fraud statutes. *Binday*, 804 F.3d at 570. Both James Avery, the former chief executive officer of Prudential's individual life insurance business, and Michael Burns, a senior vice president of Lincoln Financial, "testified unequivocally and at length that their companies refused to issue STOLI policies for economic reasons," and that "their companies expected that STOLI policies would have different economic characteristics that could reduce their profitability," including the four harms specified in the indictment: (i) that, by inflating the straw insured's financial resources, the insurers expected greater premium payments as wealthier individuals were expected to live longer; (ii) that the insurers would receive less income from premium payments than expected, since STOLI funders would typically fund near or at the minimum amount required by the policy as compared to non-STOLI policy holders; (iii) lapse rates for STOLI policies were lower, thus undermining actuarial assumptions for pricing purposes; and (iv) that STOLI holders were more likely to avail themselves of grace periods and other features that resulted in a reduced cash flow from premium payments to the insurers. *Id.* at 567-58, 573. This evidence "provided a legally sufficient basis for the jury to find that the defendants' misrepresentations exposed the insurers to an unbargained-for risk of economic loss, because the insurers expected STOLI policies to differ economically, to the insurers' detriment, from non-STOLI policies," and thus struck at an "essential element of the agreement" at issue, because the insurers' belief that they were issuing non-STOLI policies "significantly informed the [insurers'] financial expectations." *Id.* at 574. As such, the Government sufficiently established at trial that the defendants, including Kergil, participated in a scheme to defraud that is cognizable under the mail and wire fraud statutes.

In renewing his challenges to the sufficiency of the indictment and proof relating to "scheme to defraud," Kergil relies heavily on various authorities, each of do nothing to tip the balance in his favor (and most of which were decided after the Second Circuit's decision in *Binday*). For instance, Kergil relies upon the Supreme Court's decision in *Skilling* v. *United States*, 561 U.S. 358 (2010) (Mem. at 10, 24), in which the Supreme Court considered mail and wire fraud statutes to contrast their genesis to that of the honest services statute, 18 U.S.C. § 1346, in limiting the scope of that statute to criminalize "*only* the bribe-and-kickback core of the pre-*McNally* [v. *United States*, 483 U.S. 350, 360 (1987)] case law." *Id.* at 408. But that holding does nothing to undermine Second Circuit precedent regarding cognizable economic harm, as was established in this case, for purposes of traditional mail and wire fraud.

Kergil also relies upon *United States ex rel.* v. *Countrywide Home Loans,* 822 F.3d 650 (2d Cir. 2016), to argue that his conduct constituted at best a civil breach of contract, and not fraud. (*See* Mem. at 15-26). However, contrary to Kergil's assertion that *Countrywide* stands for the proposition that "[i]f there is a contract involved . . . then the only way fraud can be shown in a contractual relationship is if the alleged fraudster had no intention of keeping his part of the bargain at the time of executing the contract, or signing of the insurance application," (Mem. at 23), *Countrywide* in fact stands for the straightforward proposition that fraud cannot be established simply because a contract was subsequently breached. Nevertheless, "where allegedly fraudulent misrepresentations are promises made in a contract," fraud may be established if the defendant made the fraudulent misrepresentation "with the contemporaneous intent to defraud." 822 F.3d at 658. Thus, whether fraud can be established in the context of a contractual breach turns on "*when* the representations were made and the intent of the promisor *at that time*," and "where allegedly fraudulent misrepresentations are promises made in a

14

contract,"—such as, when Kergil and his co-conspirators made fraudulent misrepresentations to

hide the STOLI nature of the insurance policies sought—"a party claiming fraud must prove

fraudulent intent at the time of contract execution." *Id.* And despite Kergil's assertion to the

contrary, *Countrywide* does nothing to undermine the notion that a right to control theory is a

sufficient basis to establish wire fraud, because the right to control was not implicated by the

facts of that case.

