# EXHIBT ONE

**Lebovits Sentencing Memorandum**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AHT:TRP
F. #2012R01923

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2015

<u>By ECF</u>

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Chaim Lebovits
        <u>Criminal Docket No. 11-134 (SJ)</u>

Dear Judge Johnson:

     The government respectfully submits this letter in connection with the defendant's sentencing, which is scheduled for April 13, 2015.  While the Presentence Investigation Report ("PSR") indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51 months, the government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months.  Further, pursuant to the plea agreement entered into by the parties, the government recommends that the defendant be sentenced to a term of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

**I.  <u>Background</u>**

     The charges against the defendant arose from his involvement in a scheme to fraudulently induce insurance companies to issue policies with high death benefits to elderly insureds and later sell those policies for a profit, which occurred on or about and between January 2007 and May 2010.  <u>See</u> Pre-Sentence Investigation Report ("PSR") ¶ 11.  Many of the fraudulent policies were submitted through Liberty Planning, Inc., an insurance agency located in Monsey, New York, of which the defendant was the Vice-President and Managing General Agent.  PSR ¶ 4.  The defendant had authority to disburse funds from Liberty Planning's bank accounts, as well as the bank accounts of several other related entities which he controlled, including CSL Properties, LLC; CSL Properties II, LLC; CSL Properties III, LLC; and the Rocklyn Group, Ltd. (collectively, "the Lebovits Related Companies").  <u>Id</u>.

     Insurance companies do not ordinarily sell policies where the benefits payable upon the death of the insured are in excess of the amount needed to serve the specified

purpose of the policy. PSR ¶ 9.  Under New York State law, only the insured, a close family relative or an individual with an insurable interest can purchase life insurance policy on an insured's life. PSR ¶ 14.   In furtherance of the instant conspiracy, applications were submitted to insurance companies through Liberty Planning and other agencies which contained false statements that not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply.  PSR ¶ 12.  The false statements on the insurance applications included  (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) the insureds did not intend to resell the policies on the secondary market for life insurance; (3) the insureds intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or  promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies was "estate planning," "estate liquidity," "estate conservation" or some equivalent description.  Id. However, each of these statements was false.  To incentivize the elderly insureds to go along with the scheme, the conspirators paid cash and promised other financial incentives to them in exchange for the insureds submitting false applications. PSR ¶ 12.

Co-conspirators Moses Neuman, Yudah Neuman and Leo Fekete recruited elderly "straw insureds" who applied for life insurance primarily through Liberty Planning via insurance applications in which their net worths and incomes were inflated.  PSR ¶ 32. The Neumans also recruited and compensated Edward Grodsky, an accountant, who participated in the scheme by recruiting elderly straw insureds and assisting them in the application process by purporting to verify their inflated net worth and income information. PSR ¶¶ 32 and 36.   Many of the policies listed Avigdor Gutwein, a life insurance agent affiliated with Liberty Planning, as the insurance agent.  Gutwein knowingly submitted the fraudulent applications which contained false information to the insurance companies. PSR ¶¶ 32 and 34.   Leo Fekete recruited one elderly insured into the scheme and facilitated the filing of a fraudulent application which contained inflated net worth and income.  Fekete's wife, a licensed New York State insurance agent affiliated with Liberty Planning, received a commission on this policy. PSR ¶ 39.

It was also part of the scheme that the conspirators engaged in financial transactions designed to falsely convince the insurance companies that the straw insureds were paying the premiums on the policies, when in fact the policies were funded by third party investors, including the defendant. PSR ¶¶ 14, 32 and 34.  In order to conceal the source of the funds deposited into the insureds' trust accounts, the conspirators caused money to be exchanged among and between themselves, Liberty Planning, the Lebovits Related Companies and companies affiliated with the Neumans.  PSR ¶ 14.  The premium payments were either paid directly into individual trust bank accounts set up in the insured's names, or funneled through different accounts before being paid to the individual trust accounts, which in turn, paid the insurance companies.  Specifically, the defendant invested $1.9 million into two insurance policies issued to elderly insured Arnold Cohen.  The defendant deposited money for the premium payments directly into Cohen's individual trust account, and the trust account was used to pay the insurance company directly. Id.

