**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/1/2019

JAMES KEVIN KERGIL,

                    Petitioner,

        v.

UNITED STATES OF AMERICA,

                    Respondent.

No. 17 Civ. 4675 (CM)
No. 12 Cr. 152 (CM)

---

**DECISION AND ORDER DENYING PETITIONER'S MOTION TO**
**VACATE, SET ASIDE, OR CORRECT HIS SENTENCE PURSUANT TO**
**28 U.S.C. § 2255**

McMahon, C.J.:

On October 7, 2013, following a twelve-day jury trial before this Court, Kergil and his two

co-defendants were found guilty of conspiracy to commit mail and wire fraud, in violation of Title

18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code,

Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343; and

conspiracy to obstruct justice through destruction of records, in violation of Title 18, United States

Code, Section 1512(k), in connection with a scheme to defraud insurance companies which the

defendants purported to serve as agents.[1]

On July 30, 2014, the Court sentenced Kergil to 108 months' imprisonment, to be followed

by three years' supervised release.  The Court also ordered substantial forfeiture and restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Kergil

and his co-defendants, directing only a limited remand, at the Government's request, for entry of

---

[1]    Defendant Resnick was also found guilty of conspiring to obstruct justice through destruction of records,
in violation of Title 18, United States Code, Section 1512(k).  Defendant Binday was not charged in that count.

an amended restitution order in a reduced amount of $37,433,914.17. *See United States v. Binday*, 804 F.3d 558, 601 (2d Cir. 2015). On December 14, 2015, the Second Circuit denied the defendants' motions for panel and *en banc* rehearing. On June 20, 2016, the Supreme Court denied Kergil's and Binday's petitions for a writ of *certiorari*. On June 24, 2016, this Court entered the amended restitution order that the Second Circuit had directed be entered. Shortly thereafter, Kergil began serving his sentence.

In or about December 2016, Kergil filed two motions for relief from his criminal judgment pursuant to Rule 60(b)(6) and a motion for resentencing pursuant to 18 U.S.C. 3582(c)(2). The Court denied those motions on August 16, 2017, and Kergil appealed.

On June 15, 2017, Kergil, proceeding *pro se*, filed a motion to vacate, set aside or correct pursuant to 28 U.S.C. § 2255. (17-cv-4675, Dkt. No. 1 ("Pet."); *see also* 17-cv-4675, Dkt. No. 10 ("Am. Pet.").) The petition alleges, first, a variety of arguments relating to the substance of his convictions, including that (1) the Government did not prove a "scheme to defraud" (Pet. at 5, 9–14, 27–34; Am. Pet. at 10–24, 25–38); (2) there was insufficient evidence of Kergil's intent (Pet. at 5, 14–26, 34–37; Am. Pet. at 10–24, 25–38, 47–49); (3) there was insufficient evidence of a conspiracy (Pet. at 5–6; Am. Pet. at 59–61); and (4) the Court gave improper jury instructions regarding both conspiracy (Pet. at 6; Am. Pet. at 25) and aiding and abetting (Pet. at 7; Am. Pet. at 9–10, 23–24). Kergil's petition further alleges constitutional claims, including that (5) his convictions violate the due process clause (Pet. at 37–40, 43–45; Am. Pet. at 1, 8–11, 38–43, 50–58), (6) the *ex post facto* clause (Pet. at 41–42; Am. Pet at 45–47), and (7) the notice clause of the Sixth Amendment (Pet. at 46–48; Am. Pet. at 43–45); and that (8) the rule of lenity requires vacatur of his conviction on all counts (Pet. at 48–63; Am. Pet. at 50–58). Finally, the petition (briefly)

alleges that (9) he was deprived of his federal constitutional right to the effective assistance of counsel after trial, because no one filed any post-trial briefs on his behalf (Pet. at 4).

Later, Kergil secured representation, and was granted permission to re-file his § 2255 petition. On July 6, 2018, Kergil's attorney filed an amended petition. (16-cv-4675, Dkt. No. 10.) The counseled petition is not materially distinguishable from the *pro se* petition, except that it adds one additional species of claim: that Kergil was deprived of the effective assistance of counsel at sentencing because (10) his counsel failed to research sentences handed down in other stranger-originated life insurance ("STOLI") prosecutions (Am. Pet. at 1–2); and (11) his sentence was based on an erroneous calculation of loss and, therefore, an incorrect Guidelines calculation (Am. Pet. at 3–7).

The following decision addresses both Kergil's original petition and his amended petition. For the reasons that follow, the motion is denied and the petitions are dismissed—there is no need for a hearing.[2]

## I.   Kergil's Arguments Previously Raised on Direct Appeal

Most of Kergil's claims were previously raised on direct appeal.  Because the Second Circuit considered but ultimately declined to grant relief on any of these grounds, he is not entitled to collateral relief.

### A.   Applicable Legal Standard

"In the federal prisoner context, upon full and fair appellate consideration of a constitutional claim, the federal prisoner receives *before* reaching the post-conviction stage what the state prisoner does not receive until *after* exhausting that stage—plenary consideration of her

---

[2]   The Court presumes the reader's familiarity with the trial evidence and facts of the case.

3

federal legal claims by independent federal judges." Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*, 7th Edition, § 41.7(e) (Matthew Bender) (emphasis in original). Consequently, "It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal"—the so-called "mandate rule." *United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009) (quoting *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001)); *see also, e.g.*, *United States v. Yeagley*, No. 08-CR-707 (KMK), 2017 WL 76903, at *5 (S.D.N.Y. Jan. 3, 2017) ("[Petitioner's first] claim never makes it out of the blocks, as it was squarely rejected by the Second Circuit on direct appeal.").

The mandate rule is broad; it "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). In other words, "where a defendant alleges varying factual predicates to support identical legal claims relating to a particular event, all claims constitute a single 'ground' for relief for purposes of applying the mandate rule in collateral proceedings." *Id.* at 55.

## B.     The Mandate Rule Bars Most of Kergil's Substantive Claims

Nearly all of Kergil's substantive challenges to his conviction are barred by the mandate rule. Principally, this includes Kergil's arguments (1) that the Government failed to prove a scheme to defraud under the mail and wire fraud statutes (Pet. at 5, 9–14, 27–34; Am. Pet. at 10–24, 25–38) and (2) that there was insufficient evidence of Kergil's intent to harm the carriers (Pet. at 5, 14–26, 34–37; Am. Pet. at 10–24, 25–38, 47–49). Both of these substantive challenges were squarely addressed by the Second Circuit and found not to constitute grounds for relief.

As the Second Circuit explained on direct appeal, "The crux of defendants' argument . . . is that the government failed to prove that they contemplated harm to the insurers that is cognizable

under the mail and wire fraud statutes." *Binday*, 804 F.3d at 569. Defendants' arguments before the Court of Appeals took several forms, including: (*i*) "insufficient evidence of any economic difference between STOLI and non-STOLI policies," *id.* at 571; (*ii*) to the extent any economic differences existed, insufficient evidence that they were "essential elements of the bargain, and . . . therefore . . . a cognizable harm," *id.*; and (*iii*) "insufficient evidence that [defendants] understood those differences, and thus that they intended the harm," *id.* 571–72.

