UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



)
JAMES KEVIN KERGIL,          )
          Petitioner              )
                               )
     v.                        )          Case No. 12-cr-00152-CM
                               )
UNITED STATES OF AMERICA,  )
          Respondent            )
                               )

MOTION TO RECONSIDER THE COURT'S JUDGMENT OF JULY 31, 2014
PURSUANT TO RULE 60(b)(6) AND TO VACATE PETITIONER'S CONVICTION

## **PRELIMINARY STATEMENT**

Petitioner James Kevin Kergil is an innocent man, wrongfully accused, wrongfully indicted, and wrongfully prosecuted for a nonexistent crime that he did not commit, based on the now discredited "Right to Control Theory of Fraud" that was never consistent with the traditional theory of Mail & Wire Fraud. Petitioner is grateful to this Court for securing Petitioner's release from Home Confinement and now asks this Court to reconsider the Jury's verdict and the clearly defective Indictment in this case based on the recent decisions of both the Supreme Court and the Second Circuit.

## I.     LEGAL STANDARD

As the Second Circuit has stated, Rule 60(b)(6) provides, in relevant part, that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for…: (6) any…reason that justifies relief." Rule 60(b)(6). Furthermore, Rule 60(b)(6) "constitutes a grand reservoir of equitable power to do justice in a particular case; *Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986) *citing United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977))," and "is designed to balance the sanctity of final judgments and the command that justice be done in light of all the facts." *Paddington v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994). It has often been noted that Rule 60(b)(6) confers broad discretion upon the trial court to grant relief when appropriate to accomplish justice. A District Court's discretion is "especially broad under subdivision (6)." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977). The Second Circuit has long recognized that a Rule 60(b)(6) Motion is appropriate in both criminal and civil cases. *See, e.g., United States v. Becker*, 502 F.3d 122 (2d Cir. 2007).

In the Second Circuit, a District Court has the authority to vacate its own judgment *sua sponte* under Rule 60(b)(6). *See, e.g., Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 111 (2d Cir. 2001); *Matter of Perras*, 2010 WL 11627295, at \*6 (E.D.N.Y. Nov. 3, 2010); *Economist's Advocate, LLC v. Cognitive Arts Corp.*, 2004 WL 728874, at \*11 (S.D.N.Y. Apr. 6, 2004). The rule, which permits a court to "relieve a party ... from a final judgment" for "any ... reason that justifies relief," Rule 60(b)(6), "confers broad discretion ... to grant relief when appropriate to accomplish justice." *Matter of Perras*, 2010 WL 11627295, at \*6 (quoting *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009)). Relief is appropriate "where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Id.* (*quoting United Airlines* at

2

176. Courts have relied on Rule 60(b)(6) to *sua sponte* vacate a denial of habeas and reopen the proceeding. *See, e.g., Cobb v. United States*, 2019 WL 2607002, at *2 (E.D.N.Y. Jan. 11, 2019). *See, also, Walker v. Conway*, 2007 WL 2027911, at *1 (N.D.N.Y. July 11, 2007); *Cole v. United States*, 2003 WL 21909758, at *1 (E.D.N.Y. July 30, 2003).

A motion for reconsideration pursuant to Rule 60(b)(6) also serves a valuable function where the court "*has patently misunderstood a party*," or…" has made an error not of reasoning but of apprehension." *Caisse Nationale v. CBI*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). A court may also "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Becker* at 127, *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). All three of these factors are amply present in this case. "[W]hen reconsideration of an earlier ruling is requested; the District Court should place great emphasis on the interests of justice." *United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009) ("When faced with a motion for reconsideration, District Courts should apply an interests-of-justice test"). "This is so...because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from interlocutory decisions as justice requires." Alternatively, the Court can also amend a judgment pursuant to Rule 60(b)(6) – the catch-all provision of Rule 60(b) – which "allows courts to vacate judgments whenever necessary to accomplish justice…." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg* at 863).

Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the court must include a judge's power to change her mind and/or correct her own decisions just as

3

Judge Allyne Ross did in *Cobb v. United States*, No. 04-CR-203 (ARR), 2019 WL 2607002, at \*2 (E.D.N.Y. Jan. 11, 2019) ("Because I did not adequately understand Mr. Cobb's concern, I did not take action to remedy my mistake. It was not until Mr. Cobb's most recent letter that I came to comprehend my error. For the following reasons, my order denying Mr. Cobb's § 2255 petition is vacated, and his motion to vacate his sentence is granted.")

Or when, as in this case, the decision is clearly based on the government's many misrepresentations of the law and/or the facts of any given situation. The intervening change in controlling law and the "extraordinary circumstances" that the Supreme Court listed in *Buck* are all present in this case, and warrant reconsideration by this Court of its Judgement of July 2014. *See Pichardo v. Ashcroft*, 374 F.3d 46, 52 (2d Cir. 2004) (reversing District's Court's denial of post-judgment motion for reconsideration and reversing deportation order based on an intervening change in the law). Mr. Kergil respectfully asks this Court to reconsider, review, and vacate its judgment and sentence of July 31, 2014 based upon intervening changes in the controlling law of Mail & Wire Fraud and the recent abrogation of the Right to Control Theory of Fraud in *Ciminelli* and *Binday*.

4

## II.    DUE PROCESS REQUIRES VACATING THIS COURT'S JUDGMENT

From the earliest days of the Constitution, and until the middle of the twentieth century, habeas relief was limited to claims that the court lacked "jurisdiction". *See, e.g., McCleskey v. Zant*, 499 U.S. 467, 468 (1991). The understanding of a court lacking "jurisdiction" at the time of the Founding Fathers encompassed claims that an individual was detained for conduct that was not actually criminal under the applicable law.

Thus, the Framers understood that courts lacked jurisdiction to convict an individual for conduct that (in retrospect, of course, upon review) was not, by statute, a crime. *See Ex parte Yarbrough*, 110 U.S. 651, 654 (1884). ("If the law which defines the offence and prescribes its punishment is void, the court was without jurisdiction, and the prisoners must be discharged."); *Ex parte Siebold*, 100 U.S. 371, 375 (1879) (holding a "party imprisoned under a sentence of a United States court, upon conviction of a crime created by and indictable under an unconstitutional act of Congress, may be discharged from imprisonment by this court on habeas corpus" because there was no authority to indict and try the defendant for a crime is "illegal and void, and cannot be a legal cause of imprisonment"); *cf. Ex parte Page*, 49 Mo. 291, 294 (1872) (granting habeas to a person sentenced to ten years under statute that allowed maximum sentence of seven years because the "judgment of the court in passing sentence was illegal" and "absolutely void" and thus exceed[ed] the jurisdiction of the court and [was not] the exercise of an authority prescribed by law").

*Bousley v. United States*, 523 U.S. 614 (1998), totally supports Petitioner's constitutional entitlement to reconsideration and review by this Court. There, Bousley pleaded guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1), on the ground that guns in his "bedroom were in close proximity to drugs and were readily accessible". 523 U.S. at 617. Five years later, the

5

Supreme Court interpreted Section 924(c)(1)'s "use" prong more restrictively, requiring a showing of "active employment of the firearm", not merely "storing a weapon near drugs". *Id.* Bousley sought collateral relief under 28 U.S.C. § 2255, alleging that his plea was unintelligent because he was misinformed about the elements of a Section 924(c)(1) offense. The Supreme Court agreed. And while it held that Bousley had procedurally defaulted that claim by failing to raise it on direct review, that default did not bar relief insofar as petitioner could "establish actual innocence." 523 U.S. at 623. As the Supreme Court famously explained:

> [D]ecisions of this Court holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe, necessarily carry a significant risk that a Defendant stands convicted of an act that the law does not make criminal … Accordingly, it would be inconsistent with the doctrinal underpinnings of habeas review to preclude petitioner from relying on [an intervening decision] in support of his claim that his guilty plea was constitutionally invalid. *Id.* At 620-21 (internal citations and quotation marks omitted).