*United States* v. *Takhalov*, 827 F.3d 1307 (11th Cir. 2016), an Eleventh Circuit case that

was decided after his conviction became final, also does not help Kergil. In *Takhalov*, the court

held that it was error for a district court to refuse to instruct the jury in a wire fraud case that it

"must acquit if they found that the defendants had tricked the victims into entering a transaction

but nevertheless gave the victims exactly what they asked for and charged them exactly what

they agreed to pay." 827 F.3d at 1310; *see id.* at 1323-24 (explaining that error was not

harmless, and ordering retrial). In concluding that the requested instruction was warranted on the

facts of that case, the *Takhalov* court relied on the very same body of Second Circuit law that the

Second Circuit itself relied on in affirming Kergil's convictions. *See id.* at 1313-14. And unlike

the defendants in *Takhalov*, Kergil and his co-defendants *got the instruction* that the Eleventh

Circuit held was warranted under Second Circuit law:

> "In order for the government to prove a scheme to defraud, it must prove that the
> scheme, if successful, would have created a discrepancy between what the
> insurance companies reasonably anticipated and what they actually received. If all
> the government proves is that under the scheme the insurance companies would
> enter into transactions that they otherwise would not have entered into, without
> proving that the ostensible victims would thereby have suffered some economic
> harm, then the government will not have met its burden of proof."

*Binday*, 804 F.3d at 581 (quoting jury instruction).  *Takhalov*, in sum, breathes no new life into

Kergil's claims but merely reaffirms the validity of this Court's jury instructions and the

soundness of this Court's and the Second Circuit's reasoning in upholding Kergil's conviction.

Finally, in *United States* v. *Finazzo*, 850 F.3d 94 (2d Cir. 2017) (discussed by Kergil at

Mem. at 3-4, 31-34), the court reviewed its prior precedent, including that of *Binday*, in

concluding that a conviction in mail or wire fraud may lie under a "right to control" theory,

where the jury was instructed that "a victim is deprived of potentially valuable economic

information it would consider valuable in deciding how to use its assets," and "[t]o act with

'intent to defraud' means to act knowingly and with the specific intent to deceive, for the

purpose of causing some financial or property loss to another."  *Id.* at 107-110.  As the Second

Circuit concluded, in examining its own prior precedents and placing *Binday* in that context,

"[t]he common thread of these decisions is that misrepresentations or non-disclosure of

information cannot support a conviction under the 'right to control' theory unless those

misrepresentations or non-disclosures can or do result in tangible economic harm."  *Id.* at 111.

Thus, Kergil's challenge to the scheme to defraud, as established by the Government at trial, fail.

## 2.      The Government Proved Kergil's Intent to Defraud at Trial.

Kergil next argues that "there was no evidence adduced at trial or even any allegations by

any witness at trial that Mr. Kergil *intended* that any of the Carriers to suffer any loss or 'actual

concrete' harm."  (Mem. at 14).  Kergil's recitation of the purported evidence at trial regarding

his role in the scheme (Mem. at 25-26)—which paints a self-serving gloss upon his own

actions—is contrary to fact.  As described above, the Government's proof at trial established that

Kergil recruited and supervised field agents to participate in the scheme, provided agents with

forms for the Straw Insureds to complete, and ensured that the applications and supporting

documents reflected false financials for the Straw Insured, as well as false responses on the questions designed to weed out STOLI. Kergil did all of this in an effort to cash in on the commissions that he and his co-conspirators earned on each fraudulently procured policy. And to keep the scheme afloat, Kergil further undertook efforts to ensure that the STOLI scheme was not detected by the Insurers, including by coaching people to lie to representations for the carriers, and then boldly instructed others to destroy evidence once it became apparent that he was under federal investigation.