2

After the insurance companies issued the policies to the insureds, the conspirators created false records and made false statements indicating that the elderly insureds had poorer health than they actually had. PSR ¶ 15.  This was done to cause the projected life expectancies of the insured to be lowered, which would, as a result, fraudulently inflate the resale prices that prospective purchases would be willing to pay for the straw buyer's life insurance policies on the secondary life insurance market. Id. To that end, the elderly insureds were directed by the conspirators to visit doctors and lie about health problems.

The conspirators stood to profit from the scheme through: 1) the death benefits they would collect if the insureds died before the periods of contestability expired; 2) the commission that Liberty Planning, other general insurance agencies, Gutwein and other other insurance agents who participated in the scheme would receive from the premiums paid; and 3) the profits that the conspirators could make by reselling the policies on the secondary market once the periods of contestability expired. PSR ¶ 16.  While the defendant intended to realize a profit on the fraudulent insurance policies, the defendant most likely lost more money than he gained on his investment in the Cohen policies. PSR ¶ 30.

In or about 2009, after an investigation by ING uncovered numerous fraudulent applications submitted through Liberty Planning, ING filed civil actions seeking to rescind life insurance policies submitted by Liberty Planning.  In addition, other insurance companies that did business with Liberty Planning terminated their contracts with Gutwein and other agents affiliated with Liberty Planning after learning of the fraudulent insurance applications.  Following an investigation led by the U.S. Postal Inspection Service, on or about February 23, 2011, agents arrested the defendant, Gutwein, Fekete, Grodsky and the Neumans.

On September 8, 2014, the defendant pleaded guilty to Count One of a superseding indictment charging him with conspiring to defraud insurance companies, via mail and wire fraud, in violation of 18 U.S.C. § 1349.  In the plea agreement, the government agreed to recommend a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B).

## II.     **Defendant's Guidelines Calculations**

The Department of Probation's Presentence Investigation Report calculates the defendant's United States Sentencing Guidelines range to be 41 to 51 months based on a total offense level of 22 and a Criminal History Category of I.  PSR ¶¶ 58, 90.  The PSR provides enhancements for loss amount and a two-point enhancement for the defendant's role in the offense not contemplated in the parties' plea agreement.   The government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 12 to 18 months, based on a total offense level of 13 and a Criminal History Category of I.

A.    <u>Loss Amount</u>

The PSR includes a 16-level enhancement corresponding to a loss amount of more than $1,000,000 but less than $2,500,000. PSR ¶ 49.   The PSR's calculation of loss is based on commission payments in excess of $1,000,000 obtained by Liberty Planning and Avigdor Gutwein over the course of the conspiracy. Id.   However, the government has no evidence of the defendant's personal involvement in the conspiracy other than his investment in two insurance policies, nor is it clear from the government's evidence that the total amount of the commission payments obtained during the course of the entire conspiracy were foreseeable to the defendant.

Further, consistent with the government's position as to the loss amount attributable to the other co-defendants in this case, the government believes that a more accurate assessment of the loss amount corresponds to the lapse rate assessed by the insurance companies.   Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insured individuals allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur.  Here, because the premiums were actually being paid by third-parties investors who counted on the pay-out of the policy as a return on their investment, they had no intention of letting the policies lapse.  As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.   However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors.

As a result, based on the evidence available to the parties at the time of the defendant's guilty plea, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), a reasonable estimate of the loss suffered by the insurance companies that is attributable to the defendant was more than $70,000 but less than $120,000 and a corresponding 8-point enhancement is appropriate. U.S.S.G. § 2B1.1(b)(1)(E).

B.    <u>Abuse of Position of Trust</u>

The PSR also includes a two-point enhancement for abuse of trust since the defendant was a licensed insurance agent, per Guideline 3B1.3.  The government has no evidence that the defendant personally submitted any insurance applications to the insurance companies.  In addition, the government agrees with defense counsel's contention that although the policies were submitted by Liberty Planning, of which the defendant is a principal, the insurance companies conducted independent verification of the policies prior to authorization.  Accordingly, the government stands by the Guidelines calculation set forth in the plea agreement entered into by the parties.