The Court of Appeals rejected each of these arguments. First, the panel found that the Government had proven, through the testimony of two insurance executives, that STOLI and non-STOLI policies differed economically. *Id.* at 572–74. These executives testified that certain actuarial calculations derived from information about the wealth of the insured and the party making the premium payments, and that these actuarial projections changed when the real policyholder in interest was a third-party investor, rather than the elderly insured. *Id.*

Second, the panel held that a reasonable jury could have found that certain economic differences, including wealth of the insured and the probability of lapse based on the insured's ability to pay the premiums, were material and therefore essential to the bargain. *Id.* at 575–76. The Court explained that "many factors beyond age and overall health are potentially relevant in determining life expectancy," and that "A reasonable jury could infer that questions asked by an insurer about the insured's characteristics . . . are asked . . . because they are material to the insurer's underwriting decision concerning whether, and at what price, to issue the policy." *Id.* at 576.

Finally, the panel found that intent to harm the insurers could be inferred from defendants' choice to conceal the relevant information from insurers before, during, and after taking out the STOLI policies. *Id.* at 578–80; (*see also* Gov't Mem. of Law in Opp. to Def. James Kevin Kergil's

Mot. Under 28 U.S.C. § 2255 to Vacate and Reduce His Sentence, 12-cr-152, Dkt. No. 438 ("First Gov't Opp.") at 17–18 (listing evidence that Kergil concealed truthful information about the straw insureds from the carriers).)

The Court of Appeals also rejected the argument that Kergil was acting in good faith, because the carriers wished to continue to issue STOLI policies secretly while eschewing them publicly. (*See* Am. Pet. 47–49.) As the panel held, "There is no evidence in the record indicating that Kergil had reviewed the insurers' financial statements and inferred from them that STOLI business was welcome. What *is* in the record is that Kergil signed certifications required by the insurers that were specifically designed to avoid issuing STOLI policies." *Binday*, 804 F.3d at 581 (emphasis in original).

Much of Kergil's § 2255 petition rehashes these very same arguments. (*See* Pet. at 5, 9–37.) For example, Kergil argues that "Because the government just assumed that STOLI policies were an 'evil' that the carriers wished to avoid rather than business that the carriers actually encouraged, they neglected to present at trial, much less prove beyond a reasonable doubt, the necessary facts to support the elements of mail and wire fraud[.]" (Pet. at 9.) This argument depends for its force on ignoring the following facts: Kergil (unsuccessfully) presented this same defense at trial; the Government presented evidence that STOLI policies did harm the carriers; the Second Circuit found the Government's evidence sufficient as a matter of law; and the jury chose to credit the Government's version of events, rather than Kergil's.

Of course, Kergil's petition makes it abundantly clear that he personally finds the Government's evidence unpersuasive, and that he continues to view his STOLI brokerage business as a victimless crime. Needless to say, that is irrelevant. Even if this Court were not already bound by the jury's reasonable findings (it is), this Court is unquestionably bound by the mandate rule

and the Second Circuit's opinion, which unequivocally holds that the Government met its burden

to prove both a "scheme to defraud" and specific intent.

The mandate rule also bars Kergil from raising other arguments about harm and intent that,

while not raised word-for-word on direct appeal, constitute the same "ground" as the arguments

that were raised. "Ground," in turn,

> mean[s] simply a sufficient legal basis for granting the relief sought
> by the applicant.  For example, the contention that an involuntary
> confession was admitted in evidence against him is a distinct ground
> for federal collateral relief.  But a claim of involuntary confession
> predicated on alleged psychological coercion does not raise a
> different "ground" than does one predicated on alleged physical
> coercion.  In other words, identical grounds may often be proved by
> different factual allegations.  So also, identical grounds may often
> be supported by different legal arguments, or be couched in different
> language, or vary in immaterial respects.

*Pitcher*, 559 F.3d at 124 (quoting *Sanders v. United States*, 373 U.S. 1, 16 (1963)).

Kergil makes these harm and intent claims by pointing to three cases, each of which came

down after his conviction became final.  Despite their timing, however, none of these cases

represents any change in controlling law.  Moreover, each constitutes the same "ground" as an

argument that was first raised and disposed of on direct appeal.

First, Kergil argues that the Government failed to prove contemporaneous fraudulent

intent, citing *United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016).  In

*Countrywide*, the Government brought charges under the Financial Institutions Reform, Recovery

and Enforcement Act (FIRREA)—a statute that uses the federal mail and wire fraud statutes as

predicates—alleging that defendants had sold mortgages to Fannie Mae and Freddie Mac in

violation of earlier purchase agreements, in which the defendants had represented that they would

transfer "investment quality" mortgages to the GSEs.  *Id.* at 653–55.  On appeal, the defendants

challenged the verdict, arguing that the federal mail and wire fraud statutes must be interpreted by

reference to common law fraud, and that "the common law does not permit a fraud claim based solely on contractual breach." *Id.* at 658. Specifically, defendants argued that representations made in the purchase agreements were insufficient evidence of contemporaneous fraudulent intent to later transfer subpar mortgages. *Id.* at 653. The Second Circuit agreed, finding, "The Government did not prove—in fact, did not attempt to prove—that at the time the contracts were executed Countrywide never intended to perform its promise of investment quality." *Id.* at 663; *see also United States v. Connolly*, No. 16-CR-370 (CM), 2019 WL 2125044, at *15 (S.D.N.Y. May 2, 2019) (distinguishing *Countrywide*). Without contemporaneous fraudulent intent, there was no criminal fraud. *Id.*

In his petition, Kergil argues that *Countrywide* entitles him to relief, because "the only alleged misrepresentations involved in [his] case were contained within the insurance applications provided to the carriers." (Pet. at 21.) That is simply untrue. The Second Circuit, for one, previously determined that there was plenty of evidence of contemporary fraudulent intent in Kergil's case. *Binday*, 804 F.3d at 579. As the panel explained, "the evidence made clear that defendants marketed the policies to investors on the theory that the policies would prove profitable to them, precisely because the straw insureds would not live long enough for the premiums paid to exceed the death benefit. [T]he defendants knew that their misrepresentations induced the insurers to enter into economic transactions—ones that entailed considerable financial risk— without the benefit of accurate information about the applicant and the purpose of the policy." *Id.* Moreover, the panel observed, the defendants' "elaborate steps to evade . . . detection efforts by insurers" was further evidence of contemporaneous fraudulent intent. *Id.* at 580. In short, Kergil's *Countrywide* argument constitutes the same "ground" as his sufficiency of intent arguments raised on direct appeal, and it is foreclosed by the mandate rule.