In short, the Supreme Court relied on constitutional concerns to allow the defendant in *Bousley* to advance his claim where the Supreme Court's recent interpretation of a criminal statute created "a significant risk that a defendant stands convicted of an act that the law does not make criminal". *Id.* At 620 (internal quotation marks omitted). Similar constitutional concerns favor this Court reconsidering and vacating the Petitioner's conviction because nothing he did was "criminal" or in violation of any law in the past and certainly now with the Supreme Court's recent decisions.

The Due Process Clause also prohibits continued imprisonment for conduct that "a criminal statute, as properly interpreted, does not prohibit". *Fiore v. White*, 531 U.S. 255, 228 (2001) (per curiam). Like Petitioner here, the defendant in *Fiore* was convicted of violating a statute that was later interpreted to clarify that an element of the crime has a narrower meaning than the meaning

6

understood at the time the defendant was convicted. The Supreme Court deemed it "clear" that Due Process forbade Fiore's "conviction and continued incarceration" for conduct that a criminal statute, "as properly interpreted, does not prohibit". *Id.; see also Bunkley v. Florida*, 538 U.S. 835, 840 (2003) ("It has long been established by this Court that the 'Due Process Clause . . . forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt.'" (quoting *Fiore*, 531 U.S. at 228-29)). As the Supreme Court previously explained, [t]here can be no room for doubt" that sustaining "conviction and punishment . . . for an act that the law does not make criminal "inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346-47 (1974).

For similar reasons, punishing Petitioner for conduct that Congress did not make criminal also violates the Separation of Powers under the Constitution. "[U]nder our federal system it is only Congress, and not the courts, which can make conduct criminal". *Bousley*, 523 U.S. at 620-21; *see also United States v. Lanier*, 520 U.S. 259, 267-68, n.6 (1997); *United States v. Hudson*, 11 U.S. 32 (7 Cranch) (1812). Therefore, where the Supreme Court construes a federal criminal statute, detaining individuals under contrary readings of the statute exceeds the District Court's constitutionally granted authority. Such is the case under the facts this Court must assume here. Petitioner is currently being punished not because *Congress* authorized his punishment, but because *a federal court* erroneously construed the statute to criminalize conduct Congress did not in fact make a crime and which now everyone knows is not, in fact, criminal conduct.

The Supreme Court's direction that substantive interpretations narrowing criminal statutes apply retroactively on collateral review further supports the notion that the Constitution precludes punishing individuals under statutes that do not in fact criminalize their conduct – regardless of when it is actually determined what is and is not criminal conduct. In *Mackey v. United States*, 401

7

U.S. 667, 675 (1971), Justice Harlan articulated a view of retroactivity for cases on collateral review, later adopted in *Teague v. Lane*, 489 U.S. 288 (1989), that finality interests should yield when a conviction is attacked on the grounds, as is it here, that the "conduct [is] beyond the power of the criminal law-making authority to proscribe". *Id.* at 310; *see Mackey*, 401 U.S. at 692-93 (Harlan, J., opinion concurring in judgments in part). Because **"[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void . . . a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced**." *Montgomery v. Louisiana*, 577 U.S. 190, 203 (2016).

Accordingly, both the Due Process Clause and the Separation of Powers supports the common-sense proposition that the Constitution does not permit the continued punishment of an individual whose conduct was not actually a crime.

Moreover, punishing someone for conduct that is not actually a crime would also violate the Eighth Amendment. Punishment is "cruel and unusual" U.S. Const. amend. VIII, when it is "grossly disproportionate and excessive punishment for the crime". *Solem v. Helm*, 463 U.S. 277, 288 (1983). That being so, it must also violate the Eighth Amendment to inflict punishment for no crime at all, as was done in this case by this Court. **Serving "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime of' something that the law does not punish**. *See Robinson v. California*, 370 U.S. 660, 667 (1962).

## III.   THE SUPREME COURT'S DECISION IN *MARINELLO* MANDATES RELIEF IN THIS CASE

In *Marinello v. United States*, 138 S.Ct. 1101 (2018), the Supreme Court cited to several

famous cases requiring a defendant to not only know what conduct he is doing that crosses the line

into a crime or conduct proscribed by law, he must also know what punishment he will face for

breaking the law should he willfully pass that line:

> "Willfulness…requires the Government to prove that the law imposed a duty on the defendant, **that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty**." *Cheek* v. *United States*, 498 U.S. 192, 201 (1991). A taxpayer may know with a fair degree of certainty that her babysitter will not declare a cash payment as income-and, if so, a jury could readily find that the taxpayer acted to obtain an unlawful benefit for another. For the same reason, we find unconvincing the dissent's argument that the distinction between "willfully" and "corruptly"-at least as defined by the Government-reflects any meaningful difference in culpability.
>
> Regardless, to rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor. Doing so risks allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Smith* v. *Goguen*, 415 U.S. 566, 575 (1974), which could result in the non-uniform execution of that power across time and geographic location. And insofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system. That is one reason why we have said that we "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell* v. *United States*, 136 S.Ct. 2355 (2016) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). And it is why "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute.
>
> We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that *a fair warning should be given to the world in language that the common world will understand, of **what the law intends to do if a certain line is passed**. McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106-09 (emphasis added).

If Marinello did not have "Fair Warning" that he would be punished for his conduct,

certainly Petitioner could not have had "Fair Warning" that his conduct could possibly be criminal

and that he could be punished for that conduct. But more than that, *Marinello* says that in addition

to the "knowledge" that you were breaking the law, you must also know that the law intends to

punish you once you cross that "brightly marked" line. Interestingly, in *Marinello,* the Supreme

9

Court determined that Marinello not only lacked adequate "Fair Warning" that he had committed

a crime, but he also had no conception that he could go to prison for his conduct. Perhaps the best

analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter

in cash. Neither the parents nor the babysitter report that transaction to the IRS as taxable income.

Clearly, that could be considered a violation of the tax laws, but no one would seriously believe

the babysitter would be sentenced to 30 months for accepting cash "under the table" for doing her

job.

In fact, prior to *Marinello*, the District Court in Connecticut granted a new trial in *United*

*States v. Gramins* based largely on the same concept as expressed in the Second Circuit's decision

in *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"). Petitioner wishes to focus on

page 20 of that Court's decision in *Gramins*, which mentions the acquittal of the defendant David

Demos in United *States v. Demos*, No. 16-cr-220:

> "In *United States v. Demos*, another case involving misrepresentations by a broker-dealer
> in the RMBS market, Judge Thompson barred counsel and expert witnesses from using the
> terms "broker" and "commission" because "[j]urors may be familiar with brokers and the
> concept of commission in their own affairs and associate those terms with an agency
> relationship." The jury acquitted Demos on all counts. *See id*." *See* page 20, n.8:

> Mr. Demos was acquitted in large part **because the jury instructions in his case were**

**drawn from that Court's decision in *Shapiro*.** For example, Judge Chatigny stated in *Shapiro:*

> "**I don't think you can be convicted under the Constitution unless you had a**
> **sufficiently culpable state of mind such that you made a conscious choice to cross an**
> **important line and expose yourself to potential imprisonment**....The Supreme Court
> has recognized that when a challenged action or course of conduct is a technical violation
> of the law as opposed to morally reprehensible it becomes more important to make it clear
> to the jury that the Government has a burden to prove that the defendant knew his conduct
> was unlawful. **Why? Because we don't want to be exposing people to conviction and**
> **incarceration if they didn't know that this is what they were risking.**" *Demos* citing
> *Shapiro* at Vol. XIII, 2617.