One particular example highlights Kergil's intent to harm the Insurers in this manner. As the Government proved at trial, Kergil recruited one Straw Insured, Hanni Lennard, to the STOLI scheme, and managed with Binday's help to secure two $2 million policies on her life. (GX 1677, 1621, 1667). Kergil worked with Binday to coach Lennard to lie about her financials if approached by an Insurer. (GX 1687 (Kergil email to Binday confirming he had spoken with Lennard's daughter about making sure she did not speak to any insurer; Binday admonition that "[i]f she does speak to anyone, she should be consistent with the financials" Kergil had prepared); GX 1703 (false net worth and income worksheet)). When Lennard died, Kergil and Binday schemed to ensure that each got a massive cut of one Insurer's death benefit: with $343,000 going to Binday and over $1 million going to Kergil. (GX 1720; GX 1654; GX 1698; GX 2670 at 7, 11, 41, 45, 84 (withdrawal of $1 million and purchase of cashier's check in amount of $1,000,472.18); *id.* at 30 (statement showing check of $306,245.02 paid out); GX 2659-A at 302-03 (cashier's checks in amounts of $1,000,472.18 and $306,245.02 deposited into personal account Kergil held jointly with his mother); GX 2659 at 268 (deposit of $1.3 million into Kergil's personal account); GX 5004 (stipulation that on or about March 13, 2012, Kergil paid $343,143.59 for the benefit of Binday from the personal account he held with his mother)).

Kergil then made $900,000 upon the death of another Straw Insured, Doris Riviere, after he, Binday, and a third person scrambled to "invest" in the fraudulently-procured policy on the eve of the insured's death. (*See* GX 2659 at 226; GX 2693 at 5, 6; GX 2671 at 1; Tr. 1156-59).

As the Second Circuit recognized, to establish Kergil's fraudulent intent, it was "not necessary" for the Government to establish "that [the] defendant intend[ed] that his misrepresentation actually inflict a financial loss"; rather, it is sufficient to prove "that his misrepresentations induce[d] a counterparty to enter a transaction without the relevant facts necessary to make an informed decision." *Binday*, 804 F.3d at 579. The evidence at trial here against Kergil more than met this mark. *Cf. id.* at 580 (rejecting Kergil's argument that there was insufficient evidence of his intent to defraud on appeal).

Finally, Kergil asserts that because the Second Circuit's opinion in *Binday* "'does not mention the words 'good faith,'" and because "nowhere during the trial did the prosecution address Mr. Kergil's good faith, much less disprove it beyond a reasonable doubt," his conviction should be vacated. (Mem. at 36). Although this is the first time Kergil raises this argument in any form, the Court's instruction regarding intent ensures that there was no error or confusion on the part of the jury in convicting Kergil despite any purported evidence of good faith. (*See*, *e.g.*, Tr. 1578-83 (noting "[t]o act with intent to defraud, to participate in a scheme with intent to defraud means to act willfully . . . and with specific purpose of causing some deprivation of money or property . . . . In general, you should examine everything that occurred in order to decide whether a particular defendant had the intent to defraud the insurance company victims."). Although Kergil asserts that "[w]ith STOLI, the premium rates are the same, the commissions are the same, the life expectancy risk is the same and the profit potential with STOLI is far greater for the carrier," (Mem. at 32), as the Second Circuit noted in its opinion on

18

appeal in rejecting this self-serving argument, "[t]here is no evidence in the record indicating that Kergil had reviewed the insurers' financial statement and inferred from them that STOLI business was welcome. What *is* in the record is that Kergil signed certifications required by the insurers that were specifically designed to avoid issuing STOLI policies." 804 F.3d at 581. As such, the jury was entitled to reject the inference Kergil now champions here regarding his belief as to the Insurers' desire to issue STOLI policies, and there is no risk that the jurors convicted Kergil despite their belief in his good faith.

### 3. There is No Error In Kergil's Conspiracy Conviction.

Kergil further argues that his conviction for conspiracy should be overturned. (Mem. at 6-7). Kergil erroneously relies upon *United States* v. *Mahaffy*, 693 F.3d 113 (2d Cir. 2012), a case involving a conspiracy to commit securities fraud, in which the defendants defrauded the brokerage firms at which they worked of property by providing confidential information belonging to those firms to a day trading firm, to assert that "property" must involve "confidential information." (Mem. at 6). But, of course, the language Kergil quotes from *Mahaffy* do not serve to limit what constitutes cognizable harm under the mail and wire fraud statues, and are properly read to reflect the specific facts of that case. *See id.* at 122; *see also generally id.* (affirming sufficiency of evidence in conviction, but vacating and remanding for failure of Government to disclose *Brady* material). Accordingly, Kergil's argument in this regard is frivolous.