III.     <u>**Conclusion**</u>

   For the reasons set forth above, the government respectfully recommends a sentence of probation pursuant to Fed. R. Crim. P. 11(c)(1)(B), and restitution pursuant to 18 U.S.C. § 3663A, be ordered in this case, as it would be sufficient but not be greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. §  3553(a).

         Respectfully submitted,

         LORETTA E. LYNCH
         United States Attorney

     By:  /s/ *Tanisha Payne*
         Tanisha R. Payne
         Peter Baldwin
         Assistant U.S. Attorneys
         (718) 254-6358/6236

cc:  Clerk of the Court (SJ (by ECF)
   Nathaniel Z. Marmur, Esq. (by ECF and Email)
   USPO Michelle Espinoza, U.S. Department of Probation

# EXHIBT TWO

## Keller Judgment

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT FILED

## SOUTHERN DISTRICT OF CALIFORNIA 17 AUG 28 AM 11: 46

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br>JEFFREY B. KELLER (1) | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br><br>Case Number:  13CR0424-JLS  DEPUTY<br><br>Michael L. Lipman<br>Defendant's Attorney |

**REGISTRATION NO.**  37395298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒  pleaded guilty to count(s)  1 of the Superseding Information

☐  was found guilty on count(s)
after a plea of not guilty.
Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title & Section** | **Nature of Offense** | **Count Number(s)** |
|---|---|---|
| 18 USC 371 | Conspiracy to commit mail fraud and wire fraud and to defraud the United States | 1 |

The defendant is sentenced as provided in pages 2 through          5          of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s)

☒  Count(s)  (remaining counts)          are          dismissed on the motion of the United States.

☒  Assessment : $100.00 imposed
—

☒  No fine          ☒ Forfeiture pursuant to order filed          2/26/2014          , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

July 28, 2017
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page **2** of **5** |
|---|---|---|
| CASE NUMBER: | 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:

**Three (3) months**

☐   Sentence imposed pursuant to Title 8 USC Section 1326(b).

☒   The court makes the following recommendations to the Bureau of Prisons:

      1.   Incarceration at FCC Lompoc to accommodate family visits.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

      ☐   at _____ A.M.    on _____

      ☐   as notified by the United States Marshal.

☒   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

      ☒   on or before **September 15, 2017 before 12:00 PM**

      ☐   as notified by the United States Marshal.

      ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

    Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____

                       UNITED STATES MARSHAL

_____

By _____         DEPUTY UNITED STATES MARSHAL

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | JEFFREY B. KELLER (1) | Judgment - Page **5** of **5** |
| CASE NUMBER: | 13CR0424-JLS | |

## RESTITUTION

The defendant shall pay restitution in the amount of   **$1,000,000.00**   unto the United States of America.

Pay restitution in the amount of **$1,000,000.00** to the Internal Revenue Service through the Clerk, U.S. District Court. Payment of restitution shall be forthwith. During any period of incarceration the defendant shall pay restitution through the Inmate Financial Responsibility Program at the rate of 50% of the defendant's income, or $25.00 per quarter, whichever is greater. The defendant shall pay the restitution during his supervised release at the rate of $500.00 per month. These payment schedules do not foreclose the United States from exercising all legal actions, remedies, and process available to it to collect the restitution judgment.

Until restitution has been paid, the defendant shall notify the Clerk of the Court and the United States Attorney's Office of any change in the defendant's mailing or residence address, no later than thirty (30) days after the change occurs.

The Court has determined that the defendant does have the ability to pay interest. It is ordered that interest is not waived.