Kergil next relies on *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), to argue that the Government failed to prove a "scheme to defraud," and instead merely proved a "scheme to deceive." (Pet. at 27.)  In *Takhalov*, club owners were charged with wire fraud for "hir[ing] Eastern European women—known as 'Bar Girls' or 'B-girls'—to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and nightclubs." 827 F.3d at 1310.  The parties introduced conflicting evidence regarding whether the Bar Girls, acting as agents of the defendants, took further fraudulent action once inside the bars, such as forging signatures on credit card receipts, or whether their fraudulent conduct was limited to posing as tourists.  *Id.*  On appeal, the Eleventh Circuit held that it was error for a district court to refuse to instruct the jury in a wire fraud case that it "must acquit if they found that the defendants had tricked the victims into entering a transaction but nonetheless gave the victims exactly what they asked for and charged them exactly what they agreed to pay."  *Id.*

It is unclear why Kergil believes that *Takhalov* entitles him to relief, since Kergil and his co-defendants received the very instruction that the Eleventh Circuit held was warranted to help the jury distinguish a "scheme to defraud" from a "scheme to deceive":

> In order for the government to prove a scheme to defraud, it must prove that the scheme, if successful, would have created a discrepancy between what the insurance companies reasonably anticipated and what they actually received.  If all the government proves is that under the scheme the insurance companies would enter into transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm, then the government will not have met its burden of proof.

*Binday*, 804 F.3d at 581 (quoting jury instruction).  Further, the Second Circuit found that Kergil and his co-defendants had waived any objections to this jury instruction when they jointly submitted this proposed language with the Government.  *Id.* at 582–83.

Turning to Kergil's "scheme to deceive" argument, however, the concern in *Takhalov* was also squarely addressed by the Second Circuit on Kergil's direct appeal. The panel considered the issue of harm, and concluded both that the Government had satisfied its burden to prove deprivation of economically valuable information beyond a reasonable doubt, *id.* at 576–77, and that the facts proved more than a mere scheme to deceive, *id.* at 577. As the panel explained, "[T]his is not a case like the hypothetical offered by [Kergil's co-defendant] Binday of a real estate agent who receives commissions on the sale of an apartment after misleading its client as to the nationality of the buyer, but obtains for the client the precise economic terms of sale for which the client bargained." *Id.* Rather, the STOLI scheme in Kergil's case "is more analogous to a real estate agent who receives a broker's fee from a buyer after arranging for the purchase of an apartment that is known by the agent, but not by the buyer, to be infested with termites." *Id.* Again, Kergil's *Takhalov* argument is squarely foreclosed by the mandate rule.

Lastly, Kergil argues that he is entitled to relief under *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), because the Government failed to prove that Kergil's scheme led to "tangible economic harm" (or the possibility thereof) for the insurance carriers. (Pet. at 31.) In *Finazzo*, the defendant was charged with mail and wire fraud for causing Aeropostale to use a particular clothing vendor, from whom the defendant received kickbacks. *Id.* at 97. Defendant was prosecuted, in part, on the theory that he had deprived Aeropostale of the "opportunity to make informed decisions" about the vendors with whom it would do business. *Id.* Affirming the district court, the Second Circuit held that "misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm." *Id.* at 111.

It is worth noting that *the* Finazzo *panel itself* recognized that the Second Circuit had already addressed this issue in *Binday*:

> The defendants [in *Binday*] claimed that the jury instructions permitted conviction on a "right to control" theory absent a showing of cognizable harm. *We had no difficulty rejecting that argument*, reasoning that the charge "directly explained" that conviction required the government to prove cognizable harm to the insurers through deprivation of information that was of economic consequence.

*Id.* at 110–11 (internal citations omitted) (emphasis added). Kergil's *Finazzo* argument is barred (twice over) by the mandate rule.

Finally, assorted other arguments raised by Kergil in his 2255 petition were also raised and rejected on direct appeal. They are, therefore, barred by the mandate rule. (*Compare* Pet. at 5 (arguing that the Government was required to "prove beyond a reasonable doubt that Mr. Kergil contemplated and intended 'actual concrete harm' to the insurance carriers")) *with Binday*, 804 F.3d at 579–80 ("[T]he defendants knew that their misrepresentations induced the insurers to enter into economic transactions—ones that entailed considerable financial risk—without the benefit of accurate information about the applicant and the purpose of the policy."); (*compare also* Pet. at 10 (arguing that the Government constructively amended the indictment)) *with Binday*, 804 F.3d at 583–85 (there was no constructive amendment because "some of the harms that defendants contend broadened the indictment were in fact alleged in the indictment" and "Tangential evidence of two additional specific harms did not deprive the defendants of notice of the core of criminality to be proven") (internal quotation omitted).

For the reasons stated above, the bulk of Kergil's substantive arguments are barred by the mandate rule.

## II.     Kergil's Procedurally Defaulted Arguments

Several more of Kergil's claims could have been raised on direct appeal but were not. These claims are procedurally defaulted, so Kergil cannot obtain the collateral relief he here seeks.

### A.     Applicable Legal Standard

While the mandate rule operates to bar claims that were raised and disposed of on appeal, procedural default operates to bar claims that were not raised on direct appeal—unless the "defendant can first demonstrate either 'cause' and 'actual prejudice' . . . or that he is 'actually innocent.'" *Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (internal citations omitted); *see also Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007).

"In order to demonstrate cause, a defendant must show some objective factor external to the defense, such that the claim was so novel that its legal basis was not reasonably available to counsel." *Gupta*, 913 F.3d at 84 (internal quotations and alterations omitted).  Further, in order to demonstrate prejudice, the defendant must show that the error "so infected the entire trial that the resulting conviction violates due process." *Id.* at 85.  Finally, "actual innocence" means "factual innocence, not mere legal insufficiency." *Id.*

Kergil can meet neither the "cause and prejudice" nor the "actual innocence" test for any of his claims, which precludes relief.

### B.     Kergil's Remaining Substantive Challenges Are Procedurally Defaulted

On direct appeal, Kergil failed to raise the following two challenges to his conviction: that there was insufficiency evidence of a conspiracy (Pet. at 5–6; Am. Pet. at 59–61); and that the Court gave improper jury instructions regarding both conspiracy (Pet. at 7–8) and aiding and abetting (Pet. at 7; Am. Pet. at 24–25).  Kergil offers no explanation for his failure to raise these challenges to the substance of his conviction in either his original or amended petition.  The Court therefore finds that he cannot now raise them on collateral review. *Williams v. Artus*, 691 F. Supp.

2d 515, 525 (S.D.N.Y. 2010); *Mackenzie v. Portuondo*, 208 F. Supp. 2d 302, 313 (E.D.N.Y. 2002);

*Mayen v. Artist*, No. 06-cv-14261, 2008 WL 2201464, at *6 (S.D.N.Y. May 23, 2008); *Batts v.*

*Artuz*, 254 F. App'x 855, 858 (2d Cir. 2007) (summary order).

Even if they were not procedurally defaulted, however, each of these arguments would fail

on the merits.

First, Kergil contends that his conspiracy conviction should be overturned, because there

was no evidence of his entering into any agreement to commit the fraud at issue. (Pet. at 6; Am.

Pet. at 59–61.)  Contrary to Kergil's representation, however, the evidence at trial more than

established both his intent and agreement, including, as the Second Circuit explained:  his

supervising a group of field agents who would recruit the straw insureds, and his instructing those

agents that they should seek policies whose face value were small enough "to stay under the radar"

because "anything over three to four million would require excessive documentation such as tax

returns, stock reports, bank statements, that type of thing," and thus would be "fatal to the

defendants' scheme." *Binday*, 804 F.3d at 566.