Moreover, Judge Chatigny was also quoted in *Demos* as saying:

To establish that a defendant 'willfully violat[ed]' the anti-structuring law, **the Government must prove that the defendant acted with knowledge that his conduct was unlawful**." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) …. As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "**the Government must prove that the defendant acted with knowledge that his conduct was unlawful**." *Bryan v. United States*, 524 U.S. 184, 191 (1998).

The final quotation from Judge Chatigny in *Shapiro* that led to the acquittal in *Demos* and

a new trial order in *Gramins* is particularly relevant to Petitioner's Motion:

"*As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances*." *See Regent Office at* 1179 (**lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud**). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment. *I would rather risk error on the side of lenity than the other way*."

Clearly, if the defendants in *Marinello, Demos, Shapiro*, and *Gramins* did not know that

they were "crossing the line" and "breaking the law," and that they did not know they could be

prosecuted **and punished** for their conduct, Petitioner respectfully suggests that there are far fewer

"STOLI fraud" cases in America than even the few cases involving brokers lying to clients on

Wall Street.  Based on the above, Petitioner respectfully believes he is entitled to a review and

reconsideration of this Court's July 2014 Judgment in light of *Litvak II*, the new trial order in

*Gramins*, and the acquittal in *Demos*, largely based on Judge Chatigny's writings in *Shapiro*.

The Indictment must also be dismissed because it fails to allege any "**knowledge**" on the

part of the Petitioner that he was **willfully** participating in a scheme to defraud. One of the elements

11

which has been considered **indispensable** to an indictment for any type of crime is **knowledge**; e.g., knowledge that a law was broken. In *Pettibone v. United States*, 148 U.S. 197, 206-07 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their convictions, stated:

> It seems clear that an indictment against a person… must charge a knowledge or notice, on the part of the accused…. Unless that fact exists, the statutory offense cannot be committed…and without such knowledge or notice, the evil intent is lacking.

In *Direct Sales v. United States*, 319 U.S. 703 (1943), the Supreme Court further affirmed the position it had taken in *Pettibone* fifty years prior, and stated:

> Without the knowledge, the intent cannot exist…. Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal…. This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes. *Id.* at 711.

The Supreme Court has also made it very clear that unless and until there is the "concurrence" of an evil meaning mind with an evil act, there is no crime. *See Morissette v. United States*, 342 U.S. 246, 251-52 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked."). That has been called the cornerstone of American jurisprudence. *See Elonis v. United States,* 135 S.Ct. 2001 (2015) *citing Liparota v. United States,* 471 U.S. 419, 427 (1985) ("It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."). There is no mention in the Indictment of Petitioner's "specific intent" to defraud anyone, nor is there any mention in the Verdict of the "concurrence of an evil-meaning mind with an evil-doing hand." The worst thing Petitioner may have done was to not disclose the true nature of why the insurance policy was being purchased, which after the Supreme Court's decision in *Marinello* and certainly the "Bridgegate" case of *Kelly v. United States*, 140 S. Ct. 1565 (2020) and now *Ciminelli*, the fact

12

that someone lied or failed to disclose something, cannot possibly constitute Mail or Wire Fraud.

Therefore, since the Indictment is devoid of any "evil acts" actually done by Petitioner and any

"evil mind" is pure conjecture on the part of the Government and is not found anywhere in the

Indictment, Petitioner's Conviction should be vacated and the Indictment should be dismissed in

its entirety with prejudice. Because of the lack of any specific intent to defraud in the Indictment,

or proof that Petitioner knew he was committing a crime and could be punished for his conduct,

Petitioner respectfully asks this Court to dismiss his Indictment as was done by the Second Circuit

in *Aleynikov* pursuant to Rule 12(b)(3)(B) and as was done by the Supreme Court in *Marinello*.

See also the Supreme Court's 9-0 decision vacating the conviction of a Doctor in *Xiulu*
*Ruan v. United States*, 142 S. Ct. 2370, 2371, (2022) ("Finally, the Government argues that
requiring it to prove that a doctor knowingly or intentionally acted not "as authorized" will allow
bad-apple doctors to escape liability by claiming idiosyncratic views about their prescribing
authority. But the Court has often rejected this kind of argument, see, e.g., *Rehaif*, 588 U. S., at –
——, and does so again here.")

The use of Justice Oliver Wendell Holmes' description of knowing what Society will do
to you when the "bright line" of the law is crossed is particularly appropriate for this case, because
the defendant in *McBoyle* literally stole an airplane but was charged under the Automobile Act as
if he had stolen a car. Despite the defendant in *McBoyle* knowing that he was breaking the law by
stealing, he had his conviction vacated because he was charged under an improper statute that did
not include airplanes. In this case, however, Petitioner was accused of Mail and Wire Fraud, but
at this late date, there is not a single exhibit showing that Petitioner lied to anyone about anything
at any time or that he had the intent to steal anyone's money, or cause "tangible economic harm"
to any carrier, or that he caused any mailing or wire **in furtherance of** any fraud.  Furthermore,

13

the government has demonstrated its "truly neglectful" and "demonstrably lackadaisical attitude"

to Petitioner's rights by continuing to violate his Constitutional rights 11 years after his indictment

and 16 years after the alleged crime took place involving life insurance.

In his highly regarded report to Congress on Mail and Wire Fraud dated July 21, 2011,

Charles Doyle of the Congressional Research Service, states that the elements of Mail and Wire

Fraud that must be alleged in an indictment and **proven beyond a reasonable doubt** before

someone can be convicted are that the defendant(s):

(1) Used either mail or wire communications **in the foreseeable furtherance**,
(2) of a scheme to defraud,
(3) involving a material deception,
(4) with the intent to deprive another of,
(5) either property or honest services.

*See* report to Congress on the elements of Mail and Wire Fraud by the Congressional Research

Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal*

*Law*, by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these

elements with sufficient facts renders an indictment facially invalid. "Where guilt depends so

crucially upon such a specific identification of fact, our cases have uniformly held that an

indictment must do more than simply repeat the language of the criminal statute." *United States*

*v. Russell*, 369 U.S. 749, 764 (1962). Suffice it to say, the Government did not prove **any** of these

five elements at Petitioner's trial, much less proving **all** five beyond a reasonable doubt as Charles

Doyle's 2011 Report to Congress says is required.

Petitioner's Indictment is also devoid of any **specific** intent to defraud, or the Second

Circuit's required "tangible economic harm." In fact, the words "mens rea," "scienter," and even

the "specific intent to defraud" are nowhere to be found in the Indictment, even though those words

are required by the US Attorney's Manual. *See USAM Chapter 9-43.000, Criminal Resource*

14

*Manual at 948.* This fact alone renders the Indictment defective. Just reciting the basic elements

of Mail and Wire Fraud are not enough in the Second Circuit, or any circuit for that matter. The

Government must allege specific facts in an indictment that comprise a crime. *See Russell* at 764.