### 4. There is No Error In the Jury Instruction for Aiding and Abetting Liability

Finally, Kergil asserts there was error in the Court's instruction to the jury regarding aiding and abetting liability, because, in Kergil's view, the Court misinstructed the jury "to convict Mr. Kergil because they misunderstood that if Mr. Binday was guilty, then Mr. Kergil

19

has to be as well." (Mem. at 7).  Putting aside the fact that the evidence adduced at trial was

more than sufficient to sustain a conviction against Kergil as to the substantive counts without

reliance on an aiding and abetting theory, in any event, when the instruction is read as a whole,

there is no error in this regard.  *See United States* v. *Schultz*, 333 F.3d 393, 413-14 (2d Cir.

2003) (noting that, in determining whether a jury instruction was erroneous, relevant inquiry is

"whether considered as a whole, the instruction[ ] adequately communicated the essential ideas

to the jury").  Before discussing the individual charges, the Court clearly instructed that each

count was to be separately considered for each defendant:

> You need to consider separately whether the government has proved the guilt of
> *each* defendant on *each* count . . . Your decision concerning one defendant or one
> count has no bearing on the decisions you make concerning the other two
> defendants or other counts.  Any evidence that relates solely to one defendant is
> not evidence against any other defendant.  Remember that you're effectively
> conducting three trials here.  We will try to make your task easier for you by
> giving you a verdict sheet for each defendant.

(Tr. 1576).  The Court then correctly explained that, in the context of aiding and abetting law, the

the first inquiry is whether the crime itself has been committed—meaning, whether "somebody

else committed the crime," because no aiding and abetting liability can lie where there is no

underlying conviction.  (Tr. 1586).  The Court also correctly advised that, if the Government had

proven beyond a reasonable doubt that the defendant being considered had committed the

substantive offense, there was no need to consider aiding and abetting liability.  (*Id.*).  Finally,

the Court correctly instructed that under the aiding and abetting statute, "whoever aids, abets,

counsels, commands, induces or procures the commission of an offense is punishable as a

principal," and a conviction under this theory requires the Government to establish that "the

defendant *you are considering* helped or assisted that person in the commission of the offense."

(Tr. 1586-87 (emphasis added)).  Given that these are the standard instructions for aiding and

abetting liability, there was no risk of jury error in this regard.  *Cf.  United States* v. *Labat*, 905 F.2d 18, 23 (2d Cir. 1990) ( "To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime.").  Accordingly, Kergil's argument is also frivolous.

## IV.   KERGIL'S CONSTITUTIONAL CLAIMS ARE BOTH PROCEDURALLY BARRED AND MERITLESS

Kergil also argues that his convictions violated the due process clause (Mem. at 37-41, 43-45), the *ex post facto* clause (Mem. at 41-42), and the notice clause of the Sixth Amendment (Mem. at 46-48), and that the rule of lenity requires vacatur of his conviction on all counts (Mem. at 48-63).  Kergil has procedurally defaulted on these claims by failing to raise them on direct appeal, and by not asserting any "cause" or "prejudice" that appropriately justifies such failure.  But, in any event, each claim is meritless.  The Court should thus reject these constitutional claims in their entirety.