**Victim's Address:**
 IRS – RACS
Attn: Mail Stop 6261, Restitution
333 W. Pershing Avenue
Kansas City, MO 64108

# EXHIBT THREE

## Steinfeld Judgment

AO 245B (CASDRev. 08/13) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

14 APR -3 AM 9: 01

UNITED STATES OF AMERICA

**V.**

STUART STEINFELD (2)

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:   13CR0424-JLS

EUGENE G. IREDALE
_____
Defendant's Attorney

**REGISTRATION NO.**   38337298

☒ Correction of Sentence for Clerial Mistake (Fed. R. Crim. P. 36)

☒ pleaded guilty to count(s)   One of the Indictment

☐ was found guilty on count(s)   _____

after a plea of not guilty.
Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 371 | Conspiracy | 1 |

The defendant is sentenced as provided in pages 2 through ____5____ of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s)   (Remaining Counts)   are   dismissed on the motion of the United States.

☒ Assessment : $100.00 imposed

☐ No fine    ☐ Forfeiture pursuant to order filed                    , included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

March 7, 2014
_____
Date of Imposition of Sentence

HON. JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE

13CR0424-JLS

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| | |
|---|---|
| DEFENDANT: STUART STEINFELD (2) | Judgment - Page **2** of **5** |
| CASE NUMBER: 13CR0424-JLS | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
**Sixty (60) Days**

☐   Sentence imposed pursuant to Title 8 USC Section 1326(b).

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

     ☐   at _____ A.M.     on _____

     ☐   as notified by the United States Marshal.

☒   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☒   on or before **April 18, 2014**

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

    Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (CASD Rev. 08/13) Judgment in a Criminal Case

| DEFENDANT: | STUART STEINFELD (2) | Judgment - Page 5 of 5 |
| CASE NUMBER: | 13CR0424-JLS | |

# FINE

The defendant shall pay a fine in the amount of **$20,000.00** unto the United States of America.

This sum shall be paid by May 1, 2014 through the Clerk, U.S. District Court.

# EXHIBT FOUR

**Neuman Sentencing Memorandum**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

<u>By ECF</u>                                                                January 17, 2014

The Honorable Sterling Johnson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                    Re:     United States v. Moses Neuman
                            <u>Criminal Docket No. 11-134 (SJ)</u>

Dear Judge Johnson:

            The defendant in the above-referenced case, Moses Neuman, is scheduled to be
sentenced on January 28, 2014.  On April 16, 2013, the defendant pleaded guilty to Count One of
a thirteen-count superseding indictment charging him with conspiring to commit bank and wire
fraud, in violation of 18 U.S.C. § 1349.  While the Presentence Investigation Report ("PSR")
indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51
months, the government respectfully argues that, in accordance with the plea agreement entered
into by the parties, the Court should find the applicable Guidelines range to be 18 to 24 months.
Further, the government respectfully submits this letter in opposition to the defendant's letter
dated December 30, 2013 ("Def. Ltr."), asking the Court to issue a non-custodial sentence.  For
the reasons stated below, the defendant should be sentenced within the Guidelines range of 18 to
24 months.

**I.      <u>Background</u>**

        A.          <u>Offense Conduct</u>

             The defendant helped execute a scheme to deceive insurance companies into
entering into contracts for life insurance policies.  <u>PSR</u> ¶¶ 11-15.  Specifically, the insurance
companies would not have sold the life insurance policies at issue if they had known that the
premiums for such policies were paid by investors, as opposed to the insured-customers
themselves or their relatives, and that the policies would later be resold on the secondary market.
<u>Id</u>.  Generally, insurance companies do not knowingly sell a life insurance policy if the purchaser
of the policy intended from the outset to later resell the policy, nor do they knowingly sell a life
insurance policy where a third-party investor, rather than an insured or an owner, would pay the
premium.  The defendant was able to fool the insurance companies into issuing such policies by
recruiting straw applicants and instructing them to make false statements on their insurance

applications and further coaching to them on how to answer questions by third-party verifiers hired by the insurance companies to check the accuracy of the applications.  The defendant helped pay the straw buyers for their role in the scheme.