Kergil next argues that the Court erred by instructing the jury that it "may" consider

whether the alleged co-conspirators committed any overt act, when it should have instructed the

jury that it "must" do so. (Pet. at 7–8.) That language—"you may consider whether the alleged

coconspirators did anything that tended to carry out apparent criminal purpose" (Jury Charge at

35:1–3)—was an instruction on the "overt act" element of conspiracy. Rather, it was an instruction

on the existence of an agreement, and merely informed the jury that it could, but need not, infer

the existence of an agreement from the defendants' actions, as well as their words. (*See generally*

*id.* at 33:6–35:15.)

Kergil also argues that there was error in the Court's instruction to the jury regarding aiding and abetting liability, because the instruction effectively permitted a finding of guilt by association (Pet. at 7) and because the instruction did not explain the heightened *mens rea* requirement of specific intent that applies to this crime (Am. Pet. at 9). Again, however, Kergil incorrectly construes the jury charge, which faithfully and "adequately communicated the essential ideas to the jury." *United States v. Schultz*, 333 F.3d 393, 413–14 (2d Cir. 2003). The Court will not reproduce all four pages of its aiding and abetting instructions here. It is sufficient to note that the Court correctly instructed that, under the aiding and abetting statute, "the defendant *you are considering* must have willfully and knowingly associated himself in some way with the crime[,] *and he must have willfully and knowingly sought by some act to help make the crime succeed.*" (Jury Charge at 31:7–11 (emphasis added).) The jury was further instructed, "A defendant's acquiescence in the criminal conduct of others, even with guilty knowledge, is not enough to establish aiding and abetting. An aider and abetter must have his own affirmative interest in the criminal venture." (*Id.* at 31:16–20.)[3] The clear import of these instructions is that there can be no guilt by mere association, and that the defendant must have specifically intended that the crime succeed.

In sum, Kergil's remaining substantive challenges to his conviction are procedurally defaulted, and, in any event, fail on the merits.

---

[3] Moreover, the Court separately instructed the jury that it must "consider separately whether the [] government has proved the guilt of each defendant on each count, which means you have, I believe, 11 separate decisions to make, if my math is good," and that "Your decision concerning one defendant or one count has no bearing on the decision you make concerning the other two defendants or counts." (Jury Charge at 19:17–22.)

C.     **Kergil's Constitutional Claims Are Procedurally Defaulted**

Kergil also raises several constitutional arguments for the first time on collateral review, including that:  (*i*) his convictions violated the due process clause (Pet. at 37–41, 43–45; Am. Pet. at 8–10, 22–25), the *ex post facto* clause (Pet. at 41–42; Am. Pet. at 45–47), and the notice clause of the Sixth Amendment (Pet. at 46–48; Am. Pet. at 38–44); and (*ii*) the rule of lenity requires vacatur of his convictions on all counts (Pet. at 48–63; Am. Pet. at 50–58).  In neither petition has Kergil attempted to demonstrate any cause or prejudice that excuses his failure to raise these constitutional claims.  Like his substantive arguments, therefore, they are procedurally defaulted.

Moreover, even if Kergil's constitutional arguments were not procedurally defaulted, each argument would fail on its merits.

1.     **Due Process Clause and the Rule of Lenity**

"Fair notice, of course, is a right of federal constitutional dimension, grounded in the due process guarantee, established by the Supreme Court, and requiring that a criminal statute give fair warning of the conduct that it makes a crime." *Lurie v. Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) (internal quotation omitted).  The principle of fair notice is violated when the "construction of the criminal statute [is] so unforeseeable as to deprive the defendant of the fair warning to which the Constitution entitles him." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964).

Relatedly, the rule of lenity—a canon of statutory construction—is "that in criminal prosecutions, ambiguities in a statute are resolved in the defendant's favor." *Lurie*, 228 F.3d at 125 (internal quotation and alterations omitted).  "It is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.*  (internal quotation omitted).

Here, Kergil argues that his conviction violates the due process clause and the rule of lenity, because his prosecution for "STOLI fraud" constitutes an impermissible judicial expansion of the mail and wire fraud statutes, and rests on an unforeseeable statutory construction. (Am. Pet. at 8–11, 50–58.)

In support of his due process claim, Kergil first writes that "the Government is unable to point to a single case predating *Binday* wherein a conviction is based solely on misrepresentations on an insurance application as to the future sale of the policy by the owner[.]" (Am. Pet. at 39–40.)

Of course, the misrepresentations in this case were not, in fact, limited to whether the insured planned to sell the policy in the future. Far from it. Kergil and his co-defendants misrepresented, among other things, the wealth of the insureds and who was paying their premiums—both of which, as the jury found and the Second Circuit affirmed—constituted material information for the carriers when deciding whether entering into certain insurance contracts made actuarial sense. *See United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) ("[T]he immediate harm in such a scenario is the denial of a[] [victim]'s right to control her assets by depriving her of the information necessary to make discretionary economic decisions.") (quoting *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (1998)) (internal alterations omitted).

*United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999)—which Kergil mistakenly relies on for the proposition that "there is no precedent for criminal liability based on . . . misrepresentations between sophisticated parties in insurance contract negotiations"—is not to the contrary. (Am. Pet. at 52.) That case dealt with nondisclosures—*not* affirmative misrepresentations—between insurance underwriters and other parties (insureds, coinsurers, and reinsurers), and liability turned on whether a fiduciary relationship between any of the parties compelled disclosure. *Brennan*,

183 F.3d at 150. Indeed, that case expressly did not address the Government's theory of liability for any affirmative misrepresentations, as the Court of Appeals stated it had "some question whether there was sufficient evidence to support" such a theory. *Id.* at 151. *Brennan* does not reach as broadly as Kergil claims; it does not operate to shield all misrepresentations—especially affirmative misrepresentations—made in the course of commercial negotiations.

Kergil next argues that he was not given constitutional fair warning, because "at no time then or now was STOLI illegal." (Am. Pet. at 52.) Specifically, he argues, "while there were literally hundreds of civil lawsuits involving STOLI cases prior to Mr. Kergil's indictment in February of 2012, (most of which were lost by the carriers), there was not a single indictment anywhere in the country involving '*Shellef*-like' misrepresentations of deceit as used by the Binday Agency in the insurance applications in that case." (*Id.* at 56.)[4]

The absence of any factually identical criminal cases does not, however, mean that Kergil's prosecution and conviction violated the due process clause. Indeed, the United States Supreme Court has expressly held that due process does not require that there be "a factual situation that is 'fundamentally similar'" to the crime charged in order to put the defendant on notice. *United States v. Lanier*, 520 U.S. 259, 269 (1997). Rather, the "prior decisions" need only give "reasonable warning that the conduct then at issue violated" the statute. *Id.*

The theory under which Kergil was prosecuted and convicted was wholly consistent with past applications of the statute. As the Supreme Court has explained, "In 1909, Congress amended the statute to prohibit, as it does today, 'any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*," and since

---

[4]    This is not technically true; the Lebovits defendants were indicted a year before Kergil, in February 2011, for STOLI fraud. *See United States v. Lebovits*, No. 11-cr-134 SJ, 2012 WL 10181099, at *1 (E.D.N.Y. Nov. 30, 2012).

that time, "[e]mphasizing Congress' disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights." *Skilling v. United States*, 561 U.S. 358, 399–400 (2010) (quoting 18 U.S.C. § 1341) (emphasis in original). One of these "intangible rights" recognized has been the "right to control," which depends on the Government's proving that the defendant knowingly deprived the victim of material information that would cause a tangible loss. *United States v. DiNome*, 86 F.3d 277, 283 (2d Cir. 1996). Kergil himself concedes that the "right to control" theory has been used to prosecute many factually adjacent cases, including mortgage fraud, loan fraud, and insurance *claim* fraud. (Am. Pet. at 39.)