     The essence of the Government's indictment is that Petitioner allegedly did not disclose

certain information to the carriers that according to the Government, would have resulted in the

carriers not issuing those policies. Not only is this a clear violation of the *Shellef* Doctrine, *see*

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007)and *Skilling v. United States*, 561 U.S. 358, 410

(2010)("Nondisclosure is outside the bounds of the Fraud Statutes. . . ,"), it also results in a

Constructive Amendment of the Indictment as described in Judge Preska's scholarly opinion

dismissing the defendant's indictment in the famous World Trade Center case of *United States v.*

*Davis*, 2017 WL 3328240 (S.D.N.Y. 2017), where the defendant was also accused of Mail and

Wire Fraud by not disclosing the true nature of his Minority Business status:

> The theory of "constructive amendment" is based on the fundamental principle that "after
> an indictment has been returned its charges may not be broadened through amendment
> except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). "To
> prevail on a constructive amendment claim, a defendant must demonstrate that either the
> proof at trial or the trial court's jury instructions so altered an essential element of the charge
> that, upon review, it is uncertain whether the defendant was convicted of conduct that was
> the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 332, 337
> (2d Cir. 1998); *see also United States v. LaSpina*, 299 F.3d 165, 181 (2d Cir. 2002).
> Although the Court must permit "significant flexibility in proof," the defendant must be
> provided with "notice of the core criminality to be proven at trial." *LaSpina* at 181 (*quoting*
> *United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995)). A constructive amendment is a
> per se violation of the Fifth Amendment, *LaSpina* at 181, and constructive amendments
> have been found when the government alleges one theory of the case in the indictment but
> argues another at trial. *Stirone* at 217 (proof of interference with interstate shipment of steel
> from Pennsylvania to Michigan and Kentucky was constructive amendment of indictment
> that alleged interference with shipment of sand into Pennsylvania).

     Judge Preska goes on to examine the history of the Constructive Amendment Doctrine in

the Second Circuit:

In considering the issue of constructive amendment, the Court is mindful that it is a fairly narrow doctrine in this Circuit. *See United States v. Lee*, 833 F.3d 56, 70 (2d Cir. 2016) (explaining that "this court has proceeded cautiously in identifying [constructive amendment]") Indeed, the Court is aware of only six cases since 1988 in which the Court of Appeals has found constructive amendments. *See United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988); *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988); *United States v. Milstein*, 401 F.3d 53, 65 (2005); *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997); *United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001); *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008). Over the past five years the Court of Appeals has cited *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012)—a leading 2012 constructive amendment case—a total of nineteen times. *See, e.g., United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014). The Court of Appeals did not find a constructive amendment in a single one of those nineteen cases. Even after taking this background into account, however, the Court concludes that a constructive amendment occurred here.

Significantly, for Petitioner's benefit, Judge Preska carefully explains the law of

Constructive Amendment in the Second Circuit:

> To establish constructive amendment of an indictment in violation of the Fifth Amendment, "a defendant must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Bastian* at 220 (*quoting Rigas* at 227). "A constructive amendment occurs where the actions of the court 'broaden the possible bases for conviction from that which appeared in the indictment.'" *Id*. (*quoting United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2011)). The Court of Appeals elaborated upon the standard as follows: Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where "**only one particular kind of [criminal conduct] is charged ... a conviction must rest on that charge and not another**." *Zingaro* at 99(emphasis added) *Davis* at 35.

In *Davis*, the defendant really did lie, cheat, steal, and over-bill the client over $70 million

on the reconstruction of the World Trade Center. But then the Government claimed that Davis

misrepresented the status of his minority-owned businesses, which of course had nothing

whatsoever to do with the crime charged in the indictment. Just as the "Right to Control Theory

of Fraud" is cabined by the need to prove the intent by the defendant to cause "tangible economic

harm" to the victim, Judge Preska also makes clear that the "Right to Control Theory" must also

be clearly stated in the indictment, and under *Shellef, Starr, and Regent Office*, the essential nature

of the information must be clear. Not only are the words "right to control" nowhere to be found

in Petitioner's Indictment, neither are the words required by the *Shellef* Doctrine or by *Skilling*, and certainly the intent to cause "tangible economic harm" is missing because no such harm could possibly exist according to the Second Circuit's 2018 decision in *AEI v. Lincoln*, therefore making the Government's use of the "Right to Control Theory of Fraud" a Constructive Amendment of the Indictment and ignoring the requirement to prove an intent to cause "tangible economic harm." This Constructive Amendment of the Indictment requires an automatic dismissal of the Indictment and vacating of Petitioner's Conviction, especially in light of *Ciminelli* and the demise of the "Right to Control Theory of Fraud" as a viable legal premise for any Indictment.

Just as Judge Kearse's dissent in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019) and Judge Jacobs dissent in *Marinello v. United States*, 138 S.Ct. 1101 (2018) strongly and accurately predicted the Supreme Court's decision to vacate the Second Circuit's opinions, Petitioner respectfully asserts that the Constitutional defects in his Indictment are more demonstrable than all of those cases and require this Court to dismiss the Indictment as was done in *Pirro, Aleynikov,* and *Litvak* for failure to have all of the facts necessary to establish all of the required elements of a federal crime in the indictment. Additionally, moreover, "[a] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Litvak*, No. 3:13-CR-19 JCH, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (citing *Russell v. United States*, 369 U.S. 749, 764–65 (1962); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)).

IV.   THE SUPREME COURT'S UNANIMOUS DECISION IN *KELLY* REQUIRES
       THE DISMISSAL OF PETITIONER'S INDICTMENT

Just as the Supreme Court's decision in *Cleveland* led to the grant of a Writ of Coram Nobis

by the Eleventh Circuit in *Peter*, so too should this Court grant this Petition, vacate Petitioner's

Conviction and dismiss Petitioner's Indictment based on the fact that the Supreme Court in *Kelly*

thoroughly dismantled the "Right to Control" theory of fraud advanced by the Government in that

case as well as in Petitioner's case, before the decisions in *Ciminelli* and *Percoco*. In supporting

other Supreme Court precedent that reversed convictions based on intangible rights, the Supreme

Court stated that:

> "If U.S. Attorneys could prosecute as property fraud every lie [someone] tells in making
> such a decision, the result would be-as *Cleveland* recognized- "a sweeping expansion of
> federal criminal jurisdiction." *Id.* at 24. And if those prosecutors could end-
> run *Cleveland* just by pointing to the [] incidental costs, the same ballooning of federal
> power would follow. In effect, the Federal Government could use the criminal law to
> enforce (its view of) integrity in broad swaths of [activities]. The property fraud statutes
> do not countenance that outcome. **They do not "proscribe [] schemes to defraud citizens
> of their intangible rights to honest and impartial government**". *Kelly v. United States*,
> 140 S.Ct. 1565, 1573-74 (2020), *quoting McNally* at 355.

In fact, in *Kelly*, the Supreme Court cites *United States* v. *Walters*, 997 F.2d 1219, 1224

(7th Cir. 1993), where in dismissing the indictment that case, Judge Easterbrook stated:

> "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car
> to the place named in the invitation," thus expending the cost of gasoline. *Id.* "But there is
> no party; the address is a vacant lot; B is the butt of a joke." *Id.* Wire fraud? No. And for
> the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the
> [deceitful] scheme rather than a byproduct of it. *Id.* at 1226." *Kelly* at 1567, n.7.