### A.   Applicable Law

Fair notice is a constitutional guarantee grounded in due process which requires a criminal statute "give fair warning of the conduct that it makes a crime."  *Lurie* v. *Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) (quoting *Bouie* v. *City of Columbia*, 378 U.S. 347, 350 (1964)).  In recognition of this general principle, the rule of lenity counsels that "construction of a criminal statute must be guided by the need for fair warning," *Crandon* v. *United States*, 494 U.S. 152, 160 (1990), but the Supreme Court has noted that it only applies if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."  *Barber* v. *Thomas*, 560

U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see also United States* v. *Castleman*, 134 S. Ct. 1405, 1416 (2014). As a corollary to these principles, the "*Ex Post Facto* Clause enshrines in the Constitution a basic presumption of our law, that is, legislation in the criminal law is not to be applied retroactively." *United States* v. *Kilkenny*, 493 F.3d 122, 126 (2d Cir.2007) (internal quotation marks omitted)). For a law to contravene the *Ex Post Facto* clause, "two critical elements must be present: First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *United States* v. *Kumar*, 617 F.3d 612, 624-25 (2d Cir. 2010) (quoting *Miller* v. *Florida*, 482 U.S. 423, 430 (1987) (internal quotation marks omitted)).

### B.      Discussion

With regard to Kergil's constitutional claims, he has procedurally defaulted each of these claims by failing to raise them on direct appeal.[3] Moreover, Kergil has not attempted to demonstrate any cause or prejudice that excuses his procedural default, nor could he. Issues regarding the scope of the wire fraud statute and whether his conduct properly fell within prior precedent examining and applying the statute were litigated throughout the course of the case, in advance of trial, and during the appeal. Kergil could have asserted these constitutional arguments in those contexts, and offers no "circumstances external" to him for why he failed to do so. *Zhang*, 506 F.3d at 166.

---

[3] Kergil asserts, in his Petition, that "Ground One" for his motion is that "The District Court Lacked Jurisdiction," and for supporting facts references his "attached Memorandum of Law." (Mot. at 4). To the extent that any of Kergil's arguments as raised in his Memorandum can be construed as jurisdictional objections to his convictions, they should be dismissed not only because, as Kergil admits, he did not "raise this issue" on his appeal (*see id.*)—and, despite Kergil's assertion otherwise, jurisdictional arguments need not be raised for the first time in a 2255 Petition. In any event, each of these arguments that Kergil raises which might form any jurisdictional challenge are without merit.

Kergil also cannot show prejudice so as to excuse his failure to proceed on these claims in his direct appeal because his arguments regarding fair notice, due process, the rule of lenity, and the *ex post facto* clause are without merit.  None of these concerns are implicated by Kergil's prosecution and conviction here.  As the Supreme Court has explained, "[i]n 1909, Congress amended the statute to prohibit, as it does today, 'any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*," and since that time, "[e]mphasizing Congress' disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights."  *Skilling* v. *United States*, 561 U.S. 358, 399-400 (2010) (quoting 18 U.S.C.  § 1341 (emphasis in original)).  It is against the backdrop that the Second Circuit, in rejecting the defendants' arguments on appeal, found without merit the "[d]efendants['] attempt to distinguish the instant case from our precedent."  804 F.3d at 579; *see also id.* at 570-71 ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.  But we have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement.").  Because the Government's theory of prosecution against Kergil and his co-conspirators lies squarely in the heartland of the Second Circuit's precedent regarding cognizable harm under the mail and wire fraud statutes, Kergil's constitutional arguments regarding fair notice, due process, and the *ex post facto* clause are without merit.

For this same basic reason, the rule of lenity is also not implicated here.  "The rule of lenity . . . is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the [statute], such that even after a court has seized every thing from which aid

can be derived, it is still left with an ambiguous statute." *United States* v. *Shellef*, 507 F.3d 82, 106 (2d Cir. 2007) (quoting *Chapman* v. *United States,* 500 U.S. 453, 463 (1991) (citations, internal brackets, and internal quotation marks omitted)).  Kergil can point to no ambiguity in the mail or wire fraud statutes that would lend itself to the application of the rule of lenity here.