As a result, the defendant caused the submission of applications with materially false statements to insurance companies.  These false statements not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply.  The false statements that the defendant had the straw applicants submit were that: (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) neither the insureds nor the owners intended to resell the policies on the secondary market for life insurance; (3) the insureds and the owners intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or  promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies were "estate planning," "estate liquidity," "estate conservation" or some equivalent description.  Id. at ¶ 12.  Each of these statements was false.  To incentive straw buyers to go along with his scheme, the defendant paid cash and promised other financial incentives to them in exchange for the straw buyers submitting false applications.  The defendant engaged in the scheme for three years and, during that time, he and his co-conspirators obtained hundreds of millions of dollars in life insurance through the submission of fraudulent applications.

Further, to falsely convince the insurance companies that the straw buyers were personally paying the premiums on the policies, the defendant paid some of the premiums from the bank accounts of several companies he or his wife controlled.  These bank accounts were established in the names of irrevocable life insurance trusts for the straw buyers and were funded by the defendant and his co-conspirators and other third-party investors.

 In addition, after the defendant fraudulently induced insurance companies to issue policies (normally with high death benefits to elderly insureds), the defendant would assist in the creation of false records and the submission of false statements which were intended to lower the life expectancies of the elderly insureds in order to fraudulently inflate the resale prices that purchasers would be willing to pay for these policies on the secondary market (since it would make it appear as if the insured would soon die, allowing the investor to quickly collect on the policy).  In particular, the defendant instructed one straw buyer to go to the doctor and complain of the symptoms of Transient Ischemic Attacks, a very serious medical condition from which the straw buyer did not suffer.  PSR at ¶21.

## II.    Guidelines Calculation

### A.    Loss Amount

Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insureds allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur.  Here, because the premiums were actually being paid by third-parties investors (who recruited elderly straw buyers) and who counted on the pay-out of

2

the policy as a return on their investment, they had no intention of letting the policies lapse.  As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.

However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors.  As a result, based on the evidence available to the parties at the time, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), the parties agreed that a reasonable estimate of the loss suffered by the insurance companies was more than $120,000 but less than $200,000.  While the PSR noted that the defendant agreed to an amount of forfeiture of $300,00, that figure should not affect the loss amount.   During a conversation with the Probation Officer who authored the PSR, the government incorrectly told the Officer that the $300,000 represented commissions that the defendant improperly received as a result of his fraud, and the PSR accordingly added this amount to the loss figure, resulting in $420,000 of loss attributed to the defendant.  PSR ¶ 26.   In reality, the forfeiture amount ($300,000) represents proceeds from the resale of policies on the secondary market. While such sales were improper, they did not cause financial harm to the insurance companies.

As a result, the government respectfully requests that the Court adopt the loss amount of $120,000.

### B.  Sophisticated Means

The PSR includes a "sophisticated means" enhancement.  PSR ¶ 43.  While the scheme the defendant helped execute may not have been simple, and while it certainly was very serious, it is the government's position that the scheme was not "especially complex or especially intricate."  See U.S.S.G. § 2B1.1, Application Note (3)(c).  The defendant's insurance fraud was similar to many insurance fraud schemes where the applications for the policies at issue misstate material facts about the applicant's qualifications.  Further, the government's plea agreement contains no such enhancement and the government, in accordance with that agreement, continues to assert that the Court should compute the Guidelines calculation without this enhancement.

### C.  Global Plea

 The government's plea agreement provides for an additional one-point reduction in the calculation of the Guidelines range for the defendant's acceptance of a global plea, pursuant to U.S.S.G. § 5K2.0.  Because the majority of the defendant's co-conspirators also pleaded guilty alongside him, he is entitled to that reduction, even though it is not reflected in the PSR.  See United States v. Figueroa, 2013 WL 4679948 at *5 (E.D.N.Y.  Aug. 30, 2013) (Irizarry, J.) (noting that the district court the "subtracted two points for the global plea arrangement, even though that had not been recommended by the Probation Department.").