It is against this backdrop that the Second Circuit, in rejecting the defendants' arguments on appeal, found unsuccessful the "Defendants['] attempt to distinguish the instant case from" a long line of cases where the fraud deprived the victim of economically valuable information that bears on their decision-making. *Binday*, 804 F.3d at 579. "[W]e have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement." *Id.* at 570 (citing *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991); *United States v. Frank*, 156 F.3d 332 (2d Cir. 1998)); *see also DiNome*, 86 F.3d at 283; *United States v. Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991). The fact that this case involved misrepresentations made on insurance applications, versus mortgage applications or insurance claim forms, is a distinction without a difference.

Kergil next cites two cases in which courts applied the rule of lenity to find that certain conduct lay beyond the reach of federal mail, wire, and honest services fraud. Both cases are easily distinguishable.

In *United States v. $52,037.96*, No. 14-cv-591, 2015 WL 5601848 (D. Conn. Sept. 23, 2015), the Government brought a civil action *in rem* to enforce the provision of 18 U.S.C. § 981(a)(1)(c) that provides for the forfeiture of proceeds traceable to wire fraud. *Id.* at *1. The alleged scheme involved recruiting straw buyers to purchase BMWs from Connecticut dealerships, which were driven off the lot and immediately shipped to China for resale. *Id.* at *1. The district court found that this conduct did not amount to wire fraud, because, although the BMW dealerships would not have entered into the transactions had they known the identity of the real buyers, the straw buyers did not intend the dealerships to suffer any actual losses of money property, and the misrepresentations did not result in any such losses. *Id.* at *5. In determining that there was no intended or actual loss of "property," the district court employed the rule of lenity to hold that non-party BMW of North America's interest in controlling future market conditions in China was not a "property right protected by the wire fraud statute." *Id.* at *8. In Kergil's case, by contrast, the property right at issue is the right of the carriers to control their assets—which, as already discussed, is far from a novel construction.

The other case cited by Kergil, *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), is also distinguishable, as it did not involve representations "considered material for purposes of [the] mail and wire fraud statutes." *Id.* at 358. That case involved the sale of a commercial property, in which the defendant stood on both the buyer and seller side of the transaction. *Id.* There, the district court dismissed the indictment, finding that the defendant's misrepresentations were limited to non-material information—*i.e.*, the parties' negotiating positions and the identity of one party as a stalking horse—which did not deprive the parties on the other side of the transaction of information that affected their decision making. *See id.* at 366. Indeed, *Weimert* affirms that material, economic information can constitute "property" under a "right to control" theory. Like

*$52,037.96*, moreover, the rule of lenity was used only to reject "undisclosed self-dealing" as a novel interpretation of "property" in the context of honest services fraud—which had theretofore been limited to cases involving bribes or kickbacks. *Id.* at 367.

Kergil's other cited authorities are likewise inapposite or, in some circumstances, wholly unhelpful to his petition. *United States v. Lanier*, 520 U.S. 259 (1997)—a case in which the United States Supreme Court rejected the defendant's fair notice argument and affirmed his conviction— stands for the principle that convictions may be upheld "*despite* notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 269 (emphasis added). And in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), while the Court queried in dicta whether merely "persuad[ing]" someone to destroy documents could constitute obstruction of justice pursuant to 18 U.S.C. § 1512, *id.* at 703, its decision ultimately rested on an improper jury charge on scienter, not on a violation of the due process clause. *Id.* at 706.

Furthermore, it is irrelevant that New York State has not criminalized the sale of STOLI. It is a civil violation, N.Y. Ins. Law §§ 2403–04, 7815, and the fact remains that the carriers expressly forbade the procurement and issuance of such policies. In addition, under New York law that precedes the statutory enactment, while "one who obtains a life insurance policy on himself on his own initiative and in good faith . . . may freely assign the policy to one who does not have an insurable interest in him," *Life Prods. Clearing, LLC v. Angel*, 530 F. Supp. 2d 646, 653 (S.D.N.Y. 2008) (internal quotation omitted), "[i]t is also undoubtedly true that, if the policy was taken out by the parties with a view to its immediate assignment, the transaction would be nothing more than a mere subterfuge to avoid the well-settled rule that a party cannot procure

insurance upon the life of one in whom he has no insurable interest," *id.* at 654 (quoting *Travelers Ins. Co. v. Reiziz*, 13 F. Supp. 819, 820 (E.D.N.Y. 1935)); *see also* N.Y. Ins. Law § 7815(a). Such was the case here, where Kergil and his co-defendants conspired to originate policies on the lives of straw insureds, solely as an investment. "When a 'new' fraud develops—as constantly happens—the mail fraud statute becomes a stopgap device to deal on a temporary basis with the new phenomenon, until particularized legislation can be developed and passed to deal directly with the evil." *United States v. Maze*, 414 U.S. 395, 405–06 (1974) (Burger, J., dissenting); *see also id.* at 407 ("The criminal mail fraud statute must remain strong to be able to cope with the new varieties of fraud that the ever-inventive American 'con artist' is sure to develop.").

Finally, perfectly legal conduct (selling STOLI life insurance policies prior to 2010) can become illegal if it is carried out through misrepresentations about material facts. New York courts would no more countenance Kergil's behavior than did the jury.

### 2.   Ex Post Facto Clause

For a law to contravene the *ex post facto* clause, "two critical elements must be present: First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *United States v. Kumar*, 617 F.3d 612, 624–25 (2d Cir. 2010) (internal quotation omitted).

The *ex post facto* clause has no application here. Kergil does not (indeed, could not) point to any statutory amendment enacted after the conduct at issue occurred. *Cf. United States v. Guzman*, 591 F.3d 83, 94 (2d Cir. 2010), as amended (Jan. 8, 2010) (*ex post facto* clause implicated where conduct occurred after SORNA's enactment and after the effective date of applicable regulations). Here, the charged conduct began in 2006. The only amendments to the mail and wire fraud statutes passed after that time were enacted in 2008, and these involved mail or wire

fraud relating to a presidentially-declared emergency. P.L. 110–179 §§ 3, 4, January 7, 2008, 121 Stat. 2556. Needless to say, Kergil was not charged under these provisions.

To the extent Kergil argues that his conviction violates the *ex post facto* clause because it rests on an unforeseeable judicial construction of the statute, this is an argument addressed, not to the *ex post facto* clause, but to the due process clause and the rule of lenity. *See Rogers v. Tennessee*, 532 U.S. 451, 458–59 (2001). The Court has already addressed and rejected these arguments.

### 3.  Notice Clause

Kergil contends that his indictment violated the notice clause of the Sixth Amendment because it failed to inform him of the actual nature and the cause of the accusations against him. (Am. Pet. at 43.)