The Supreme Court decision in *Kelly* discussed how the defendants committed a despicable

act that should be condemned politically and actually did lead to Governor Christie falling in the

polls, but also went on to say it was not a property crime nor did it cost citizens money or property,

and therefore could not be prosecuted as Mail or Wire Fraud. The First Circuit came to the same

decision in the case of *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019), where it

vacated the conviction of the defendants for the government's failure to prove only one of the

essential elements of the crime under 18 U.S.C. §666 because:

> the government was required to establish that...the Commonwealth of Puerto Rico,
> received at least $10,000 in federal "benefits" within the meaning of that statute. The
> government did not meet this burden. Accordingly, we must reverse defendants'
> convictions for federal program bribery...For the reasons explained above, we conclude
> that the government failed to establish an essential element of the crime it charged
> defendants with. We need not go further and hereby reverse Bravo's and Martínez's §666
> convictions. We direct the district court to enter a judgment of acquittal on both charges.
> *Bravo-Fernandez* at 244, 250-51

In this case, not only were all of the insurance company premiums paid, there was never

any attempt to "obtain" any money or property from the Carriers. In fact, the goal was just the

opposite, which was to pay the Carriers the premiums that they had bargained for in the numerous

insurance contracts. Even more significant to Petitioner's claim that his Indictment should be

dismissed for failure to state a federal crime after the unanimous Supreme Court decision in *Kelly*

that dispensed with the "Right to Control" theory of fraud is the Second Circuit's decision in *AEI*

*v. Lincoln*, 892 F.3d 126 (2018), which specifically supports that fact that the Carriers were not

cheated in this case because they received the actuarially-calculated premium amounts that they

charged:

> "Nevertheless, Lincoln received all the payments it was due under the contract, and it is
> not alleged that the application was fraudulent with regard to Fischer's health. Jacob, the
> broker, received a commission of approximately $100,000 for his efforts with respect to
> Fischer's policy and, although he was aware that agents are forbidden by law to share their
> commissions with clients, transferred $50,000 to Irving for acting as a "middleman."
> Although everyone involved feigned ignorance during his or her testimony that the district
> court found untrustworthy, **the district court found little reason to doubt that they all
> knowingly engaged in what was a STOLI scheme**." *AEI* at 130.

> "Lincoln concedes that despite the fraud, the policy's premiums were calculated "based on
> the statistics that applied to this woman with respect to her age and other conditions," which
> Lincoln does not allege to be fraudulent, and it received all the "premiums that [its] actuary

said should be applicable here." **In other words, Lincoln was not "cheated of premiums."** *Id.* (emphasis added).

In fact, just as the insurance executives testified in *Binday*, the life insurance Carriers in this case considered death benefits to be a "cost of doing business" and not a fraud loss because they "received the full economic benefit of its bargain." *Binday* at 570. Thus, not only was there no intended loss or "intent to defraud" or an intent to seize real money or property from the Carriers as required by *Kelly*, the worst that the Government can say about Petitioner is that he did not disclose the financial documentation behind the policy purchases. But, once again, not only is that allegation demonstrably false, if the Government's case is based on nondisclosure, then *Skilling* is directly on point because "Nondisclosure is outside the bounds of the fraud statutes." *Skilling* at 410. See also *Chiarella* – on duty to disclose. Therefore, just as a number of cases that have been recently dismissed based on *Kelly* (*see, e.g., Olan v. United States*, No. 20-306, Judgment Vacated January 11, 2021), Petitioner respectfully submits to this Court that his Conviction be vacated and his Indictment be dismissed based on the Supreme Court's unanimous decisions in both *Skilling* and most recently in *Ciminelli*.

## V.   THE SECOND CIRCUIT'S DECISION IN *COUNTRYWIDE* NEGATES ANY POSSIBLITY OF MAIL OR WIRE FRAUD IN THIS CASE

When the Court sentenced Petitioner in 2014, it did not have the benefit of the Second Circuit's scholarly decision discussing the history of the Mail and Wire Fraud statutes in *United States v. Countrywide,* 822 F.3d 650 (2d Cir. 2016), the Eleventh Circuit's description and adoption of Second Circuit law in *United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016) or the now-famous Seventh Circuit decision limiting Mail and Wire Fraud between sophisticated parties in negotiating a contract in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016). The Court also did not have the benefit of *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*" June 2018), which led the Court in that case to granting a Rule 33 New Trial Order for Michael Gramins, who was the co-defendant of Ross Shapiro in the famous securities fraud case of *United States v. Shapiro*, No. 15-cr-155. On the same day that *Litvak II* was issued by the Second Circuit, a jury also acquitted David Demos for the similar charge of lying to his clients on Wall Street. *See United States v. Demos*, No. 16-cr-220. Therefore, there is a good argument to be made that several Courts in the Second Circuit have now recognized that lies done in the negotiations of contracts or commercial transactions are not enough to trigger the Mail and Wire Fraud statutes.

The now-famous *Countrywide* decision by the Second Circuit was largely based on two seminal cases from the First Circuit: *McEvoy Travel v. Heritage Travel,* 904 F.2d 786, 791-92 (1st Cir. 1990) ("the common law requires proof--other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation.") *Countrywide* at 660, and *Sanchez* v. *Triple-S,* 492 F.3d 1, 11 (1st Cir. 2007), stating:

> **A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes**. *See, e.g., United States* v. *Autuori,* 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the

mails or telephone) who did not take the initiative to reveal negative information about the product and who-a jury might find-secretly harbored in his heart the hope that the buyer would never ask." *Id.* (emphasis added).

The Second Circuit posited the central issue in *Countrywide* as to what constitutes fraud in the case of a contract and illustrates the fundamental difference between a mere breach of contract and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide* at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion to vacate a conviction may be based on an intervening change in the law. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous cases in its analysis of the history of Mail and Wire Fraud.

In *Countrywide,* the Second Circuit evaluated "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?" *Countrywide* at 658. The Court concluded that a "scheme to defraud" requires proof of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is not an intent not to perform one's obligations under the contract at the time of executing the same, a subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the Mail or Wire Fraud statutes. The legal standard in *Countrywide* was only by a "preponderance of the evidence", whereas in Petitioner's case it was beyond a reasonable doubt.

22

In analyzing the history of the Mail and Wire Fraud statutes and citing *Durland v. United States*, 161 U.S. 306, 313 (1896), the Second Circuit buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that he or she is lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on it or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.* Obviously, the only promise made in this case, the promise to pay the premium charged by the carriers, was kept. The Government knows that the Carriers were paid the full premiums charged by each Carrier for each insured as described by the Second Circuit in *AEI Life LLC v. Lincoln Ben. Life Co.*, 892 F.3d 126 (2d Cir. 2018).

The Second Circuit further emphasized **that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that intention not to perform on the promise when it was made.** *Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the Mail and Wire Fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661–62.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland v. United States*, 161 U.S. 306 (1896) and related cases, along with the history of the Common Law

23

and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on,

however, is *when* the representations were made and the intent of the promisor *at that time*. . . .

where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming

fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent,

willful breach cannot sustain the claim." *Countrywide* at 658. The Second Circuit then

summarized its holding as follows: "a contractual promise can only support a claim for fraud upon

proof of fraudulent intent not to perform the promise at the time of contract execution. Absent

such proof, a subsequent breach of that promise—even where willful and intentional—cannot in

itself transform the promise into a fraud." *Id*. at 662. Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle
> incorporated into the federal mail and wire fraud statutes. Applying these principles to a
> fraud claim based on the breach of a contractual promise, we conclude that the proper time
> for identifying fraudulent intent is contemporaneous with the making of the promise, not
> when a victim relies on the promise or is injured by it. *Only if a contractual promise is
> made with no intent ever to perform it can the promise itself constitute a fraudulent
> misrepresentation. Id*. (emphasis added).

Suffice it to say, if there was no Mail and Wire Fraud in the billions of dollars of fraudulent

mortgages purchased by FNMA that cost the American Taxpayer even more billions to bail out

the banks and FNMA, then clearly there can be no fraud in this case where the Carriers were paid

the premium they requested for the individual contracts based on Age, Gender, and Health.