Kergil's cited authorities are each inapposite.  *United States* v. *Brennan*, 183 F.3d 139 (2d Cir. 1999) (cited at Mem. at 49) can easily be distinguished as the Second Circuit's concern in dictum about the Government's novel theory of an existence of a fiduciary duty of insurance underwriters to insureds, coinsurers, and reinsurers regarding certain facts pertinent to a crash of an insured, an airline, in the aftermath of an airplane crash.  *Id.* at 141, 150.  No such novel theory of fiduciary duties was implicated in Kergil's case.  Similarly, Kergil's reliance on *United States* v. *$52,037.96*, No. 14 Civ. 591 (D. Conn. Sept. 23, 2015) (Dkt. No. 21), an opinion dismissing a civil *in rem* action after examining the scope of honest services fraud, is equally unavailing in establishing his rule of lenity argument in this context.  There, the district court dismissed the forfeiture proceeding because the Government had failed to adequately plead fraud, either under the standard set forth in *United States* v. *Shellef*, 507 F.3d 82, 107 (2d Cir. 2007), or under a theory of honest services fraud, because the sale of the items at issue were negotiated at arm's length, the scheme resulted in a monetary profit to the purported victim, and the misrepresentation did not go to the essential element of the bargain (or indeed, any part of the bargain).  *See id.* at 11-14.  For the reasons set forth above, the facts of the *in rem* action are clearly distinguishable from the instant case, and the scheme to defraud the Insurers that Kergil and his co-conspirators perpetrated.

Finally, to the extent that Kergil argues that "[a]t this late date, the government has failed to state with particularity what act of Mr. Kergil's alone (as opposed to anyone else's conduct)

was a crime" (Mem. at 43), this argument is also without merit.  As the Second Circuit noted, in rejecting the defendants' constructive amendment arguments on appeal:

> From the indictment through the trial, the government consistently maintained that defendants sought to obtain money (in the form of commissions) from the victim insurers, by an elaborate scheme of deliberate falsehoods that were designed to deceive the insurers into issuing policies that reasonable insurers would have and did believe were economically disadvantageous, and that defendants knew that the insurers were attempting to detect and avoid, and that defendants deliberately marketed to investors as policies on which the investors would profit at the insurers' expense.

*Binday*, 804 F.3d at 585.  There can be no argument, given the consistency of the Government's position as to the defendants' culpability for the duration of the prosecution, that Kergil did not have adequate notice as to the allegations against him.   Thus, Kergil's invocation of constitutional claims here does nothing to support the relief he seeks.

## V.   KERGIL CANNOT ESTABLISH THAT HE SUFFERED FROM INEFFECTIVE ASSISTANCE OF COUNSEL

Kergil argues that he suffered from ineffective assistance from counsel.  (*See* Mot. at 5 (defining "Ground Two" for his 2255 Petition as "Ineffective Assistance of Counsel"); Mem. at 4).  Specifically, Kergil argues that because of "Mr. Binday's 'shenanigans' and not paying his attorneys after the trial was over, no one ever filed any post-trial briefs" on behalf of Kergil's behalf, which Kergil asserts constitutes "constitutionally Ineffective Assistance of Counsel." (Mem. at 4).  Because Kergil does not (and cannot) meet the standard for constitutional ineffectiveness articulated under *Strickland*, this argument also fails.

### A.   Applicable Law

To establish an ineffective assistance of counsel claim, "a defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States* v. *Brown*, 623 F.3d 104, 112 (2d Cir.

2010); *see Strickland* v. *Washington*, 466 U.S. 668, 688-89, 693-94 (1984).  Only if both elements are satisfied can a reviewing court conclude that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.

With respect to the first element—the "performance" prong—to eliminate the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'"  *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689); *Parisi* v. *United States*, 529 F.3d 134, 141 (2d Cir. 2008) (noting that reviewing courts should be "mindful of the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts").

With respect to the second element—the "prejudice" prong—a defendant must meet the "heavy burden" of showing "actual prejudice"; in other words, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 692, 694.  A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687.

In applying these principles, the Supreme Court has noted that the "object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.  Applying this teaching, the Second Circuit has often rejected ineffectiveness claims by determining that, in view of the strength of the prosecution's case, the defendant is unable to establish prejudice.  *See, e.g.*, *Strouse* v. *Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (court declines to address alleged deficiencies of counsel given the overwhelming evidence of guilt at trial); *United States* v. *Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [appellant], there is little reason to believe that alternative counsel would have fared any better."); *United States* v. *Reiter*, 897 F.2d 639, 645 (2d Cir. 1990) (although counsel's performance at times fell below professional standards, Sixth Amendment claim fails "given the overwhelming evidence against [the defendant]").