As a result, the government urges the Court to adopt the following Guidelines calculation:

III.    <u>Conclusion</u>

For the reasons discussed above, the government respectfully requests that the Court sentence the defendant to a term of incarceration within the applicable Guidelines sentencing range of 18 to 24 months' imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:    ___/s/_____
       Todd Kaminsky
       Assistant U.S. Attorney
       (718) 254-6367

cc:    Clerk of Court (SJ)
       Susan Necheles, Esq.  (by email)

# EXHIBT FIVE

**Lebovits** *New York Post* **Article**


METRO

# $500M 'insure-scam' ring nailed

By Philip Messing

February 24, 2011 | 5:00am

Greedy life-insurance agents took out huge policies on penniless seniors, and then asked them to fake illnesses so they'd seem more likely to die, as part of a $500 million scam, investigators said yesterday.

The fraudsters sought to cheat not only the insurance companies, from whom they reaped huge commissions, but also investors looking to buy the policies on the secondary market, postal inspectors said in mail-fraud charges filed against eight defendants in Brooklyn federal court.

Chaim Mayer Lebovits, of Liberty Planning, in Monsey, NY, facilitated the purchase of policies on behalf of the elderly "straw buyers," according to the complaint.

He and seven other defendants were released on bail yesterday.

*Recommended by*

# EXHIBT SIX

**Quatrella *Wall Street Journal* Article**

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.          Order a reprint of this article now

# THE WALL STREET JOURNAL.

WSJ.com

NOVEMBER 13, 2008

# Source of Cash for Seniors Is Drying Up

By ANNE TERGESEN

Older adults turning to the "life settlement" industry to help them through tough times are finding that this popular source of quick cash is getting harder to tap.

Life settlements, in which people sell their life-insurance policies to investors in exchange for a lump-sum payment, were a $12.2 billion business in 2007, according to Conning Research & Consulting Inc. in Hartford, Conn. Despite regulators' concerns about the industry's high fees, opaque nature and aggressive sales practices, that figure is more than triple the amount of just three years earlier. The growth, in part, reflects the fact that retirements have been stretching longer -- and nest eggs shrinking faster -- than many retirees ever imagined.

More recently, however, fallout from the credit crisis, coupled with a critical change in September in how sales of life-insurance policies are priced, means that several buyers of such policies -- who make their money by pocketing the death benefit when the initial policyholder dies -- have either pulled out of the market or scaled back their purchases. The buyers that remain are, in many cases, offering lower prices. And that is cutting off a source of cash for the growing numbers of older adults who rely on such sales to shore up shaky finances.

"Several seniors we've transacted with lately have suffered tremendous losses in their retirement savings and seen substantial equity value in their homes wiped away," says Mark Goode, chief executive of the Peninsula Group in Washington, which buys life-insurance policies for institutional investors. "Many sellers simply need the cash. Their question today is: 'How quickly can we close?'"

The increasingly common answer: not very soon, if at all. Richard Hess of Lancaster, Pa., recently approached Milestone Managers & Providers in Manheim, Pa., about selling his $100,000 policy to raise "a little extra money." The 66-year-old was told he had missed his window of opportunity.

"Six months ago we might have had a buyer," says Kristian Armstrong, chief executive of Milestone, which specializes in buying policies with death benefits

under $1 million. "But as it stands now, 66-year-olds are typically not going to get anything."

## Big Investors Flee

Capital to purchase life-insurance policies is less plentiful than it was just a few months ago. Hit by the credit crunch, some big investors in life settlements, including hedge funds such as London-based BlueCrest Capital Management, have dropped out of the market or are limiting their purchases, industry observers say. Mr. Goode at the Peninsula Group estimates that "the number of active funders has been reduced by half over the past 12 to 18 months."

At National Financial Partners, a nationwide network of advisers specializing in life insurance, executive benefits and financial planning, commissions and fees from life settlements fell 28% in the first nine months of the year. BlueCrest didn't return a call for comment.

But the credit crunch isn't the only problem. In mid-September, a set of life-expectancy tables many investors use to help determine the prices they're willing to pay for policies were revised by one of the major firms that calculates them, 21st Services in Minneapolis. The tables now indicate policyholders are likely to live longer -- an average of about 20% longer for men and 15% for women -- than previously expected. (The exact change varies by age, gender, smoking status, and health.)