This argument, while not expressly raised on direct appeal, is comprehended in Kergil's constructive amendment argument, which *was* raised and rejected by the Second Circuit on direct appeal. As the Second Circuit found when rejecting the defendants' constructive amendment arguments, the indictment was sufficiently detailed and charged the same theory that the Government proved at trial:

> From the indictment through the trial, the government consistently maintained that the defendants sought to obtain money (in the form of commissions) from the victim insurers, by an elaborate scheme of deliberate falsehoods that were designed to deceive the insurers into issuing policies that reasonable insurers would have and did believe were economically disadvantageous, and that defendants knew that the insurers were attempting to detect and avoid, and that defendants deliberately marketed to investors as policies on which the investors would profit at the insurers' expense.

*Binday*, 804 F.3d at 585.

In addition, the Court addressed this argument well before Kergil's trial, in response to his and his co-defendants' request for a bill of particulars. *United States v. Binday*, 908 F. Supp. 2d

22

485, 497 (S.D.N.Y. 2012). In denying the defendants' request, this Court found that "the 32-page indictment is extremely detailed[,] and voluminous discovery has already been provided to defendants. Defendants have more than enough information about the charges against them to enable them to prepare their defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense"—the very concerns implicated by the Sixth Amendment. *Id.* Kergil provides no reason why the Court should revisit that finding on collateral review.

### D.      Kergil's Other Miscellaneous Arguments Are Procedurally Defaulted

Kergil briefly raises other arguments for the first time on collateral review, and offers no explanation for why he failed to raise them on direct appeal. Therefore, these arguments are also procedurally defaulted. (*See, e.g.*, Pet. at 5 ("no case in any circuit . . . explains how having the 'deceiver' pay money to the 'deceived' constitutes mail and wire fraud"); *id.* at 10–11, 24 (facts did not meet "mirror image" definition of fraud from *Skilling v. United States*, 561 U.S. 358, 400 (2010)); *id.* at 11 ("government also failed to show any mailings or wires in furtherance of a scheme to defraud").)

## III.      Kergil's Ineffective Assistance Claims

The last group of claims asserted by Kergil in his 2255 petition are ineffective assistance of counsel claims. Because Kergil cannot demonstrate either that his counsel's performance was deficient or that he was prejudiced thereby, these claims also fail.

### A.      Applicable Legal Standard

Ineffective assistance claims may be properly asserted for the first time in a 2255 petition. *See United States v. Fiseku*, 915 F.3d 863, 874 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1643 (2019); *see also United States v. Lloyd*, 901 F.3d 111, 124 (2d Cir. 2018). To establish an ineffective assistance of counsel claim, "a defendant must show: (1) that counsel's representation fell below

23

an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010) (internal quotation omitted); *see Strickland v. Washington*, 466 U.S. 668, 688–89, 693–94 (1984).

With respect to the first element—the "performance" prong—to eliminate the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

Regarding the second element—the "prejudice" prong—a defendant must meet the heavy burden of showing "actual prejudice"; in other words, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 692, 694. A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.

To warrant a hearing on an ineffective assistance of counsel claim in a Section 2255 petition, a defendant must show that he has a "plausible" claim of ineffective assistance of counsel. *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993)). "'Bald allegations' unsupported by evidentiary facts do not"

warrant a hearing. *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977).

> **B.    Kergil Can Show Neither Deficient Performance Nor Actual Prejudice With Respect to His Trial Counsel**

Kergil argues that his trial counsel's performance was constitutionally deficient because "no one ever filed any post-trial briefs" on his behalf. (Pet. at 4.) Kergil claims this resulted from "Mr. Binday's 'shenanigans' and not paying his attorneys after the trial was over[.]" (*Id.*) That is the entirety of his argument; he does not explain how the outcome would have been different had any post-trial motions been filed or what these motions would have contained. His amended petition does not address this argument at all, except for a one-sentence argument that "not submitting a post-trial Rule 29, Rule 33, or even a post-sentencing Rule 35 Motion" constituted "substandard performance" by Kergil's attorney. (Am. Pet. at 7.)

Kergil has failed to demonstrate that he was deprived of the effective assistance of counsel after trial. First, the basic factual premise—that no one ever filed a Rule 29 or Rule 33 motion on his behalf—is wrong. All three defendants moved, during trial, for a judgment of acquittal pursuant to Rule 29. The Court entertained argument from all three defense counsel on many of the same issues regarding whether the scheme was cognizable, and whether the Government's proof was sufficient to establish that a fraud had occurred, as had been raised during the duration of the proceedings. (Tr. at 1215–33.) The Court denied the motions. (*Id.* at 1233.) The failure to renew a Rule 29 motion at the close of trial does not constitute ineffective assistance of counsel, where the Court has previously denied the motion at the close of the Government's case. *See, e.g.,* *Geronimo v. Rushing*, No. 11-CV-1121 (CBA), 2014 WL 4678253, at \*19 (E.D.N.Y. Sept. 19, 2014); *Velez v. United States*, No. 05-CR-537 (RCC), 2006 WL 1952191, at \*7 (S.D.N.Y. July 10, 2006).

In addition, Kergil is unable to demonstrate prejudice, both because the Second Circuit confirmed the sufficiency of the evidence as to all defendants and all counts on direct appeal, and because nothing in Kergil's petition identifies any newly discovered evidence or other grounds that, in the interest of justice, would require a new trial. "Failing to make a motion for a judgment of acquittal that had no chance of success fails both prongs" of *Strickland*. *United States v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004); *see also United States v. Becker*, No. 01-CR-156 (RPP), 2005 WL 3110650, at *3 (S.D.N.Y. Nov. 18, 2005) ("Because each of the claims set forth in Petitioner's memorandum of law in support of his motion for judgment of acquittal . . . were presented to, and rejected by, the Second Circuit on direct appeal, it cannot be said that the dismissal of the untimely Rule 29 motion undermines confidence in the outcome of Petitioner's trial.") (internal quotation omitted).   With respect to Rule 35, Kergil fails to argue that his sentence resulted from "arithmetical, technical, or other clear error," as would be required to entitle him to relief.  Fed. R. Crim. P. 35; *see also Cisneros v. United States*, No. MO-05-CR-156, 2008 WL 11431068, at *3 (W.D. Tex. July 23, 2008) (counsel not ineffective for failing to make futile Rule 35 motion).

Kergil attempts to argue that the very fact of not filing a Rule 29 or Rule 33 post-trial renders his counsel's assistance ineffective *per se*, but there is no requirement that counsel do so. *United States v. Johnson*, 995 F. Supp. 1259, 1263 (D. Kan. 1998) ("there is no constitutional right to assert a motion for new trial" under Rule 33); *United States v. Reiter*, No. 87-CR-132 (VSB), 2018 WL 340008, at *5 (S.D.N.Y. Jan. 9, 2018) (no due process right to challenge a sentence under Rule 35) (citing *United States v. Rivera*, 376 F.3d 86, 91–92 (2d Cir. 2004)).  Indeed, counsel reasonably may believe that the claims would be more successfully raised on direct appeal, or counsel may simply believe they are meritless.  *See United States v. Peterson*, 233 F. Supp. 2d 475, 495 (E.D.N.Y. 2002).