The Court also did not have the benefit of the detailed opinion from the Eleventh Circuit

in *Takhalov*, describing and thereby adopting the law of the Second Circuit as to what is required

for there to be a violation of the Mail and Wire Fraud statutes. Deceit is not enough; there must

be an actual intent to harm the victim of the deceit. To explain this fine but vital distinction in the

law, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor" to

explain its position. Most recently, the Second Circuit has made it abundantly clear that not only

must there be more than deceit in a Mail and Wire Fraud case based on the Right to Control Theory of Fraud, there must also be "intended" demonstrable "tangible economic harm" to the victim before somebody can be held accountable under the Mail and Wire Fraud Statutes. *See Finazzo* at 111 *citing Mittelstaedt* at 1216-17. In *Finazzo*, the Second Circuit uses its own parable to teach its lessons concerning the Mail and Wire Fraud statutes by stating that if an apparel company did not wish to be involved with overseas child labor, and a supplier lied about their non-involvement in child labor, that would be deceit but it would not impact the economics of the benefit of the bargain, which would be based on the quality, the amount, and the cost of the goods. So, unless the lie or the deceit was meant to cause "tangible economic harm" to the alleged victim, it is doubtful that the Mail and Wire Fraud statutes would apply according to the Second Circuit. This is particularly true in the accusations in Petitioner's case, because no one disputes that the STOLI policies have been profitable to the carriers, the only risk that bothered the carriers was the reputational risk of STOLI (like child labor). More importantly, it is an ancient axiom of the law that the "knowledge of the agent is the knowledge of the carrier." *See, e.g., Stipcich v. Metropolitan Life,* 277 U.S. 311 (1928).

For that reason, the Eleventh Circuit in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) is particularly important to Petitioner's motion to vacate his conviction as the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the Mail and Wire Fraud statutes and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive" for its own uses to define that requirement under the Federal statutes. If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then the decision in *Takhalov* calls into question this Court's determination of any scheme to defraud the carriers, much less one carried out by the Petitioner.

25

In order to explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the Mail and Wire Fraud statutes, the Eleventh Circuit in *Takhalov* uses what might be called the "Parable of the Deceitful Neighbor." The Eleventh Circuit describes two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit carefully explains why the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

Petitioner's indictment clearly fails to articulate any particular "scheme to defraud" because the very facts of the case belie the existence of any "scheme to defraud" by anyone, but especially Petitioner who did not lie to anyone about anything at any time.

Even deceitfully breaching a contract is not a crime per se; something more than "deceit" is required to make a case for Mail and Wire Fraud. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited above in *Takhalov* by the Eleventh Circuit describing the law of Mail and Wire Fraud in the Second Circuit. If the alleged deceit merely and solely causes the victim to enter into a contract that they would not normally enter, that is merely a "scheme to deceive" and not an illegal scheme to defraud. *Takhalov* at 1314, *citing Shellef* at 108 and *Starr* at 98.

26

Petitioner's indictment is filled with speculation about how STOLI policies might affect insurance carriers, speculation by the government that is not just specious, but has been proven false in numerous civil lawsuits, and theories about possible fraud, but there is no specific claim of actual fraud, or allegations that Petitioner intended any of the Carriers to suffer any "actual concrete" harm, which is the sine qua non of Mail and Wire Fraud, and Petitioner certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See the dispositive quote from *Takhalov* about harm:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*. *Takhalov* at 1313.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation of the law stating that "a schemer who tricks someone to enter into a transaction they would not have entered into has not "schemed to defraud" so long as he does not intend to harm the person that he intends to trick." Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive, but not one *to defraud*." (Emphasis in original) *See Takhalov* at 1313-14.

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit in its example of the difference between a "scheme to

deceive and a "scheme to defraud" distinguishes between a high-end rare premium bourbon whisky and a cheap bar brand. The fact that the bar-girl works for the bar does not matter because the businessman got what he bargained for which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if they substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that may be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the Deceitful Neighbor gave her a real dollar for the four quarters was merely a scheme to deceive; whereas in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used the phone to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit, utilizing the wires of the phone call.

To be a "scheme to defraud" the schemer must also make a misrepresentation that is material to the very nature of the bargain. This is important to Petitioner's case because the "scheme" upon which his indictment was based, was at most merely a scheme to deceive in that any misrepresentations were merely to induce the insurance carriers to issue policies they may not have issued had they known all the facts. In Petitioner's case, there was no proof at trial that Petitioner lied or deceived anyone.

Just as with the STOLI fraudsters in *AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 138 (2d Cir. 2018)*, at no time did the *Binday* defendants lie about Gender, Age, or Health, nor is that alleged in Petitioner's indictment as required by *Neder v. United States*, 527 U.S. 1 (1999). The only misrepresentations that the *Binday* defendants made were about the reason for purchasing the insurance or the wealth of the insured, just like the Deceitful Neighbor lied about his child being ill, but the *Binday* defendants did not lie about the essential elements of the life

28

insurance bargain which are Gender, Age, and Health. Also as in *AEI Life v. Lincoln*, the full

amount of premiums were paid, and all of the Applications were filled out properly, unlike in *AEI*

*v. Lincoln*:

> Lincoln also argues that the policy was void *ab initio* because Fischer never consented to
> it. Fischer testified that she was unaware of the life insurance policy and denied signing the
> application. Maybe so, but New York's incontestability law does not create an exception
> for lack of consent. *AEI Life LLC v. Lincoln Benefit Life Co.,* 892 F.3d 126, 138 (2d Cir.
> 2018).

In describing and adopting the law of the Second Circuit as its own as to the difference

between a "scheme to deceive" which is not criminal, and a "scheme to defraud" that is prohibited

by the Mail and Wire Fraud statutes, the Eleventh Circuit stated the following in *Takhalov*:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases
> have "drawn a fine line between schemes that do no more than cause their victims to enter
> into transactions that they would otherwise avoid—which do not violate the mail or wire
> fraud statutes—and schemes that depend for their completion on a misrepresentation of an
> essential element of the bargain—which do violate the mail and wire fraud statutes."
> *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*,
> 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are
> insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be
> coupled with a contemplated harm to the victim [that] affect[s] the very nature of the
> bargain itself. Such harm is apparent where there exists a discrepancy between benefits
> reasonably anticipated because of the misleading representations and the actual benefits
> which the defendant delivered, or intended to deliver.") (internal quotation marks omitted);
> *United States v. Regent Office*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that
> the defendants intended to deceive their customers but they did not intend to defraud them,
> because the falsity of their representations was not shown to be capable of affecting the
> customer's understanding of the bargain nor of influencing his assessment of the value of
> the bargain to him, and thus no injury was shown to flow from the deception."). Moreover,
> the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation
> of an ambiguous provision of federal law. Their interpretation follows as a matter of logic
> from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or
> "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot
> convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a
> deceit." *Shellef* at 108. Thus, even if a defendant lies, and even if the victim made a
> purchase because of that lie, a wire-fraud case must end in an acquittal if the jury
> nevertheless believes that the alleged victims "received exactly what they paid for."
> *Takhalov* at 1314-15, citing *Shellef* at 108.

This statement by the Eleventh Circuit describing the law of the Second Circuit conforms to other case law emanating from the Second Circuit that without the "intent to harm" there can be no scheme to defraud. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to prove that the defendant actually intended and contemplated "concrete harm" to the pension fund). *See, also, Finazzo* at 111 *citing Mittelstaedt* at 1216-17 that the intended harm must be "tangible economic harm."

Therefore, based on the Eleventh Circuit's description of the law of Mail and Wire Fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that the scheme alleged in this case was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder* and *Skilling v. United States*, 561 U.S. 358 (2010), or was a case of "Nondisclosure" as mentioned in *Ciminelli v. United States*, 598 U.S. 306, 317, (2023), *Skilling*, and most famously *Chiarella v. United States*, 445 U.S. 222, 236, (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.")