**B.     Discussion**

Kergil cannot establish either prong of *Strickland* ineffectiveness.  To begin, all three defendants in fact moved, during trial, for a judgment of acquittal pursuant to Rule 29.  The Court entertained argument from all three defense counsel on many of the same issues regarding whether the scheme at issue was cognizable, and whether the Government's proof was sufficient, to establish that a fraud had occurred, as had been raised during the duration of the proceedings, and then were again raised by the defendants on appeal.  (*See* Tr. 1215-33).  The Court then (correctly) denied the motions.  (Tr. 33).  Thus, Kergil's basic factual premise as to ineffectiveness fails.  Second, there is no *per se* rule that it is unreasonable for counsel to not file post-trial motions, especially if counsel does not believe there would be any benefit to raising such claims in a post-trial context in lieu of raising them on appeal.  Finally, Kergil does not (and

cannot) articulate any way in which he suffered prejudice through his counsel's failure to file a Rule 33 motion, which requires vacatur only if the defendant can establish that the "interest of justice so requires." Fed. R. Crim. P. 33(a). For instance, Kergil points to no newly discovered evidence upon which a Rule 33 motion could lie. *See* Fed. R. Crim. P. 33(b)(1); *see also United States* v. *Gordilis*, 982 F.2d 64, 72 (2d Cir. 1992) (noting Rule 33 motions based on newly discovered evidence should be granted only under "the most extraordinary circumstances" such as when the evidence "would probably lead to an acquittal."). Moreover, none of the arguments he advanced on appeal, or now, have any merit, or otherwise undermine confidence in his conviction, in light of the overwhelming evidence, both as to the scheme as a whole and as to Kergil's rule therein, supporting his conviction. Accordingly, Kergil's passing assertion of ineffective assistance should be rejected.

## VI.    KERGIL IS NOT ENTITLED TO RESENTENCING

Kergil asserts as Grounds Three and Four in his Petition that his sentence was based on an erroneous calculation of loss, and that the sentencing Guidelines calculations were incorrectly calculated. (*See* Mem. at 3-4). To the extent this Court has not already addressed and rejected these arguments (*see* Dkt. No. 428), the Second Circuit addressed and rejected them on direct appeal, and thus Kergil is precluded from reconsideration of these claims here. *See Binday*, 804 F.3d at 596-600. Of note, the Second Circuit emphasized that, even if the loss calculations were imprecise for purposes of sentencing, it took "comfort in the district court's emphatic statement that it would have imposed the same sentence regardless of the loss amount, which renders any error in the loss calculation harmless." *Id.* at 598. Further, the Second Circuit noted that, "even if no loss is attributed to the policy outcomes on the STOLI policies that defendants fraudulently imposed on the insurers, the approximately $11.7 million that the defendants received in

commissions constitutes an actual loss to the insurers," which still resulted in a "20-level increase" in the Guidelines sentence. *Id.* at 599. Kergil's Guidelines range under this alternative calculation would be 121-151 months, which is still above the term to which Kergil was ultimately sentenced. *See id.* Since Kergil does not articulate any new argument for error with regard to his sentence, this challenge also fails.