This means investors are likely to have to wait longer to collect those benefits. They're also likely to have to pay additional premiums -- an extra expense that's driving down the amount they're willing to pay for new policies.

Regulators have long expressed concerns about the life-settlement industry. While a cash windfall may be appealing, hidden costs -- including high fees and potential tax liabilities -- can substantially erode what policyholders receive from these deals.

Life-settlement brokers often pocket the lesser of 6% of a policy's face value or 30% of the gross sale price. While heirs who inherit life-insurance benefits pay no income tax on their payouts, those who sell their policies are subject to income tax on at least some of their gains. (The rest may qualify for capital-gains tax treatment. But because the Internal Revenue Service has yet to issue a ruling on the tax treatment of life settlements, this "remains uncertain," says Stephan Leimberg of newsletter publisher Leimberg Information Services.)

There are other risks, too. Those who sell a policy only to later decide they need additional insurance may find they've used up all of the coverage a carrier will sell them. And because the market isn't generally transparent, it's often hard for

those who sell policies to know whether they're getting a good price.

Still, with a life settlement, policyholders can typically net more than is available by surrendering a policy to the insurer for a lump-sum payment. Before selling, you should consult a financial planner, an accountant, or an attorney. Alternatively, if your policy has cash value and you prefer to keep it -- or can't find a buyer -- there may be ways to borrow against it or withdraw funds from it.

To get access to more cash, you can ask your insurer to scale back the death benefit. "By restructuring the policy, you may be able to draw out any cash that's no longer needed to support the coverage," says Gary Cotter, a certified financial planner at Cotter Financial in Sun City Center, Fla. But there are caveats. Under some circumstances, loans or withdrawals can trigger tax bills, Mr. Cotter says. Moreover, if you deplete your policy's cash value, your coverage will lapse. Ask your insurer to project the impact of a withdrawal or loan, he advises.

In some situations, you may even fare better than you would with a life settlement. Under New York Life Insurance Co.'s Access Plus program, for example, clients of the insurer who are 65 or older and meet certain health requirements may be able to borrow more than a policy's cash value. Borrowers must repay the principal and interest from their policies' death benefits. Those with a terminal illness, meanwhile, may be eligible to receive the policy's entire death benefit. They will typically owe ordinary income tax on the gains from such a payment, known as an "accelerated death benefit," Mr. Cotter says.

While the funding drought may reverse when the credit crunch recedes, industry insiders say the higher life-expectancy estimates are likely to continue to weigh on prices. "Due to the revisions in the tables, it's hard for buyers to even assess what a policy is worth," says Jonathan Forster, a partner at law firm Greenberg Traurig, which has represented investors in these transactions.

## Renegotiating Deals

This has left cash-strapped seniors at the mercy of yet another market beset by falling prices. Brokers say many deals negotiated this summer have since fallen through, only to be resurrected at lower prices.

Larry Rybka, president and CEO of Akron, Ohio, brokerage firm Valmark Securities, says investors canceled 12 of the 18 contracts his firm was closing at the time the life-expectancy tables were revised. Mr. Rybka says his brokers were ultimately able to secure deals -- at much lower prices -- for nine of the 12 transactions.

One of those clients recently negotiated the sale of a policy for 60% less than he was offered last summer, when he first shopped the policy to investors. Although

Case 3:17-cr-00003-AWT   Document 24-4   Filed 04/27/17   Page 4 of 4

reluctant to sell, the client -- a man whose business is now on the rocks -- can no longer afford to pay the premiums, Mr. Rybka adds.

Skip Santori, a financial planner at Santori & Peters in Monroeville, Pa., represents an 82-year-old woman who has been trying to sell two $750,000 policies since August. Two years ago, when Mr. Santori handled the sale of an identical policy for the same client, she received $145,000. This time, the winning bid came in at $120,000 per policy. But when the life-expectancy tables were revised, that deal fell though.

While a new buyer recently offered $83,000 for each policy, this company, too, has pulled the offers, Mr. Santori says. "They said their liquidity froze up."

**Write to** Anne Tergesen at anne.tergesen@wsj.com

Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com