In sum, Kergil's claim that he was deprived of the effective assistance of trial counsel fails.

## C.     Kergil Cannot Show Actual Prejudice With Respect to His Sentencing Counsel

Kergil argues that his attorneys were constitutionally ineffective at sentencing because (*i*) his sentence was based on an erroneous calculation of loss and, therefore, an incorrect Guidelines calculation (Am. Pet. at 3–7), and (*ii*) his counsel failed to research sentences handed down in other STOLI prosecutions (Am. Pet. at 1–2).   Kergil claims that both a proper loss calculation, which he believes is $0, and reference to other STOLI cases, where the sentences were shorter, would have substantially reduced his sentence.

Assuming for purposes of Kergil's motion that his counsel's performance at sentencing fell below the constitutionally-required minimum, Kergil has not demonstrated actual prejudice resulting from these errors.

### 1.     Loss Calculation

Kergil first argues that he is entitled to relief under *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018), because the district court erroneously calculated both actual ($38,153,631) and intended ($141,947,800) loss, which led to a higher sentence.   (Am. Pet. at 5.)   It is unclear how this argument relates to Kergil's underlying ineffective assistance of counsel claim.   Presumably, Kergil means to suggest that his counsel should have caught the erroneous loss calculation at sentencing but failed to, thereby leading the Court to give Kergil a longer sentence.

Of course, there can be no prejudice with respect to any erroneous calculation of intended loss, as the Court considered only actual loss at sentencing.

Regardless of whether Kergil's actual loss claim is construed as a (defaulted) challenge to the substance of his sentence, or as a claim for ineffective assistance of counsel, Kergil's claim fails on the merits, both because this Court already considered and rejected this argument at

sentencing, and because this Court did not hand down a Guidelines sentence for Kergil, which renders any potential miscalculation harmless.

*Rosales-Mireles* concerned "whether a miscalculation of the United States Sentencing Guidelines range, that has been determined to be plain and to affect a defendant's substantial rights, calls for a court of appeals to exercise its discretion under Rule 52(b) to vacate the defendant's sentence." 138 S. Ct. at 1903. To the extent this Court has not already addressed and rejected this argument (*see* Dkt. No. 428), the Second Circuit addressed and correctly rejected it on direct appeal. *See Binday*, 804 F.3d at 595–600 (explaining and approving the methods used to calculate losses). Specifically, the Second Circuit emphasized that, even if the loss calculations were imprecise for purposes of sentencing, it "t[ook] comfort in the district court's emphatic statement that it would have imposed the same sentence regardless of the loss amount, which renders any error in the loss calculation harmless." *Id.* at 598.

Moreover, Kergil's argument that the actual loss calculation is erroneous because the Court "forgot to factor in the premiums paid of over $70 million" is simply wrong. (Am. Pet. at 5.) The Court did, in fact, account for premiums: "To reach actual losses, the government examined the 74 policies that were issued pursuant to the scheme proved at trial. It added all the commissions and death benefits that had been paid under these policies, *and subtracted from that amount any premiums the Insurers received . . . on a policy the outcome of which is known.*" *Binday*, 804 F.3d at 596 (emphasis added) (internal quotation and citation omitted). In other words, the calculation of loss *did* account for premiums, at least with respect to the policies that were considered—*i.e.*, any Binday Agency-originated policies that had terminated or lapsed. Indeed, there was a lengthy colloquy about Government's arithmetic at sentencing. (Sentencing Tr. at 5–8; 19–23.)

Kergil's argument that "if there are no premiums paid in the first place, there will be no . . .
commissions paid to the agent" does not save his claim. (Am. Pet. at 5.) Commissions paid to
agents for fraudulently-obtained policies cause a loss to the insurer, who would otherwise retain
such funds. *Cf. United States v. Shkreli*, No. 18-819, 2019 WL 3228933, at *3, --- F. App'x ---,
(2d Cir. July 18, 2019) ("[A]t the very least, the gains to Shkreli include the money he caused his
investors to invest via fraud," even if those investors subsequently earned money.) (summary
order). And, as already discussed, when payouts to the investor-beneficiaries are factored in, the
policies caused losses to the insurance carriers on the whole.

In sum, there was no prejudice to Kergil from the Court's actual loss calculation, and, in
any event, no prejudice resulting from its computation of the Guidelines range.

### 2.    Substantive Unreasonableness

Kergil argues that his sentence was "substantively unreasonable" when compared to other
STOLI cases, and that he was prejudiced by his counsel's failure not to "even check Westlaw or
PACER" for STOLI cases to be used for comparison at sentencing. (Am. Pet. at 1–2.)

Kergil's substantive unreasonableness argument—which appears unconnected to his
ineffective assistance argument—is barred by the mandate rule. The Second Circuit considered
this very argument on appeal, reviewed Kergil's sentence in light of his conduct, and concluded
unequivocally that "Kergil cannot meet our high bar for vacating a sentence as substantively
unreasonable." *Binday*, 804 F.3d at 600.

Turning to Kergil's ineffective assistance argument, the amended petition identifies four
different defendants prosecuted and sentenced for STOLI fraud. (Am. Pet. at 2.) He attaches four
exhibits relating to each of these defendants: two criminal judgments recording sentences of sixty
days (Am. Pet. Ex. 3 (amended judgment in *United States v. Steinfeld*, No. 13-cr-424 (S.D. Cal.
Apr. 3, 2014)) and three months (Am. Pet. Ex. 2 (amended judgment in *United States v. Keller*,

No. 13-cr-424 (S.D. Cal. Aug. 28, 2017)), respectively, and two sentencing memoranda from the Government recommending sentences of 12 to 18 months (Am. Pet. Ex. 1 (sentencing submission in *United States v. Lebovits*, No. 11-cr-134 (E.DN.Y. Apr. 9, 2015) (probation)) and 18 to 24 months (Am. Pet. Ex. 4 (sentencing submission in *United States v. Neuman*, No. 11-cr-134 (E.D.N.Y. Jan. 17, 2014)), respectively.

Keller's three-month sentence (Am. Pet. Ex. 2) was handed down after Kergil was sentenced, so his counsel's failure to mention this case was not objectively unreasonable. *See Bienvenido v. United States*, No. 10-CV-2938 (LTS), 2011 WL 1142920, at *3 (S.D.N.Y. Mar. 22, 2011). As to the remaining three defendants, even assuming *arguendo* that Kergil's counsel's conduct was objectively unreasonable, Kergil's claim fails because he cannot demonstrate any prejudice resulting from his counsel's failure to identify these cases and include them in his sentencing submission.

Under 18 U.S.C. § 3553(a)(6), a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" *Id.* This factor requires "a court to consider whether a defendant is favored or disfavored by a particular sentence 'compared to all those similarly situated defendants'" nationwide—not merely a few discrete cases. *United States v. Toohey*, 132 F. App'x 883, 886–87 (2d Cir. 2005) (summary order) (emphasis removed) (quoting *United States v. Joyner*, 924 F.2d 454, 461 (2d Cir. 1991)); *accord United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). A court considers, among other things, whether "other [similarly situated] defendants had pled guilty and cooperated with the government," *James v. United States*, 603 F. Supp. 2d 472, 482 (E.D.N.Y. 2009), as well as the specific and distinguishing characteristics of the defendant and crime at issue, *United States v. Qualls*, 613 F. App'x 25, 31 (2d Cir. 2015) (summary order).