See also a recent decision granting a Rule 29 Judgment of Acquittal based on *Ciminelli* and the demise of the "Right to Control Theory of Fraud" in *Binday* by Judge Cogan in *United States v. Nordlicht*:

> The analysis is different, though, for Nordlicht and Levy's wire fraud conspiracy convictions. Wire fraud, unlike securities fraud, does require "an intent to deprive the victim of money or property." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019). At the time defendants filed the instant motion, the law in the Second Circuit was that the term "property" in the above standard included "intangible interests such as the right to control the use of one's assets." *Id.* at 85. It followed, said the Second Circuit, that a defendant was guilty of wire fraud if he schemed to deprive investors of "potentially valuable economic information" "necessary to make discretionary economic decisions." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). This was known as the "right-to-control theory" of wire fraud. While the instant motion was *sub judice*, the Supreme Court decided *Ciminelli v. United States*, 143 S. Ct. 1121, 1128 (2023), which rejected the Second Circuit's right-to-control theory as inconsistent with "traditional concepts of property," the text of 18 U.S.C. § 1343, and the structure and history of the federal fraud statutes. This Court thus ordered supplemental briefing to address whether *Ciminelli*

requires vacatur of Nordlicht and Levy's wire fraud conspiracy convictions. At most, Nordlicht and Levy intended to deprive bondholders of the knowledge that conflicted bonds were voting on the indenture amendments.

*Ciminelli* expressly rejected the notion that nondisclosure of a conflict could serve as the basis for a wire fraud conviction. Specifically, the Supreme Court pointed to United States v. Viloski, 557 F. App'x 28 (2d Cir. 2014) – a Second Circuit case affirming a wire fraud conviction based on an undisclosed conflict of interest – as an example of how the Second Circuit had "vastly expand[ed] federal jurisdiction without statutory authorization" by making "a federal crime of an almost limitless variety of deceptive actions." *Ciminelli*, 143 S. Ct. at 1128 (citing Viloski). Because no reasonable jury could find that defendants intended to defraud bondholders of anything other than "potentially valuable economic information," *Ciminelli*, 143 S. Ct. at 1127, Nordlicht and Levy's Rule 29 motion for a judgment of acquittal is granted as to their convictions for conspiracy to commit wire fraud. The Court grants this motion under Rule 29 rather than Rule 33 because it concludes, in light of *Ciminelli*, that the evidence at the Nordlicht-Levy trial was insufficient to sustain their convictions for conspiracy to commit wire fraud. The Court construes Nordlicht and Levy's supplemental briefing as a renewed Rule 29 motion on the ground of excusable neglect – namely, an intervening change in the law. See Fed. R. Crim. P. 45(b)(1)(B); That said, the Court also alternatively grants a new trial on the wire fraud charge in the interest of justice because (1) it's not clear which theory of intent the jury convicted under, and (2) evidence at Small's trial (e.g., DX 6793, DX 6405, and Pulvino's testimony) established that defendants lacked the requisite criminal intent to sustain their wire fraud convictions. *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at 5-6 (E.D.N.Y. July 12, 2023).

## VI.   RECENT DECISIONS IN OTHER CIRCUITS WARRANT GRANTING RELIEF IN THIS CASE

Similar to the Second Circuit's decision in *Countrywide*, and the Eleventh Circuit's decision in *Takhalov*, the Seventh Circuit's decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) has been cited in hundreds of articles across the country for its analysis of the Mail and Wire Fraud statutes. *See, e.g., When Do Business Negotiations Cross the Line and Become Fraud?*, New York Law Journal, Abramowitz, E. and Sack, J., May 5, 2016.

In *Weimert*, the Seventh Circuit reversed a banker's conviction for Mail and Wire Fraud because they felt the materiality element of the federal fraud statutes was being stretched too far "to criminal deception about a party's negotiating positions." *Weimert* at 357. While it is clear that Weimert did lie to parties on both sides of a transaction to purchase a property from Anchor Bank, those lies actually caused Anchor Bank to pay him a large bonus so that he could purchase his equity stake in the property that he was in charge of selling for Anchor Bank, and also caused the purchaser to pay more than they would have, had Mr. Weimert not been involved. Once again, unlike Petitioner, it is undisputed that Mr. Weimert lied to both his employer – the Seller – and to his future "partner" – the Purchaser – in this transaction, and clearly his lies caused his "partner" to pay more than they needed to, but also "harmed" his employer by the amount of the bonus that went into Weimert's pocket and the diversion of proceeds from the increased cost.  For his negotiation deceptions, and for inserting himself in the transaction, Mr. Weimert was indicted on six counts of wire fraud and found guilty of five counts by the jury in the district court.

In reversing Weimert's conviction, the Seventh Circuit declared that the Mail and Wire Fraud statutes had been stretched "far beyond where they should go." *Id.* at 355.  The court then itemized four ways that the Mail and Wire Fraud statutes had been stretched too far:

First, information about a party's negotiating position is surely material in the sense that it is capable of influencing another party's decisions. Second, actionable deception can include false statements of fact, misleading half-truths, deceptive omissions, and false promises of future action. All of these descriptions may fit deceptions about negotiating positions, at least if a negotiator's present state of mind is treated as a fact. Third, the false statement may be made to someone other than the owner or holder of the money or property targeted by the scheme. And fourth, it is no defense that the intended victim either trusted the defendant too much or was too savvy to be fooled. *Id.* at 357.

The Court then states that: negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id*. at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of Mail and Wire Fraud statements." *Id.* The Mail and Wire Fraud statutes do not cover all behavior which strays from the ideal." *Id*. at 357.

Petitioner did not lie or misrepresent anything to anyone, much less make a "material" misrepresentation as required by *Neder* and *Weimert*. In *Weimert*, Mr. Weimert's lies caused the Purchaser to pay more and the Seller to get less then had he not inserted himself (especially with the big bonus he required from the Bank), but the Seventh Circuit's opinion – just like the Eleventh Circuit's opinion in *Takhalov* – demonstrates that proving fraud requires evidence of more than just sharp, or even distasteful, business practices, and that a "scheme to defraud" requires intent to deceive, about a material and essential element of the deal, and contemplated harm to the victim. Whether by affirmative misrepresentation, omission, or failure to correct a counterparty's mistaken belief, fraud requires a deception of an essential element of the bargain. Without such deceit, fraud does not exist in the common law, or under the Mail and Wire Fraud statutes.

Additionally, this Court did not have the benefit of two other recent landmark cases from the First Circuit limiting the Mail and Wire Fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. *See Tavares* (in reversing RICO and mail fraud convictions and

33

ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States,* 323 U.S. 88, 95 (1944)). Furthermore, this Court did not have the benefit of the First Circuit's overturning the *See, e.g.,* the First Circuit's recent decisions in *United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016):

*See, e.g.,* the First Circuit's recent decisions in *United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016):

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie*, 549 F.3d at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann*, 323 U.S. at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). *Maze, supra* at 405 " *Tavares* at 59.

The First Circuit went on to say in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) that "under the government's theory, any false statement in an application…could constitute a federal crime." But unlike the defendants in *Berroa*, Petitioner has not lied to anyone about anything in this case at any time.

As described above, neither Petitioner nor the Court had the benefit of the now-famous Seventh Circuit decision in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016), where Weimert, a banker negotiating a deal to sell a property owned by his employer, a major bank, not only lied to his current employer the bank, but also lied to his future "partner" the real estate company and pocketed millions of dollars that he took from both his employer and his future

34

partner. However, despite these falsehoods, in vacating Weimert's conviction, the Seventh Circuit

made the following comments limiting the scope of the Mail and Wire Fraud statutes:

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often
> try to mislead the other party about the prices and terms they are willing to accept. Such
> deceptions are not criminal.

> To take a simple example based on price, suppose a seller is willing to accept $28,000 for
> a new car listed for sale at $32,000. A buyer is actually willing to pay $32,000, but he first
> offers $28,000. When that offer is rejected and the seller demands $32,000, the buyer
> responds: "I won't pay more than $29,000." The seller replies: "I'll take $31,000 but not
> a penny less." After another round of offers and demands, each one falsely labeled "my
> final offer," the parties ultimately agree on a price of $30,000. Each side has gained from
> deliberately false misrepresentations about its negotiating position. Each has affected the
> other side's decisions. If the transaction involves interstate wires, has each committed wire
> fraud, each defrauding the other of $2,000? Of course not. But why not? The...answer is
> that negotiating parties, and certainly the sophisticated businessmen in this case, do not
> expect complete candor about negotiating positions, as distinct from facts and promises of
> future behavior. Deception about negotiating positions—about reserve prices and other
> terms and their relative importance—should not be considered material for purposes of
> mail and wire fraud statutes. *Weimert* at 357-58.

> In commercial negotiations, it is not unusual for parties to conceal from others their true
> goals, values, priorities, or reserve prices in a proposed transaction. When we look closely
> at the evidence, the only ways in which Weimert misled anyone concerned such negotiating
> positions. He led the successful buyer to believe the seller wanted him to have a piece of
> the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the
> actual terms of the deal, however, were fully disclosed and subject to negotiation. There
> is no evidence that Weimert misled anyone about any material facts or about promises of
> future actions. *Id.* at 354.

> The mail and wire fraud statutes do not cover all behavior which strays from the
> ideal....[W]e know of no other case in which a court has found that deceptive statements
> about negotiating positions amounted to a scheme to defraud under the mail or wire fraud
> statutes. *Id.* at 357-58.

In the end, the Seventh Circuit determined that Weimert's dealings in selling the Chandler

Creek property were "sharp and self-interested, but they did not amount to wire fraud....[A]ll terms

of the deal were on the table. [They] might have been able to secure a better deal if it had known

the underlying priorities of prospective buyers and Weimert, but that is . . . a matter for the

corporate boardroom and civil law, not a federal criminal trial." *Id.* at 370.

Just as the Second Circuit reviewed the history of the Mail and Wire Fraud statutes in *Countrywide*, and the Eleventh Circuit reviewed the history in *Takhalov*, and the Seventh Circuit review that history in *Weimert*, so, too, did the Sixth Circuit examine that same history to conclude that property for the purposes of the Mail and Wire Fraud statutes does not include "a right to accurate information", or what might be referred to in the Second Circuit as the "right to control theory" of fraud, where a company is being deprived of information that would have affected their economic decision making. *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014). In *Sadler*, Nancy Sadler's conviction for wire fraud was reversed despite the fact that she lied to pharmaceutical companies about the reasons why she was buying large quantities of drugs. She and her husband were convicted of running a pill mill, but her conviction for wire fraud was vacated because she paid full price for the drugs and her lies as to why she wanted the drugs were not just "immaterial" to the bargain, the deceit and lies did not constitute depriving the victims of money or property or creating pecuniary losses as required by the Mail and Wire Fraud statutes because she paid full price for the pills:

> But paying the going rate for a product does not square with the conventional understanding of "deprive." *United States v. Cleveland*, 531 U.S. 12, 19 (2000). Stealing the pills would be one thing; paying full price for them is another. Case law reinforces that the conventional meaning of "deprive" applies in the fraud context. To be guilty of fraud, an offender's "purpose must be to injure," *Horman v. United States,* 116 F. 350, 352 (6th Cir. 1902), a common-law root of the federal fraud statutes, *see Neder v. United States,* 527 U.S. 1, 21–25 (1999); Restatement (Second) of Torts §531 ("**One who makes a fraudulent misrepresentation is subject to liability for pecuniary losses suffered**.''). Nancy may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them. As to the wire-fraud count, she ordered pills and paid the distributors' asking price, nothing more.
>
> As an alternative, the government offers another potential deprivation: Nancy's lies convinced the distributors to sell controlled substances that they would not have sold had they known the truth. Nancy in other words deprived the companies of what might be called a right to accurate information before selling the pills. To support this theory, the government points to the testimony of one distributor's representative, who said she would have been "concern[ed]" had she known more about Nancy's operation.

36

That silence also requires us to pick the more lenient reading of the wire fraud law. **''[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.''** *McNally* at 359–60. ''Money,'' ''property'' and ''the intangible right of honest services'' clearly and definitely fall within the fraud statutes' scope, 18 U.S.C. §§1343, 1346, but other interests—such as the right to accurate information—do not. **Without more, we must conclude that the distributors' truth-in-purchasing concerns do not support a federal criminal conviction.** *Sadler* at 590-92 (emphasis added).

As the Court, and certainly the Government realizes by now, the Supreme Court's decision

in *Ciminelli* is based largely upon the Sixth Circuit's decision in *Sadler* which is described

in depth above.  As the Supreme Court stated in *Ciminelli*:

The right-to-control theory applied below first arose after M*cNally* prevented the Government from basing federal fraud convictions on harms to intangible interests unconnected to property. See *United States v. Wallach*, 935 F.2d 445, 461–464 (C.A.2 1991). As developed by the Second Circuit, the theory holds that, "[s]ince a defining feature of most property is the right to control the asset in question," "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States v. Lebedev*, 932 F.3d 40, 48 (2019) Thus, a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States v. Binday*, 804 F.3d 558, 570 (C.A.2 2015) [3] The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights."FN 3 At least two Circuits have expressly repudiated the right-to-control theory of wire fraud. *United States v. Sadler*, 750 F.3d 585, 590–592 (C.A.6 2014); *United States v. Bruchhausen*, 977 F.2d 464, 467–469 (C.A.9 1992). *Ciminelli v. United States*, 143 S. Ct. 1121, 1127, (2023)

## VII.   RELIEF REQUESTED

### RELIEF SOUGHT

Petitioner respectfully requests that the Court grant the instant Petition and issue an order: (i) vacating and setting aside the Order of Restitution and Petitioner's 2014 conviction for Mail and Wire Fraud in its entirety; (ii) expunging and sealing all records of the foregoing indictment and conviction; (iii) ordering the Government to return all funds paid to the Government on behalf of Petitioner in this case; and (iv) granting such other and further relief as this Court deems just, equitable, and proper.

### EXPEDITED RELIEF

Petitioner's conviction continues to prevent him from acting as an insurance agent or working on any ERISA Employee Benefit Plan. This has caused and continues to cause significant financial instability to Petitioner. Accordingly, to the extent possible and practicable, Petitioner most respectfully requests that his Petition be treated on an expedited basis as the Petitioner served a long sentence for conduct that was never criminal, even before *Ciminelli*.

### EXPUNGEMENT

After a conviction is invalidated "district courts possess ancillary jurisdiction to expunge criminal records. That jurisdiction flows out of the congressional grant of jurisdiction to hear cases involving offenses against the United States pursuant to 18 U.S.C. § 3231." *See, e.g., United States v. Sumner,* 226 F.3d 1005, 1014 (9th Cir. 2000). Here, in the event the Court grants this Petition and invalidates Petitioner's conviction, Petitioner respectfully requests that this Court order the record of the conviction to be expunged and sealed. As discussed, *supra*, Petitioner's conviction is invalid as a matter of law and was premised on erroneous applications of the law that were never

38

valid. Accordingly, Petitioner has demonstrated appropriate, extraordinary, and unusual circumstances to warrant the relief of expungement and the return of all funds paid to the Government over the past nine years.

## VIII.   CONCLUSION

Therefore, based on the Supreme Court vacating the convictions in *Binday* based on the demise of the "Right to Control Theory of Fraud" as explained in *Ciminelli* and *Percoco*, which is intervening law that establishes that Petitioner's conduct was at no time criminal, Petitioner respectfully moves this Court to reconsider and vacate its July 31, 2014 Judgment as to all counts pursuant to Rule 60(b)(6).

Respectfully Submitted:

/s/ James Kevin Kergil
James Kevin Kergil
Petitioner, *pro se*
258 High Street
Peekskill, NY. 10566