## VII.   KERGIL CANNOT CHALLENGE HIS ORDER OF FORFEITURE

Finally, the Supreme Court's recent decision in *Honeycutt* v. *United States*, 137 S. Ct. 1626 (2017) (cited by Kergil at Mem. at 2-3), does not provide Kergil with a basis to vacate the forfeiture order in this case. Section 2255 is limited in coverage and scope to claims that challenge the legality of the defendant's "custody" and that seek "the right to be released." *See* 28 U.S.C. 2255(a) (permitting motions to vacate by "[a] prisoner in custody under sentence of a court . . . claiming the right to be released"). This custodial limitation embedded in the text of Section 2255 means that Kergil cannot now challenge the forfeiture ordered against him through this vehicle. *See Kaminski* v. *United States*, 339 F.3d 84, 87 (2d Cir.) (fine and restitution orders not challengeable in a Section 2255 proceeding) (collecting cases), *cert. denied*, 540 U.S. 1084 (2003); *see also Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994) (holding more generally that "the habeas corpus statute confers jurisdiction to district courts to entertain habeas petitions for relief solely from persons who satisfy the status or condition of being 'in custody'"); *Nigro* v. *United States*, No. 09-CR-1239 (PKC), 2016 WL 3211968, at *9 (S.D.N.Y. June 9, 2016), *appeal dismissed* (Sept. 9, 2016), *cert. of appealability denied* (July 7, 2016) (applying *Kaminski* to a collateral challenge of a forfeiture order and holding that the claim is not properly raised under § 2255). This is so even if the challenge to the non-custodial aspects of a sentence

is raised in conjunction with a challenge to a sentence of imprisonment.  *Kaminsky*, 339 F.3d at 87-88; *accord United States* v. *Thiele*, 314 F.3d 399, 400 (9th Cir. 2002).[4]

---

[4] Other courts to have considered forfeiture specifically have found that forfeiture may not be challenged in a habeas petition.  *See, e.g.*, *Rodriguez v. United States*, 132 F.3d 30 (1st Cir. 1997) (per curiam) (claim that forfeiture of property was excessive "is not cognizable in a § 2255 proceeding since appellant seeks only relief from a monetary-type penalty and not release from confinement."); *United States v. Ramsey*, 106 F.3d 404 (7th Cir. 1997) (unpublished) (same); *United States v. Banguera*, 62 F.3d 393 (5th Cir. 1995) (per curiam) ("Because [the defendant] is challenging only the forfeiture of assets, which does not go to the validity of his conviction or sentence, his claim is not cognizable under § 2255."); *United States v. Finze*, 428 F. App'x. 672, 677 (9th Cir. 2011) (unpublished) (because a "forfeiture claim . . . is not a claim for release from custody," claim is not cognizable on collateral review); *Smullen v. United States*, 94 F.3d 20, 26 (1st Cir. 1996); *Campbell v. United States*, 330 F. App'x. 482 (5th Cir. 2009) (per curiam) (fine and restitution orders not challengeable in a Section 2241 petition); *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997) (holding that "§ 2255 is not available to challenge an order of restitution imposed as part of a criminal sentence"); *United States v. Thiele*, 314 F.3d 399, 400 (9th Cir. 2002) (Section 2255 "is available to prisoners claiming the right to be released from custody.  Claims for other types of relief, such as relief from a restitution order, cannot be brought in a § 2255 motion, whether or not the motion also contains cognizable claims for release from custody.") *Blaik v. United States*, 161 F.3d 1341, 1342-1343 (11th Cir. 1998) (fine and restitution orders may not be attacked under § 2255) (collecting cases); *Arnaiz v. Warden*, 594 F.3d 1326 (11th Cir. 2010) (per curiam) (restitution order not challengeable in a Section 2241 petition).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Kergil's Section 2255 Petition in its

entirety, and the Court should decline to issue a certificate of appealability.

DATED:        October 13, 2017
              New York, New York


                                  Respectfully submitted,

                                  JOON H. KIM
                                  Acting United States Attorney


                          By: ___/s/_____
                                  Eun Young Choi
                                  Assistant U.S. Attorney
                                  Southern District of New York
                                  Tel. (212) 637-2187

## <u>CERTIFICATE OF SERVICE</u>

I, Eun Young Choi, hereby certify that on October 13, 2017, I caused a true and correct

copy of this memorandum of law to be served on defendant James Kevin Kergil by U.S. mail at

the following address:

> James Kevin Kergil
> Reg. No. 66387-054
> FPC Canaan
> P.O. Box 200
> Waymart, PA  18472

_____/s/_____<br>
Eun Young Choi<br>
Assistant U.S. Attorney