Where "the challenged sentence falls within the applicable Sentencing Guidelines range, a defendant complaining of substantive unreasonableness bears a particularly heavy burden because" such a sentence "achieves the purposes outlined in 18 U.S.C. § 3553(a), including its parsimony clause." *United States v. Samet*, No. 06-CR-5254, 2008 WL 162848, at *2 (2d Cir. Jan. 18, 2008). A concomitantly higher hurdle applies to a defendant challenging his below-Guidelines sentence.

Kergil presumably means to argue that the Court's awareness of other, lower sentences in STOLI cases would have changed its calculus with respect to the 3553(a)(6) factor. This argument fails, however, because Kergil cannot demonstrate that these defendants had "similar records" and were found guilty of "similar conduct." None of the other three defendants were found guilty on multiple counts or on the underlying substantive offenses (as Kergil was), and none of the losses in these cases came close to the over $30 million in actual losses—or even to the $11 million in commissions—in Kergil's case.

In *U.S. v. Lebovits*, No. 11-cr-134 (E.D.N.Y. Apr. 9, 2015), ECF No. 300, for example, Chaim Lebovits pled guilty to a single count of conspiracy to commit mail and wire fraud based on his investment in two STOLI policies, *id.* at 2, and the Government recommended a sentence of 12 to 18 months.[5] *Id.* at 3. To calculate actual loss, moreover, the Government recommended using the policies' lapse rate rather than the brokers' commissions, because the Government conceded that it had "no evidence of [Lebovits'] personal involvement in the conspiracy other than his investment in two insurance policies," and admitted it was not clear from its evidence "that the

---

[5]     Lebovits' PSR recommended a Guidelines range of 41 to 51 months.  (ECF No. 300 at 1.)  Kergil's petition does not state what sentence Lebovits ultimately received.

total amount of the commission payments obtained during the course of the entire conspiracy were foreseeable to the defendant." *Id.*

Kergil, by contrast, was found guilty of (1) conspiracy to commit mail and wire fraud, the substantive crimes of (2) mail and (3) wire fraud, and (4) conspiracy to commit obstruction of justice. And, unlike Lebovits, whose conduct was limited to moving money into accounts to disguise the provenance of premium payments, *id.* at 2, Kergil was more intimately involved in the fraud scheme at issue, including: recruiting brokers, coaching straw insureds, creating fraudulent documentation to support the applications, and destroying incriminating documents.

Like Lebovits, in *United States v. Steinfeld*, No. 13-cr-424 (S.D. Cal.), Stuart Steinfeld pled guilty to a single count of conspiracy. (Am. Pet. Ex. 3 at 1.) Additionally, gain to Steinfeld was calculated by the Government to be over $200,000 but less than $400,000 dollars for purposes of the Guidelines, a far cry from the over $11 million in commissions earned by the Binday Agency. (Gov't Opp. Ex. B.) Finally, unlike in Kergil's scheme, "the investors for all the policies Keller created"—and of which Steinfeld was a part—"stopped payment before the insured party died, and the insurance companies were never required to pay death benefits." (Gov't Opp. Ex. A at 3.) As a result, there was no actual loss to the insurance companies in that case.

Similarly, in *United States v. Neuman*, No. 11-cr-134 (E.D.N.Y.), Moses Neuman also pled guilty to a single count of conspiracy. (Am. Pet. Ex. 4 at 1.) Moreover, Neuman and the Government stipulated in that case that loss should be calculated at more than $120,000 but less than $200,000 for Guidelines purposes—again, far lower than even the $11 million in commissions in this case. (*Id.* at 3.)

Kergil also briefly recites other, high-profile financial fraud cases, and contrasts his sentence with the shorter sentences received by those defendants. (Am. Pet. at 7.) These cherry-

picked cases do not represent the universe of fraud cases, where sentences can exceed ten years. *See United States v. Bennett*, 252 F.3d 559, 567 (2d Cir. 2001) (collecting examples). Moreover, Kergil has failed to show that raising these cases with the Court at sentencing—cases that were already on the Court's radar screen—would have resulted in a lower sentence. *Cf. United States v. Tirado*, 270 F. App'x 919, 921 (11th Cir. 2008) (defendant failed to show her sentence was substantively unreasonable, because "although she cites several other fraud cases from this circuit, she fails to present any evidence that those defendants had similar records and were convicted of similar conduct").[6]

I restate what I said at sentencing:  Kergil got the sentence I thought just, and nothing— not a different loss amount, not the sentences imposed on other criminals for other crimes, and nothing else—would have resulted in a reduction in his sentence.

### D.    Kergil's Other Ineffective Assistance Claims Are Meritless

Kergil's amended petition makes a brief, one-clause argument that his counsel was ineffective because he did "not negotiate[e] a plea deal." (Am. Pet. at 7.)  Kergil does not claim that he asked his counsel to negotiate a plea agreement, that he would have accepted a plea offer instead of going to trial, or that a plea offer would have resulted in a more favorable sentence. Accordingly, "[Kergil]'s naked claim without any discussion of the sentence he would have faced

---

[6]    As one district court across the river eloquently put it,

> Counsel's failure to find and bring to my attention during sentencing cases of other criminal defendants who committed similar crimes as defendant who were sentenced to less time was neither deficient nor prejudicial because defendant had the benefit of a fulsome sentencing hearing, prior to which the parties made several submissions on a myriad of issues and considerations.  Sentencing a criminal defendant is necessarily an individualized endeavor[.]  Although I have an obligation to avoid unnecessary disparities in sentencing, defendant's unique facts and circumstances can certainly warrant a different—or longer— sentence than those imposed on other white-collar criminals[.]  Just because defendant disagrees with my decision does not mean his counsel was deficient for failing to mention every single instance in which a white-collar criminal was sentenced to less time than defendant, or that I would have sentenced defendant to less time if those cases had been cited to me.

*United States v. Leventhal*, No. 13-cr-0695, 2019 WL 1747000, at *6 (E.D.N.Y. Apr. 18, 2019).

if he had entered a plea to the entire Indictment is insufficient to trigger a hearing or to show that this petition should be granted." *Colotti v. United States*, No. 04-CR-1110 (DC), 2011 WL 6778475, at *16 (S.D.N.Y. Dec. 21, 2011). It is well established that "there is no constitutional right to plea bargain in the first instance." *Carter v. United States*, No. 09-CR-103 (HSM), 2018 WL 1387065, at *11 (E.D. Tenn. Mar. 19, 2018).

In sum, because Kergil fails to demonstrate either unreasonable performance by counsel or any prejudice resulting therefrom, his ineffective assistance of counsel claims also fail.

## CONCLUSION

The motion is denied and the petitions are dismissed.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from an order denying Kergil's motion would not be taken in good faith. *See Feliz v. United States*, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002).

This constitutes the decision and order of the Court.

The Clerk of Court is respectfully requested to close the open motions at Dkt. No. 10 in Civ. No. 17-4675, and at Dkt. Nos. 419 and 452 in Crim. No. 12-152.

Dated: August ___, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES